UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------x
                              :

OLIN CORPORATION,            :

                         :

             Plaintiff,     :      No. 84-cv-1968

                         :

      – against –        :      **OPINION**

                         :

INSURANCE COMPANY OF NORTH  :
AMERICA, et al.,         :

                         :

          Defendants.    :

----------------------------------------------x

On February 23 and 24, 2016, this court heard argument on Olin's motion to enforce a 1984 insurance settlement that resolved certain insurance claims relating to Olin's manufacture of a pesticide known as DDT (the "1984 Settlement").  At the heart of the dispute is whether Commercial Union, whose successor is OneBeacon, is contractually bound to make settlement payments under the 1984 Settlement.  For the reasons set forth below, the court grants Olin's motion in part and finds that Commercial Union and its successors were party to the 1984 Settlement and thus agreed to make settlement payments.  However, consistent with the opinion below, the parties are directed to further brief the issues of how much is owed on the 1984 Settlement and how interest should be calculated on those amounts.

## I.   **Factual Background**

Various individuals and entities brought suit against Olin, alleging that Olin's manufacture of DDT harmed those parties or their real property.  In 1983,

Olin settled that litigation by agreeing to pay a total of $24 million and to undertake certain environmental remediations (the "Initial Settlement").

Olin had extensive insurance coverage. After Olin entered into the Initial Settlement, Olin filed insurance claims and, in October 1984, settled with certain insurers on thirty-eight specific insurance and reinsurance policies relating to Olin's DDT manufacturing site in Huntsville, Alabama (the "1984 Settlement").[1] Of the thirty-eight insurance policies, three were Commercial Union policies issued to Olin. Those policies were EY8057-011, EY8057-012, and EY8057-013. Commercial Union purchased reinsurance on those three policies from Lloyd's of London and London Companies ("Lloyd's"). The Lloyd's reinsurance policies were also part of the 1984 Settlement.[2]

From Olin's perspective, the mechanics of the settlement were relatively straightforward:  insurers would provide Olin with 75% indemnity on the value of future claims that Olin would pay on the Initial Settlement, and, in exchange, Olin would give up further rights to make claims on the insurance policies specified in the settlement instrument.

The settlement was considerably more complicated from the insurers' perspective, in large part because the settlement involved thirty-eight different

---

[1]   For purposes of this opinion, claims relating to Olin's manufacture of DDT at its plant in Huntsville, Alabama are referred to as "Huntsville-related" claims. Claims relating to Olin's manufacture of DDT at plants other than in Huntsville, Alabama, are herein referred to as "DDT-related" claims.

[2]   It should be noted that both Lloyd's and Commercial Union had issued other insurance policies to Olin, though those other policies were not made part of the 1984 Settlement and were instead the subject of later litigation. Additionally, Olin litigated insurance claims relating to its manufacture of DDT at sites other than Huntsville, Alabama.

policies and because the parties agreed that liability would be several, not joint. Pl.'s Mem. Supp. Mot. Enforce Huntsville Settlement, Ex. B ¶ 14, Oct. 15, 1984 (hereinafter 1984 Settlement).    The insurers thus needed to fairly allocate payment responsibility under the settlement agreement, and they did so according to the time value of risk. For the 227 months that Olin had insurance coverage, each month would be allocated one "share." The settlement agreement covered three twelve-month policies issued by Commercial Union.    Therefore, those three Commercial Union policies, together, accounted for 36 of the 227 shares.

After the 1984 Settlement was finalized, and as Olin continued to make settlement payments of its own on the Initial Settlement, Olin also began submitting claims for payment under the 1984 Settlement. Olin did so by first submitting an invoice to the insurers' agent at Mendes & Mount LLP. Mendes & Mount would then collect payment from the insurers and issue Olin a single check. The amount that Olin received varied over the years for myriad reasons— Olin's claim amounts varied; certain insurers were insolvent or otherwise unable to pay the full amount due; or perhaps claims were miscalculated. The shortfalls went undetected for many years.

In 2009, Olin settled most of its claims with Lloyd's on other DDT-related litigation. Part of that settlement involved the promise of Lloyd's to pay some past-due amounts on the 1984 Settlement. When Olin calculated the past-due amounts for which Lloyd's was responsible under the 2009 settlement, Olin realized that Commercial Union was also in arrears on the 1984 Settlement. In

3

2010, Olin repeatedly alerted Commercial Union and its successor, OneBeacon, to the problem. OneBeacon failed to meaningfully respond to Olin's correspondence for years. Finally, in 2015, OneBeacon took a position: it disclaimed any responsibility to pay Olin under the 1984 Settlement. OneBeacon instead averred that the 1984 Settlement bound only Lloyd's to a payment obligation.

The parties now seek the court's assistance in resolving whether the 1984 Settlement obligates Commercial Union's successors to make settlement payments.

## II. Discussion

### A. Choice of Law

Olin's motion requires the court to interpret the terms of the 1984 Settlement. A settlement agreement is a contract and is interpreted according to general rules of contract interpretation. Collins v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir. 2002). The rules of contract interpretation vary from state to state and although the parties have elsewhere agreed that New York contract law applies, Olin Corp. v. Ins. Co. of N. Am., et al., 771 F. Supp. 76, 78 (S.D.N.Y. 1991), they have not explicitly done so here. Therefore, it is first necessary to determine which state's rules of contract construction apply.

Generally, courts apply the law of the state chosen by the parties to govern their contractual rights. Woodling v. Garrett Corp., 813 F.2d 543, 551 (2d Cir. 1987). Where a choice-of-law clause is nonspecific or unclear, courts in New York apply a "center of gravity" or "grouping of contacts" choice-of-law analysis.

4

Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 394 (2d Cir. 2001) (quoting

Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309 (1994)). As part

of this analysis, courts consider a variety of factors, including the domicile or

place of business of the contracting parties, the place of contracting, the place of

negotiation and performance, and the location of the subject matter.   See

Restatement (Second) of Conflict of Laws § 188; Fieger, 251 F.3d at 394.  These

considerations are aimed at approximating the parties' justified expectations at

the time of drafting the contract.  Restatement (Second) of Conflict of Laws § 188

cmt. b.

Here, the 1984 Settlement agreement contains a nonspecific choice-of-law

clause.  It provides as follows:

> This Agreement shall be construed, and the legal relations,
> rights and duties between the parties thereto shall be
> determined, in accordance with (i) the laws of the United
> Kingdom in regard to all matters concerning the execution
> hereunder, and the authority therefor, and (ii) the law of the
> appropriate United States jurisdiction as to all other matters.

1984 Settlement ¶ 23.  Here, the parties have made clear that United States law,

rather than British law, applies to disputes having to do with Commercial

Union's involvement in the 1984 Settlement. However, the 1984 Settlement does

specify what the parties meant when they agreed that the "the law of the

appropriate United States jurisdiction" would apply.

The case of Supply & Bldg. Co. v. Estee Lauder Int'l, Inc., No. 95-cv-8136,

1999 WL 178783, at *2 (S.D.N.Y. Mar. 31, 1999) is relevant here.  The contract

at issue contained a forum-selection clause that provided for venue in New York,

but the choice-of-law clause generically stated that "the Laws of the United

5

States" would apply to any disputes arising under the agreement. Id. at *3. The parties disagreed as to which state's law applied to their written agreement. The court held that the agreement designated New York as its choice of law. To arrive at that conclusion, the court looked to the forum choice of New York and the fact that public policy favors New York courts retaining lawsuits where New York is the designated forum. The court also gave weight to the fact that no party argued that any state in America other than New York had any meaningful contacts to the contract. Importantly, the party objecting to the application of New York law relied exclusively on New York case law in its dispositive motions and in all of its correspondence with the court. Id.

Here, neither party has raised choice-of-law issues in this dispute. Consequently, no party has argued that any particular state in America had meaningful contacts with this contract. But the parties tacitly accept that New York contract law applies here; both parties direct the court to New York law when arguing points of statutory construction and elsewhere cite to case law in the Second Circuit in their briefs. See, e.g., Pl.'s Reply Br. 14–15; Def.'s Opp'n Br. 13. This is persuasive even though the 1984 Settlement does not provide for a venue, as the agreement in Supply & Bldg. Co. does.

It is also reasonable to believe that when the parties agreed to apply "the law of the appropriate United States jurisdiction" to the 1984 Settlement, they were agreeing to apply the law of the venue in which their dispute was to be heard. That venue is New York. For all of these reasons, the court is persuaded that the parties intended for New York law to govern the instant dispute.

B. The Meaning of "London" in the 1984 Settlement

New York's parol evidence rule generally bars admission of extrinsic evidence to vary or contradict the terms of a fully integrated writing. Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 69 (2d Cir. 2008) (citing Primex Int'l Corp. v. Wal-Mart Stores, Inc., 89 N.Y.2d 594, 599–600 (N.Y. 1997)). A written contract is considered integrated when the parties intend it to constitute the complete and final expression of their agreement. Starter Corp. v. Converse, Inc., 170 F.3d 286, 295 (2d Cir. 1999) (citing E. Allan Farnsworth, Contracts § 7.3 (2d ed. 1990)). When a contract lacks an integration clause, courts must "determine whether the parties intended their agreement to be an integrated contract by reading the writing in light of the surrounding circumstances." Id. (quoting Bourne v. Walt Disney Co., 68 F.3d 621, 627 (2d Cir. 1995)). Analysis of the surrounding circumstances sheds light "upon the type of transaction involved, the scope of the written contract and the content of any other agreements." Bourne, 68 F.3d at 627. When an agreement is not fully integrated, the parol evidence rule does not apply and a court may consider extrinsic evidence of separate agreements. Id. at 626–27.

The court now concludes that the 1984 Settlement was intended as a fully integrated document. Although the 1984 Settlement does not contain an integration clause, neither party now disputes that the 1984 Settlement is fully integrated, nor does either party assert that later oral or written agreements altered the terms of the 1984 Settlement. Rather, the parties assert that post-settlement documents merely shed light on the significance of the 1984

7

Settlement. This serves to further affirm that the parties intended the 1984 Settlement to be a complete record of the mutual promises.

Having found that the 1984 Settlement is fully integrated, the court must now decide whether it is also unambiguous, such that extrinsic evidence should not be considered to interpret its meaning. Omni Quartz, Ltd. v. CVS Corp., 287 F.3d 61, 64 (2d Cir. 2002). When analyzing the meaning of certain language in a contract, courts "should accord that language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'" Thompson v. Gjivoje, 896 F.2d 716, 721 (2d Cir. 1990) (quoting William C. Atwater & Co. v. Panama R.R. Co., 246 N.Y. 519, 524 (1927)). Courts do not consider contract terms or clauses in isolation; rather, each part of the contract should be considered "in light of the obligation as a whole." Albany Med. Ctr. v. Preferred Life Ins. Co. of N.Y., 851 N.Y.S.2d 843, 846 (N.Y. Sup. Ct. 2008).

The degree of ambiguity or clarity of a contract is a legal question for the court to decide. Brass v. Am. Film Techs., Inc., 987 F.2d 142, 149 (2d Cir. 1993). A contract term is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir. 1996) (quoting Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355 (1978)); see also Curry Road Ltd. v. K Mart Corp., 893 F.2d 509, 511 (2d Cir. 1990). "Language whose meaning is otherwise plain does not become ambiguous merely because the

8

parties urge different interpretations in the litigation." Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989). Only where the language at issue is unambiguous may the court construe it as a matter of law. Id.

On the other hand, an ambiguous term is susceptible to more than one interpretation by "a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Curry Road, 893 F.2d at 511; see also Olin Corp. v. Am. Home Assur. Co., 704 F.3d 89, 99 (2d Cir. 2012). If a court concludes that a provision in an insurance contract is ambiguous, it may consider extrinsic evidence to determine the parties' intent at the time the contract was formed. JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).

As noted above, Olin argues that the 1984 Settlement binds Commercial Union and its successors to payment obligations. In so arguing, Olin contends that the plain terms of the 1984 Settlement provide that Commercial Union is included within the definitions of "London," "London Company," and "London insurer," the terms used to define Olin's indemnitors under the 1984 Settlement.

Conversely, OneBeacon argues that its predecessor, Commercial Union, is unambiguously excluded from the definitions of "London," "London Company," and "London insurer," and, therefore, neither Commercial Union nor its successors were ever bound to make payments to Olin under the 1984 Settlement.

Both parties argue that the 1984 Settlement clearly and unambiguously favors their interpretation. At the same time, however, both parties ask the court to consider extrinsic evidence to support their differing interpretations. Because the court finds that the 1984 Settlement is unambiguous as to the parties on whom it imposes payment obligations, the court declines to consider either party's extrinsic evidence and will interpret the meaning of the contract based on the contract language alone.

### 1. Analysis of the Preamble

The court begins its analysis of the 1984 Settlement with the Preamble. The Preamble contains what is ultimately the clearest attempt at defining the parties bound by the agreement. There, the signatories agreed that the parties bound by the agreement included:

> "Olin Corporation . . . and those Certain Underwriters at Lloyd's, London and London Companies, hereinafter referred to collectively as 'London', providing insurance (and in the case of the policies issued by Employers Commercial Union Insurance Company of America, hereinafter referred to as 'Employers', providing reinsurance thereto) . . . . [T]he terms 'London insurer' or 'London insurers' shall mean one or more of such Certain Underwriters at Lloyd's, London . . . and London Companies who are parties to this Agreement . . . . Commercial Union Insurance Company, a . . . successor in interest to Employers, joins to make subject to this Agreement the policies set out in Exhibit A as issued by Employers and to that extent is included within the definition of 'London', 'London Company' and 'London insurer.'"

1984 Settlement, Preamble. Exhibit A contains the three Commercial Union policies EY8057-011, EY8057-012, and EY8057-013 that were, in turn, reinsured by Lloyd's, as noted above. 1984 Settlement Ex. A.

Neither party disputes that "London," "London Company," and "London insurer" bear payment obligations under the 1984 Settlement.  Olin points out that the Preamble language plainly provides that "Commercial Union . . . is included within the definition of 'London', 'London Company' and 'London insurer.'" 1984 Settlement, Preamble.  OneBeacon, on the other hand, seizes on language of apparent limitation.  It argues that Commercial Union joined the agreement only to make subject to the agreement its three policies so that the 1984 Settlement would settle and release Lloyd's of its reinsurance obligations on those policies.  Put simply, it argues that Commercial Union was party to the agreement for the convenience of Lloyd's, and not because Commercial Union assumed any payment obligations.

OneBeacon's interpretation of the Preamble is misguided.  It requires the court to make unintuitive leaps that have no textual basis in the 1984 Settlement.  OneBeacon argues that the 1984 Settlement was meant to address some unspecified reinsurance arrangement between Lloyd's and Commercial Union or to alter the payment mechanism so that Lloyd's was agreeing to pay Olin directly in Commercial Union's stead.  Any such arrangements do not emerge from the text of the 1984 Settlement, and the court has not been asked to consider evidence of any other agreement or codicil suggesting otherwise.

OneBeacon's argument is all the more unconvincing because the opposite conclusion emerges directly from the text.  A plain reading of the Preamble language is that Commercial Union is included within the definition of "London," "London company," and "London insurer" "to the extent" that its policies are set

11

out in Exhibit A.  In other words, Commercial Union is responsible for settlement payments relating to the policies it issued to Olin, and only on those policies.

Accordingly, the court reads the plain language of the Preamble to mean that the terms "London," "London Company," and "London insurer" include Commercial Union.  This conclusion emerges directly from the text and requires no extra-textual inferences or assumptions.  It follows that the court need not resort to review of extrinsic documents to find that the parties' meant anything other than what they agreed to in the 1984 Settlement.

### 2.  The Contract as a Whole

The text following the Preamble confirms the court's ultimate conclusion that Commercial Union and its successors agreed to make settlement payments under the 1984 Settlement.  Specifically, the court refers to two categories of textual support—language demonstrating that the parties intended for Commercial Union to be included among "London," "London Company," and "London insurer," and, separately, language denoting that Commercial Union, itself, agreed to make settlement payments.

First, various sections of the 1984 Settlement signal to the court that the terms "London," "London Company," and "London insurer" definitively include Commercial Union.  In one such section, the 1984 Settlement "sets out the initial payment schedule by policy," which reflects "each policy forming a part of the London excess coverage in effect during such policy number, policy period, identification of each participating London insurer, and proportion of risk subscribed for therein by each such London insurer."   1984 Settlement ¶ 6.

12

Exhibit D-1, to which paragraph six expressly refers, lists the details of each policy made part of the 1984 Settlement. For each of the Commercial union three policies at issue here, Exhibit D-1 lists the number of shares "London" is to pay. In the case of each policy, London owed twelve shares of the 75% payment amount. But Exhibit D-1 provides even more specificity. It states, in the case of each of those three policies, that "<u>Commercial Union</u> . . . pays 12 shares of London 75% . . . ." 1984 Settlement, Ex. D, at D-2-17–19 (emphasis supplied). These details denote two key facts to the court: that Commercial Union was intended as part of the "London" umbrella, and that Commercial Union agreed to be the payor. If, as OneBeacon suggests, Lloyd's and Commercial Union undertook a special payment arrangement whereby Lloyd's paid Commercial Union's share of the 1984 Settlement, at least some hint of that arrangement would be evident from the text of paragraph six or exhibit D-1. No such language exists.

In addition, paragraph 22(b) of the 1984 Settlement puts Commercial Union (as well as the other "London" insurers) under the "London" subheading for purposes of "notices, requests, demands and other communications or deliveries." 1984 Settlement ¶ 22(b). This, too, confirms that Commercial Union falls under the defined term "London."

The same can be said of paragraph twenty-seven, recited above for a different purpose. That paragraph specifies the applicable law in case of contract disputes and states that British law applies in disputes involving "London

13

insurers (other than Commercial Union and North River)." Again, Commercial Union is grouped in as a "London" insurer.

The second category of support for the court's decision is found in the portions of the 1984 Settlement connoting that Commercial Union agreed to make settlement payments. For example, in the second paragraph of the "Agreements" section, the parties decided that Olin would provide notice of indemnification claims to directly to both Commercial Union and to attorneys for Lloyd's. 1984 Settlement ¶ 2. If Olin's participation in the 1984 Agreement were a mere formality for the benefit of Lloyd's in extinguishing its reinsurance policies, Commercial Union would not have needed to receive notice of claims. Rather, the more logical and obvious explanation is that Olin gave notice of claims to Commercial Union because Commercial Union bore an obligation to make payments.

Another example is found in Exhibit A, to which the Preamble refers. That exhibit separately lists the policies that are "expressly made part of" the 1984 Settlement. Commercial Union's three insurance policies are among those listed. Exhibit A further notes that the providers of those policies are either "referred to collectively as 'London,' 'London Company' and 'London insurer,'" id., or "included within the definition of 'London,' 'London Company' and 'London insurer,'" id. at 2. Again, this section demonstrates that Commercial Union, as an insurance provider of a policy listed in Exhibit A, is included in what is "referred to collectively as 'London,' 'London Company' and 'London insurer.'"

14

It should also be noted that Exhibit A separately lists Commercial Union's insurance policies and Lloyds' reinsurance policies. That Exhibit A separately lists each company's policies indicates to the court that each company's policies were made part of the agreement. Nothing hints to the court that Commercial Union's policies were included in the agreement for any limited purpose, as OneBeacon argues. Rather, the plain text of Exhibit A indicates that Commercial Union's policies were made part of the agreement in precisely the same way as Lloyds' policies were made part of the agreement—to bind the providers to make settlement payments in accordance with the agreement.

There are, however, aspects of the 1984 Settlement that give the court pause. For example, on one occasion, the 1984 Settlement differentiates between "London insurers" and "non-London insurers." 1984 Agreement ¶ 7. However, the term "non-London insurer" is neither defined in the document nor repeated ever again. Moreover, there is no language to suggest that Commercial Union qualified as a "non-London" insurer. Though confusing, this term does not alter the court's view.

The court also notes that paragraph twelve of the 1984 Settlement provides that Olin will dismiss from its action "the London insurers named as defendants therein," and that the dismissal "shall be with prejudice solely as to London to counts dealing with the Huntsville DDT Situation and without prejudice with respect to any other counts." 1984 Settlement ¶ 12. This language suggests that the 1984 Settlement disposed of all Huntsville-related insurance claims Olin might make against Lloyd's and Commercial Union. But Olin had sued Lloyd's

15

and Commercial Union for indemnity based on insurance policies that were not included in the 1984 Settlement. Indeed, those additional policies were the subject of later settlements and litigation. And to further add to the confusion, neither party is able to point to anywhere in the record that suggests that Olin sought dismissal—with or without prejudice—from the suit. Hr'g Tr. 95:7–96:7; 96:22–97:8, Feb. 23, 2016.

The above confusions do little to move the mark for either party, nor do they render the otherwise clear contract ambiguous so as to allow the court to resort to the review of extrinsic evidence. This is especially true in light of the strong plain-language support for Olin's position that Commercial Union and its successors did agree to pay settlement shares to Olin under the 1984 Settlement.

**III.   Judge Sand's 1991 Decision**

The court must also make mention of Judge Sand's 1991 decision and its effect, if any, on the instant dispute. By way of background, the 1984 Settlement did not resolve all of Olin's DDT-related litigation. Rather, Olin further litigated Huntsville-related and DDT-related claims stemming from the Olin's liability for pesticide development at locations other than Huntsville. Some of the Huntsville-related litigation concluded when Judge Sand granted summary judgment to Commercial Union because Olin had untimely filed certain insurance claims on the Huntsville site. Judge Sand's decision does not explicitly list the Commercial Union policies to which it referred. Instead, the opinion referred to "all" Commercial Union policies—meaning all those in effect at the time that Judge Sand authored his opinion.

16

OneBeacon asserts that Judge Sand's decision is significant in two ways: First, it references an affidavit in which Olin explicitly listed the policies that were at issue in the 1991 dispute, and that list included the three Commercial Union policies that were purportedly disposed of in the 1984 Settlement. This argument is improper because it requires the court to use the 1991 decision as extrinsic evidence to shed light on the meaning of the 1984 Settlement. As decided above, the 1984 Settlement is unambiguous and fully integrated, and the court declines to employ extrinsic evidence to prove the meaning of an already-clear contract.

Second, OneBeacon argues that the very existence of Judge Sand's 1991 opinion proves that the 1984 Settlement could not have—and did not—settle all of Commercial Union's Huntsville-related claims.    But this is undisputed. Commercial Union issued more policies than were named in the 1984 Settlement, and it is clear that the policies not named in the 1984 Settlement were the subject of later litigation before Judge Sand.   Judge Sand's opinion did not have any effect on the three Commercial Union policies listed in the 1984 Settlement because Olin had already reached a compromise with Commercial Union as to disputes on those three polices.

## IV.   **Statute of Limitations & Payment**

Having found that OneBeacon is among the parties bound by the 1984 Settlement, the remaining question is one of payment. OneBeacon argues that, even if its predecessor, Commercial Union, was subject to the 1984 Settlement, the court should reject Olin's present motion because it is precluded by New

17

York's six-year statute of limitations governing breaches of contract. OneBeacon Opp'n Br. 12–14.  It contends that the statute of limitations expired in 1991 or 1997, and in either event, Olin's current claim is untimely.  Olin disagrees and instead reasons that the statute of limitations began to accrue much later because Commercial Union continued to pay claims under the 1984 Settlement until at least 2004, and it was not until 2015 that Commercial Union/OneBeacon informed Olin that it would not pay any amounts under the 1984 Settlement.  Olin Reply Br. 13.

As discussed above, settlement agreements are, of course, contracts.  See supra Part II.A (citing Collins v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir. 2002)).  Under New York contract law, the statute of limitations is six years and begins to accrue upon breach.  See N.Y. CPLR 213(2) (stating that an action upon a contractual obligation or liability must be commenced within six years); ABB Indus. Sys., Inc. v. Prime Tech., Inc., 120 F.3d 351, 360 (2d Cir. 1997) ("[I]n New York it is well settled that the statute of limitation for breach of contract begins to run from the day the contract was breached, not from the day the breach was discovered, or should have been discovered.").  Where a contract contemplates continuous performance—for example, through multiple payment installments or multiple payments upon invoice—each instance of non-performance is considered a partial breach of the contract unless the aggrieved party elects to terminate the contract.  Farnsworth § 8.16; Restatement (Second) Of Contracts § 236, cmt. b.  If the breaches are partial and ongoing, each one re-commences the statute of limitations for purposes of timely filing a lawsuit or finding liability.

18

See C. of W. Haven v. Commercial Union Ins. Co., 894 F.2d 540, 546 (2d Cir. 1990). For purposes of collecting damages, however, the rules differ. In that context, damages can be awarded beginning "from the date calculated by subtracting the limitations period from the date of filing." Id.

Here, the 1984 Settlement Agreement contemplated continuing performance by the parties. So while Olin is correct that its cause of action is timely, both parties' statute of limitations calculations for payment are incorrect as a matter of law.

Olin's Appendix A sets out twenty-two dates from 1989 to 2015 that correspond with unpaid amounts on Commercial Union's share of the 1984 Settlement. Olin Reply Br. App. A. Olin argues that it is owed $240,766.58 on those twenty-two claims and another $220,535.83 in interest for a grand total of $461,302.41. But Olin's request for payments dating back to 1989 ignores the continuing natures of the 1984 Settlement, of Commercial Union/OneBeacon's responsibility to pay under the agreement, and of Olin's own continuing responsibility to bring timely claims for any amounts it is owed. The law of the Second Circuit is clear: OneBeacon may be held liable only for damages allocable to the period starting six years prior to the filing of Olin's motion to enforce the 1984 Settlement on November 24, 2015.

Nor can the court automatically accept Olin's interest calculation absent further inquiry. Appendix A does not specify what the claim dates refer to, or how Olin calculated the interest payments and why. And OneBeacon has not provided the court with its views on how interest should be calculated.

19

Therefore, at this time, the court lacks sufficient information to render a decision on how much OneBeacon owes Olin pursuant to the 1984 Settlement Agreement.

## V.   Conclusion

For the foregoing reasons, the court concludes that the parties intended for Commercial Union and its successors to make settlement payments in accordance with the 1984 Settlement because they fall within the definitions of "London," "London Company," and "London insurer."   To aid the court in determining what payment is due, the parties are directed to submit briefs laying out an interest calculation and specifying the dates on which the interest began to accrue for each claim within the statute of limitations.   The parties are encouraged to stipulate to claim dates and amounts to the extent possible.

SO ORDERED.

Dated:  New York, New York
March 11, 2016

Thomas P. Griesa
United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 03/11/2016

20