UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
OLIN CORPORATION,                   :

            Plaintiff,              :          84 Civ. 1968

                                   :          OPINION AND ORDER

            -v-                    :

INSURANCE COMPANY OF NORTH AMERICA, :
ET AL.,                            :

            Defendants.            :
------------------------------------x



JED S. RAKOFF, U.S.D.J.

        The present dispute marks the latest phase in the 32-year

long litigation between plaintiff Olin Corporation ("Olin") and

its insurer, defendant Insurance Company of North America

("INA"), a litigation that has occupied the substantial

attention of four successive federal district judges, two of

whom are now deceased (though presumably from other causes). In

the instant iteration, Olin seeks to recover from INA the

expenses incurred by Olin in defending litigation brought by

third-party plaintiffs concerning two sites: the "Hamden Site"

and the "Chula Vista Site." By bottom-line Order dated October

26, 2016, this Court granted Olin summary judgment on its claims

relating to the Hamden Site, in the sum of $1,762,595.90, plus

prejudgment interest. With regard to the claims relating to the

Chula Vista Site, the Court granted Olin partial summary

judgment, holding that Olin timely notified INA of two third-

1

party suits (the "Federal Suit" and the "State Suit"), but otherwise denying summary judgment to either side.

Thereafter, however, INA's counsel became aware of certain documents, timely produced by Olin, that were material to its motion for summary judgment regarding the Chula Vista Site. The Court thereupon permitted the parties to submit supplemental briefing on the impact, if any, of those documents on the Court's prior rulings. In its supplemental briefing, INA withdrew its prior argument that Olin's notice of the Federal Suit was untimely and instead claimed that Olin's notice was deficient because it failed to transmit "critical" information to INA necessary to trigger the duty to defend. Upon review of the parties' supplemental briefing, the Court modifies its prior bottom-line ruling but only to the extent of withdrawing its prior determination that Olin timely notified INA of the Federal Suit. This Opinion and Order thereby amends the Court's prior "bottom-line" ruling and sets forth the reasons for all the Court's rulings now embodied in that amended order.

The Court begins with Olin's claims for defense costs in connection with the Hamden Site. Olin purchased primary insurance policies from INA covering the periods 1950-1970 (the "Hamden Policies"). Pl.'s Rule 56.1 Statement in Support of Its Motion for Summary Judgement on Its Claim for Defense Costs

2

Associated with the Hamden Site ("Hamden R. 56.1 Statement") ¶¶ 1-2, ECF No. 1898.[1] In each, INA agreed to "defend" Olin in "any suit . . . seeking damages on account" of property damage or personal injury covered by the Hamden Policies, "even if any of the allegations of the suit are groundless, false or fraudulent." Hamden R. 56.1 Statement ¶ 5.

On May 2, 2003, several landowners (the "Hamden Plaintiffs"), individually and on behalf of a putative class, filed Collins v. Olin Corp. and Town of Hamden, alleging personal injuries and property damage caused by Olin's alleged disposal of industrial waste at private and public dumps in Hamden, Connecticut (the "Collins litigation"). Hamden R. 56.1 Statement ¶¶ 6, 12, 16-17, 22-24. The plaintiffs alleged that "Olin negligently disposed of and/or released hazardous substances in the Newhall Section of Hamden over the course of many years, [and] negligently disposed of hazardous substances that have contaminated the soil and ground water flowing under the Newhall Section." Hamden R. 56.1 Statement ¶ 24. The pleadings additionally incorporated an April 2003 Consent Order, which stated that "[d]umping at the Hamden Middle School Property by respondent Olin continued until at least 1957" —

---

[1] Unless otherwise indicated, citations refer to the corresponding paragraphs of both parties' Rule 56.1 statements.

3

seven years into the period covered by the Hamden Policies. Olin provided INA with notice of the Collins litigation on May 21, 2003, and demanded that INA provide a defense. Hamden R. 56.1 Statement ¶¶ 42-43. INA did not provide coverage.

In December 2006, the Hamden Plaintiffs filed a Second Amended Complaint ("SAC"). The SAC asserted a putative class of all persons who owned real property in the Newhall Section of Hamden at specified addresses. Hamden R. 56.1 Statement ¶ 10. The SAC further identified three subclasses: 1) the Contaminated Properties subclass; 2) the Stigma subclass; and 3) the Response Cost subclass. Hamden R. 56.1 Statement ¶ 11. The Contaminated Properties subclass consisted of members who owned property "onto which Olin disposed of contaminated fill after it purchased Winchester in 1931". Id. The Stigma subclass consisted of members who owned property "onto which Olin did not dispose of industrial waste containing contamination after it purchased Winchester in 1931, but who ha[d] suffered damages as a result of their close proximity to the Contaminated Properties Subclass." Id. The Response Cost subclass represented members who owned property onto which dumping had not occurred, but "who ha[d] or w[ould] incur response costs in order to redress residual contamination." Id.

4

In 2008, the court certified the proposed class and subclasses. The next year, on October 28, 2009, without admitting liability, Olin entered into a class settlement, thereby ending the litigation. Hamden R. 56.1 Statement ¶ 31. At no point did the court make a determination as to if and when damage occurred to the Hamden Plaintiffs' properties.

Olin now seeks summary judgment on its claim against INA for Olin's defense costs incurred in the Collins litigation, in the amount of $1,762,595.90, plus prejudgment interest. INA opposes, arguing that the alleged property damage occurred outside the period covered by the Hamden Policies. INA further argues that even if it had a duty to defend, the Court should allocate defense costs between Olin and INA to account for damage during periods when Olin lacked insurance.

In determining whether an insurer has a duty to defend, "only those facts alleged in the underlying complaint are relevant to determining the scope of this duty." Cont'l Cas. Co. v. JBS Const. Mgmt., Inc., No. 09 CIV. 6697 (JSR), 2010 WL 2834898, at *2 (S.D.N.Y. July 1, 2010). The allegations in a complaint must be "liberally construed" in favor of coverage, Ruder & Finn Inc. v. Seaboard Sur. Co., 422 N.E.2d 518, 521 (N.Y. 1981), and "the duty to defend arises if the claims against the insured arguably arise from a covered event, even if

5

the claims may be meritless or not covered." Rhodes v. Liberty Mut. Ins. Co., 892 N.Y.S.2d 403, 405 (N.Y. App. Div. 2009). Moreover, "[a]ny ambiguity as to the insurer's duty to defend is resolved in favor of the insured." IBM v. Liberty Mut. Fire Ins. Co., 363 F.3d 137, 144 (2d Cir. 2004).

The parties agree that Olin dumped waste on some of the Hamden Plaintiffs' properties before 1950 but ceased dumping on those properties prior to the policy periods (1950-1970). They also agree that Olin dumped waste near the Hamden Plaintiffs' properties up until 1957. They disagree about whether the SAC alleges a reasonable possibility of property damage during the policy periods through migration of waste into the groundwater.

The Second Circuit has held that property damage can continue after active disposal ceases if contamination seeps into the soil and groundwater. Olin Corp. v. Certain Underwriters at Lloyd's London, 468 F.3d 120, 131 (2d Cir. 2006) ("property damage occurs as long as contamination continues to increase or spread, whether or not the contamination is based on active pollution or the passive migration of contamination into the soil and groundwater."). Applying this principle, several courts in this District have held that allegations of migration trigger the duty to defend, even though the dumping took place

6

outside the policy period and the complaints did not specify when the migration occurred.

For example, in Stone & Webster Mgmt. Consultants v. Travelers Indemn. Co., plaintiffs brought two complaints concerning separate sites, the first of which alleged that "there ha[d] been releases of hazardous substances on or from the [dumping] site into the soil, sediment and groundwater." No. 94-cv-6619, 1996 WL 180025, at *10 (S.D.N.Y. Apr. 16, 1996) (internal citation omitted). The second complaint went one step further and alleged that there "have been and continue to be releases . . . of hazardous materials (emphasis added)." Id. The court noted that neither complaint alleged when such releases occurred, but the "clear implication is there have been continual releases and will continue to be releases until the hazardous materials are removed" because "[g]roundwater migrates, and the contaminants can form plumes that expand over time." Id. (citing Todd, Groundwater Hydrology, 2d Ed. 1980 at 64). The court therefore held that the allegations triggered the insurer's duty to defend.

Likewise, in Employers Ins. of Wausau v. Duplan Corp., the complaints alleged that from 1970 through 1979, the defendants disposed of chemicals which were "released to the soil and groundwaters in and around the [disposal] facility and site."

7

No. 94-cv-3143, 1999 WL 777976, at *31-32 (S.D.N.Y. Sept. 30, 1999). The court held that since the defendants' insurance coverage continued to 1973, the allegations triggered the insurer's duty to defend.

Here, the Collins pleadings on their face allege property damage as a result of migration of contamination. The pleadings state that that Olin "negligently disposed of hazardous substances that have contaminated the soil and ground water flowing under the Newhall Section." The SAC further adds subclasses that are dependent on migration of waste. The "Stigma subclass" consists of members owning property "onto which Olin did not dispose of industrial waste, . . . but who have suffered damages as a result of their close proximity to the Contaminated Properties Subclass." Likewise, the "Response Cost subclass" consists of members who "who have or will incur response costs in order to redress residual contamination," and is not limited to plaintiffs whose properties were actually dumped on.

INA responds that the pleadings fail to allege property damage during the policy periods because there is no claim that groundwater contamination was "ongoing and continuous." This argument is insufficient as a matter of law. While an insurer must be relieved of its duty to defend where the pleadings "unequivocally demonstrate that the plaintiff is actually

8

contending entitlement to damages outside of the policy's coverage," A. Windt, 1 Insurance Claims and Disputes § 4:28 (6th ed.), the pleadings here are ambiguous concerning when the contamination migrated onto the Hamden Plaintiffs' properties, and such ambiguity must be resolved in favor of the insured. See IBM, 363 F.3d at 144; Stone & Webster, 1996 WL 180025, at *10; Employers Ins., 1999 WL 777976, at *31-32. Moreover, the SAC alleges that "[d]umping at the Hamden Middle School Property by respondent Olin continued until at least 1957." Although the Hamden Middle School was not located on the Hamden Plaintiffs' properties, the dumping during the 1950s raises an inference that the contamination migrated during the policy period (1950-1970). See Employers Ins., 1999 WL 777976, at *31-32.

Accordingly, the Collins pleadings, liberally construed, raise a reasonable possibility of property damage during the

policy periods.[2] Olin is therefore entitled to summary judgment in its favor on this issue.[3]

INA next argues that even if it had a duty to defend, the Court should allocate defense costs between Olin and INA to account for damage during periods when Olin lacked insurance. Under this formula, INA would be responsible for 25.97% of Olin's defense costs.

New York permits allocation of costs relating to the <u>duty to indemnify</u> between the insurer and insured where the injuries occurred during covered and uncovered time periods. <u>Keyspan Gas E. Corp. v. Munich Reinsurance Am.</u>, Inc., 37 N.Y.S.3d 85, 92 (N.Y. App. Div. 2016). New York courts have not, however, opined on whether costs relating to the <u>duty to defend</u> may be allocated between an insured and insurer. See <u>Cont'l Cas. Co. v. Rapid-Am. Corp.</u>, 80 N.Y.2d 640, 656 (1993); <u>Olin Corp. v. Century Indem.</u>

---

[2] INA additionally argues that the <u>Collins</u> pleadings do not allege "property damage or injury from the alleged damage to groundwater." INA is incorrect. The pleadings state, in two paragraphs after their respective groundwater allegations, that as "a proximate result of Olin's negligent acts and omissions, the plaintiffs . . . have suffered damages, including damage to the value of their homes and properties, loss of use and enjoyment of their properties." Hamden R. 56.1 Statement ¶¶ 27-28.

[3] Because the Court finds that the allegations concerning groundwater contamination establish a duty to defend, the Court does not reach Olin's argument that the allegations concerning dumping at the Hamden Middle School Site in the 1950s independently trigger this duty.

Co., 522 F. App'x 78, 80 (2d Cir. 2013). But assuming, arguendo, that New York law does permit such allotment, costs nonetheless may not be allocated if there is "no reasonable means of prorating the costs between covered and non-covered items." See Olin Corp., 522 F. App'x at 80. Such is the case here.

During earlier litigation between the parties concerning the site known as Morgan Hill, Judge Griesa (who was then overseeing the overall litigation) declined to allocate costs between INA and Olin where the claims also concerned contamination of groundwater. Defs.' Memorandum in Opposition to Pl.'s Motion for Summary Judgment in Support for Defense Costs Associated with the Hamden Site ("Defs.' Hamden Opp.") at 24-25, ECF No. 1914. Judge Griesa held that because expert testimony failed to "establish the time of injury in any satisfactory way," allocation of costs was not reasonable because it "would be sheer guesswork." Id. The Second Circuit affirmed finding "no error" in the court's conclusion because of the "absence of any jury determinations as to when—if ever—negligent waste disposal occurred, as well as indefinitive expert testimony as to the pace of perchlorate migration or the dates of initial contamination." Olin, 522 Fed. App'x at 80.

As in Morgan Hill, the claims here allege contamination of groundwater but fail to establish the time of the injury in any

11

satisfactory way. There are no jury determinations as to when, if ever, that contamination occurred, and the expert testimony proffered by the parties is at best inconclusive.

INA responds that unlike Morgan Hill, there is no dispute here that Olin dumped waste on some of the Hamden Plaintiffs' properties prior to the period covered by the policies, and therefore Olin should be accountable for defense costs predating 1950.[4] INA's distinction is immaterial. The issue is not when the dumping occurred, but rather when the property damage occurred, because that is the event that triggered coverage. There are no findings of fact demonstrating that pre-1950s dumping damaged the Hamden Plaintiffs' properties or showing the degree to which such dumping (standing by itself) was responsible for plaintiffs' injuries. Allocating defense costs is as much guesswork here as it was in the Morgan Hill dispute, and the Court therefore declines INA's invitation to engage in such speculation.

For the foregoing reasons, the Court grants Olin summary judgment on its claims relating to the Hamden Site, in the sum of $1,762,595.90, plus prejudgment interest.

---

[4] See Transcript dated Oct. 21, 2016 at 34-35, ECF No. 1933.

The parties' motions concerning the Chula Vista Site present a closer call. By way of background, Olin purchased two primary insurance policies from INA that were in effect during the period 1965 to 1970 (the "Chula Vista Policies"). Pl.'s Rule 56.1 Statement in Support of Their Motion for Summary Judgment ("Chula Vista R. 56.1 Statement") ¶¶ 3, 4, ECF No. 1901. In both, INA promised to "defend" Olin in "any suit . . . alleging . . . destruction and seeking damages on account thereof."[5] Chula Vista R. 56.1 Statement ¶¶ 5, 8.

On December 12, 2003, two plaintiffs (the "Chula Vista Plaintiffs") sued Olin, United Enterprises, Inc. ("UE"), and other entities in a suit in the Southern District of California (the "Federal Suit") captioned <u>Otay Land Co. v. United Enters., Ltd.</u>, No. 3:03-cv-02488 (S.D. Cal. 2003). Chula Vista R. 56.1 Statement ¶ 10. The Chula Vista Plaintiffs alleged that Olin and the other defendants "arranged for disposal of hazardous substances at the Site from approximately 1965 until approximately 1997." Chula Vista R. 56.1 Statement ¶¶ 11, 12. The disposal of these contaminants resulted in damage to the Chula Vista Plaintiffs' properties, and the complaint asserted a

---

[5] The Court notes that while Policy SRL 2217 does not contain this specific language, it is materially identical. Chula Vista R. 56.1 Statement ¶ 8.

mix of federal and state law claims. Chula Vista R. 56.1
Statement ¶¶ 10-14.

Olin never owned property or operated any business at the
Chula Vista Site. Chula Vista R. 56.1 Statement ¶ 29. Instead,
in a 1965 franchise agreement, Olin allowed UE to use its
Winchester name at a skeet and trap shooting park operated by UE
at the Chula Vista Site (the "Franchise Agreement"). UE agreed
to indemnify Olin for loss or damages stemming from its
operation. Chula Vista R. 56.1 Statement ¶ 2.

On May 10, 2004, Olin prepared a letter to INA (the "May
2004 Notice") attaching a copy of the summons and complaint in
the Federal Suit and the Chula Vista Plaintiffs' Notice of
Intent to File Suit under the Resource Conservation and Recovery
Act ("RCRA"). Chula Vista R. 56.1 Statement ¶ 35-37. In its
letter, Olin reported that the Federal Suit provided "a
reasonable possibility of coverage under policies of insurance
sold by INA to Olin," and demanded that INA "pay Olin's defense
costs." Chula Vista R. 56.1 Statement ¶ 38. Olin also stated
that it had retained Morgan, Lewis & Bockius ("Morgan Lewis") to
represent it in the litigation, and asked INA to "let us know

14

immediately if you object to that firm's representation of Olin."[6] Chula Vista R. 56.1 Statement ¶ 39.

Six months later, on November 15, 2004, Olin filed a declaratory action against UE seeking indemnification (the "UE Suit"), which UE contested. Chula Vista R. 56.1 Statement ¶ 44. Olin did not give INA notice of the UE Suit at the time of its filing. The next year, in May 2005, UE entered into a purchase agreement to sell certain assets and real estate, including the Chula Vista Site, to a third party known as the Baldwins. As part of that sale and purchase, the Baldwins agreed to assume "any potential liability United Enterprises may owe to Olin under the Franchise Agreement." Chula Vista R. 56.1 Statement ¶ 45.

On July 17, 2006, the federal court dismissed the Federal Suit, finding that there was no basis for federal jurisdiction. Chula Vista R. 56.1 Statement ¶ 22. Three days later, on July 20, 2006, the same plaintiffs re-filed their claims in the Superior Court of California (the "State Suit"), captioned Otay Land Co. v. United Enters., Ltd., No. GIC-869480. Chula Vista R. 56.1 Statement ¶ 23. The State Suit complaint was identical to

---

[6] As explained in greater depth below, while INA originally took the position that Olin never sent the May 2004 Notice, INA now argues that it received the notice but that the notice was deficient.

the third amended complaint from the Federal Suit. Chula Vista
R. 56.1 Statement ¶¶ 10, 22. Olin did not provide notice of the
State Suit to INA at the time of its filing.

In November 2006, Olin, UE and the Baldwins entered into a
Settlement and Tolling Agreement ("the Baldwin Settlement").
Chula Vista R. 56.1 Statement ¶¶ 46, 50. Pursuant to the
settlement, effective retroactively as of February 1, 2006, the
Baldwins assumed "all of United Enterprises' rights and
obligations arising from the Franchise Agreement as they relate
to Olin's claim for defense and indemnity" and agreed to assume
Olin's defense of the underlying litigation going forward. Chula
Vista R. 56.1 Statement ¶¶ 46-47. The Baldwins did not reimburse
Olin for defense costs Olin had incurred prior to February 2,
2006 defending the Federal Suit, but the agreement permitted
Olin to seek recovery of that amount from the Baldwins at the
conclusion of the State Suit. Chula Vista R. 56.1 Statement ¶¶
46, 48.

The next year, in January 2007, Olin and INA entered into a
Settlement Agreement and Release, effective retroactively as of
September 30, 2005 (the "INA Settlement Agreement"). The
agreement amended Olin's notice obligations and stated that with
respect to "Non-Released Claims" (which expressly included
litigation relating to the Chula Vista Site), "Olin will provide

16

notice and/or supplemental information . . . only once it determines that expenditures are reasonably likely to exceed $100,000 with respect to such occurrence."

During the several years that followed, Baldwin complied with its obligation to pay Olin's defense costs. Then, in the summer of 2012, the Baldwins notified Olin that they had become insolvent and could no longer make payment. Chula Vista R. 56.1 Statement ¶ 52; Defs.' Memorandum in Opposition to Pl.'s Motion for Summary Judgement on its Claim for Defense Costs Associated with the Chula Vista Shooting Range Site ("Defs.' Chula Vista Opp.") at 12, ECF No. 1917. Thereafter, in a September 2012 letter, Olin for the first time informed INA of the State Suit, the UE Suit, and the Baldwin Settlement. Chula Vista R. 56.1 Statement ¶¶ 65, 69. Olin remained a defendant in the State Suit until it reached a settlement with the Chula Vista Plaintiffs, effective May 2013. Chula Vista R. 56.1 Statement ¶ 26.

On May 10, 2016, this Court granted Olin leave to amend its Third Amended Complaint to add Chula Vista as a site in dispute between the parties. On September 23, 2016, the parties each moved for summary judgment on Olin's claim against INA for defense costs relating to the Chula Vista Site. INA opposed Olin's motion, among other reasons, on the ground that INA had no record of the May 2004 Notice and that, accordingly, there

17

was a genuine dispute whether Olin had actually sent the
document.

As noted, the Court, by bottom-line Order dated October 26,
2016, granted Olin partial summary judgment holding that Olin
had timely notified INA of two third-party suits (the "Federal
Suit" and the "State Suit"). The Court otherwise denied the
parties' motions (but without prejudice to either party filing a
pre-trial motion in limine to exclude expert testimony
concerning the reasonableness of Olin's defense costs).
Thereafter, on November 4, 2016, INA made an application for
supplemental briefing after INA's counsel became aware of a
letter sent from INA to Olin, dated January 12, 2005 (the
"January 2005 Letter"), confirming that INA had in fact received
the May 2004 Notice. The Court granted the application,[7] and INA
subsequently withdrew its argument that Olin's notice of the
Federal Suit was untimely.[8] INA now claims in its supplemental

---

[7] The Court has wide discretion to allow supplemental filings.
Jackson v. Goord, 664 F. Supp. 2d 307, 313 (S.D.N.Y. 2009).
INA's application came before the Court issued an opinion
explaining its bottom-line rulings. Moreover, both parties were
partially to blame for the oversight. While INA should have
become aware of the January 2005 Letter sooner, Olin failed to
raise the letter's existence at oral argument on the motions for
summary judgment when the Court asked Olin's counsel point-blank
whether "INA did not respond for the next two years or so" to
the May 2004 Notice. See Transcript dated October 21, 2016 at 7.

[8] See INA's Reply Mem. Regarding INA's January 12, 2005 Letter in
Connection with the Cross Motions for Summary Judgment as to

18

briefing that the May 2004 Notice was deficient because it
failed to transmit information necessary to establish a duty to
defend on the part of INA. In particular, INA's January 2005
Letter states that although the May 2004 Notice purported to
attach the summons and complaint in the Federal Suit and other
relevant pleadings, Olin failed to actually include the
attachments. The January 2005 Letter therefore requested these
documents along with eight other categories of information

---

Chula Vista ("Defs.' Supp. Reply") at 3, ECF No. 1939 ("INA has
never disclaimed based on late notice of the 2003 federal suit .
. . . INA's argument remains that Olin's notice was insufficient
as to the subsequent state suits and that Olin wrongfully
impaired INA's subrogation rights.").

19

relating to the Federal Suit,[9] and stated that it "cannot reach any determination in their absence."[10] Olin did not respond.

The Court now turns to the merits of the parties' arguments. The parties do not dispute that the complaints in the Federal, State, and UE Suits fall within the scope of INA's duty to defend. However, they dispute (1) whether the May 2004 Notice transmitted to INA the information necessary to trigger the duty to defend; (2) whether Olin fulfilled a condition precedent to coverage by giving INA timely notice of the State and UE Suits; (3) whether Olin forfeited its claim to payment by impairing INA's subrogation rights; and (4) whether Olin's defense costs

---

[9] The other categories included: (2) the amount of the claimed defense costs segregated among legal fees, investigation, consultants, and internal expenses, if any, incurred to date; (3) a copy of all pleadings, in addition to the underlying complaint and Notice of Intent to File Suit requested above, which Olin has received to date in connection with the Chula Vista site; (4) a complete report on what has happened in the underlying case to date, including but limited to any settlement conferences; (5) information on Olin's relationship to the Chula Vista site; (6) information on what was Olin's ownership or other interest in the site; (7) information on when Olin acquired ownership or other interest in the site, and when it relinquished or sold ownership or other interest in the site; (8) any indemnification agreements Olin may have with prior owners; and (9) any sales documents or other transactional documents containing provisions relating to liabilities at the site.

[10] INA further stated that the delay in INA's response was due to the fact that INA had not received the May 2004 Notice until November 15, 2004 – nearly six months after Olin prepared the document. Curiously, this is the same day that Olin filed suit against UE.

with respect to the Suits were reasonable. For the following reasons, the Court grants Olin partial summary judgment holding that it timely notified INA of the State Suit, and in all other respects denies the parties' motions.

The Court begins with whether the May 2004 Notice was deficient. There is a genuine dispute whether the May 2004 Notice did in fact attach the summons and complaint in the Federal Suit and the Notice of Intent to File Suit under the RCRA. INA's January 2005 Letter states that although Olin intended to attach these materials, INA did not receive any attachments. Olin responds that it is entitled to the presumption that the summons and complaint were received because the May 2004 Notice was correctly addressed to one of INA's offices. Under New York law, where "there is proof of the office procedure followed in a regular course of business, and these procedures establish that the required notice has been properly addressed and mailed, a presumption arises that notice was received." Meckel v. Cont'l Res. Co., 758 F.2d 811, 817 (2d Cir. 1985); see Allstate Ins. Co. v. Patrylo, 144 A.D.2d 243, 246 (1988). Olin, however, fails to show that it followed its regular course of business in sending the May 2004 Notice. To the contrary, INA's January 2005 Letter indicates that there may have been some error at Olin's end, since INA purportedly did

21

not receive the notice until November 2004 – nearly six months after it was prepared. Olin must therefore offer at trial better evidence concerning the May 2004 Notice's preparation, mailing, and the like to take advantage of the presumption of receipt and, in any event, INA may be able to offer evidence to rebut the presumption.

If Olin can show that INA received the summons and complaint, it is immaterial that Olin did not provide documentation relating to the eight other categories of information identified in the January 2005 Letter. In the absence of any conditions precedent, the duty to defend arises when the allegations in the complaint fall within the policy's coverage. Bausch & Lomb Inc. v. Lexington Ins. Co., 414 F. App'x 366, 370-71 (2d Cir. 2011). There is no indication that the provision of those additional materials were intended to be a condition precedent to INA's duty to defend, and INA does not argue to the contrary. Instead, INA argues that this information was "critical" to its coverage determination. Defs.' Supplemental Mem. Regarding INA's January 12, 2005 Letter in Connection with the Cross Motions for Summary Judgment as to Chula Vista ("Defs.' Chula Vista Supp. Mem.") at 3, ECF No. 1937. While this information may be relevant to whether INA had a duty to indemnify, see Goldberg v. Lumber Mut. Cas. Ins. Co.,

of N.Y., 297 N.Y. 148, 153 (1948), INA fails to explain why this information is necessary to determine whether the allegations in the Federal Suit fall within INA's duty to defend. Indeed, INA concedes that it "has not disputed that the allegations in the complaint give rise to the duty to defend." Defs.' Chula Vista Supp. Mem. at 3. INA's duty to defend is therefore triggered regardless of whether it received information relating to the other eight categories of information identified in the January 2005 Letter, so long as Olin provided INA the summons and complaint in the Federal Suit and the Notice of Intent to File Suit under the RCRA. The first issue for trial, therefore, is whether the summons and complaint were in fact sent to INA.

The parties next move and cross-move for summary judgment concerning the timeliness of Olin's notice of the State and UE Suits. The Chula Vista Policies state that "if claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by the insured or the insured's representatives." Defs.' Chula Vista Opp. at 14. Under New York law, when "notice of suit and occurrence is required by the contracts between the parties, unless insureds provide this notice to insurers in a timely fashion, insurers have no duty to

defend." Maryland Cas. Co. v. W.R. Grace & Co. - Conn., No. 88
CIV. 4337 (JSM), 1994 WL 167962, at *4 (S.D.N.Y. Apr. 29, 1994).

Olin is entitled to partial summary judgment holding that
its notice of the State Suit was timely. The parties agree that
Olin gave INA notice of the State Suit in 2012, nearly six years
after it was filed. However, this delay does not render the
notice untimely. The State Suit was initiated after the INA
Settlement Agreement, which modified the Chula Vista Policies'
notification requirements. In particular, the INA Settlement
Agreement states:

> Olin's claims for coverage for such occurrence(s) will
> not be prejudiced if notice is not given based on a
> determination that the claim will not exceed $100,000
> in expenditures, but it later develops that Olin gives
> timely notice based on its subsequent determination at
> a later point in time that expenditures with respect
> to that occurrence will exceed $100,000.

Chula Vista R. 56.1 Statement ¶ 62. Olin did not expect to file
a claim with INA in excess of $100,000 when the State Suit was
filed in July 2006, because the Baldwins were assuming and
paying for Olin's defense. Chula Vista R. 56.1 Statement ¶¶ 50-
53. It was only in August 2012, when the Baldwins informed Olin
that they would no longer pay, that Olin first expected to incur
expenditures greater than $100,000 and sent INA notice of suit
less than three weeks later. Chula Vista R. 56.1 Statement ¶¶
63-66.

24

INA responds that the settlement agreement requires notice if Olin's defense costs generally exceed $100,000, regardless of who is paying. INA is incorrect. The INA Settlement Agreement concerns when Olin must submit a "claim for coverage" to INA and does not require notice if Olin determines that "the claim will not exceed $100,000." Chula Vista R. 56.1 Statement ¶ 62. Olin did not expect to submit a claim until the Baldwins ceased paying for its defense in 2012. The Court accordingly grants Olin partial summary judgment holding that it timely notified INA of the State Suit.

Disputes of material fact nonetheless preclude partial summary judgment with respect to the timeliness of the UE Suit. Unlike the State Suit, the UE Suit was filed before the INA Settlement Agreement took retroactive effect. Olin concedes that it did not give INA notice of the UE Suit until nearly eight years after its filing in 2012. Olin nonetheless argues that it was excused from providing notice of the UE Suit because INA breached the Chula Vista Policies prior to the UE Suit's filing. In particular, Olin claims that INA constructively denied coverage by failing to respond to the May 2004 Notice during the

25

six month period between its purported transmittal and the initiation of the UE Suit.[11]

Under New York law, when "one party commits a material breach, the other party is relieved, or excused, from its further performance obligations." Wechsler v. Hunt Health Sys., Ltd., 330 F. Supp. 2d 383, 414 (S.D.N.Y. 2004). Furthermore, long delays in processing a claim may have the same effect as denial of the claim. See Isadore Rosen & Sons, Inc. v. Sec. Mut. Ins. Co. of New York, 31 N.Y.2d 342, 348 (1972).

There is a genuine dispute whether INA improperly delayed responding to the May 2004 Notice.[12] While Olin contends that it sent the notice in May 2004, INA's January 2005 Letter states that INA did not receive Olin's notice until November 2004. Olin does not argue that a two month delay is improper, and Olin must therefore show at trial that it transmitted the May 2004 Notice

---

[11] While Olin also contends that its May 2004 Notice gave notice for the entire Chula Vista litigation, the requirements in the Chula Vista Policies are particular and exacting, and require that Olin "forward to the company every demand, notice, summons or other process received by the insured." Olin gave INA no such information relating to the UE Suit as part of the May 2004 Notice because the suit had yet to be filed.

[12] The Court notes that INA does not challenge the premise of Olin's argument, which is that a material breach by an insurer excuses the insured from complying with a policy's notification requirements — even for future lawsuits. The Court therefore deems such a challenge waived.

26

on or about the date that it was prepared and that INA's delay in responding constituted a constructive denial of coverage.

Assuming that Olin can make such a showing, the Court rejects INA's argument that it was not required to respond to the May 2004 Notice. INA contends that even if it delayed in responding to the May 2004 Notice, this delay was proper pursuant to the parties' custom. In particular, INA argues that Olin followed a practice known as "end-of-suit protocol," whereby Olin paid its own legal fees and waited to seek reimbursement until the end of litigation. See Defs.' Chula Vista Opp. at 5; Pl.'s Reply Memorandum in Support of Its Motion for Summary Judgment for Defense Costs Associated with the Chula Vista Shooting Range Site ("Pl.'s Chula Vista Reply") at 2-4, ECF No. 1924. INA argues that its silence was consistent with this protocol.

The Court is not persuaded. There is no evidence that end-of-suit protocol entirely excused INA from responding to a request for a defense from Olin. End-of-suit protocol merely governed when the parties would expect INA to pay Olin's costs. The existence of the January 2005 Letter demonstrates that INA had a continuing obligation to respond, even if end-of-suit protocol was in effect.

27

Moreover, Olin repudiated end-of-suit protocol prior to the filing of the Federal Suit. In November 2003, Olin wrote to INA that it would "expect a full, contemporaneous defense from INA" going forward (the "November Letter"). While INA responded the next month that the change in protocol did "not automatically create a duty by INA to pay all of the defense costs for all prior matters Olin was itself handling (emphasis added)," INA did not dispute the change in protocol for future matters.[13] To this effect, the final line of INA's reply states that INA adheres to all of its prior reservations with respect to all prior claims and proceedings.

For the foregoing reasons, the Court denies partial summary judgment to both parties on whether Olin's notice of the UE Suit was timely.

The next issue is whether Olin forfeited its coverage by impairing INA's subrogation rights. "Subrogation, an equitable doctrine, entitles an insurer to 'stand in the shoes' of its

---

[13] To be sure, INA did raise a concern about how Olin would allocate defense costs among insurers, which would have been relevant to new litigation as well. But this is not a legally cognizable concern. Any insurer with the duty to defend must pay all costs upfront, even though allocation may later be appropriate. Cont'l Cas., 80 N.Y.2d at 655. INA's concern regarding allocation was not a reasonable ground for opposing a change in payment policy, and the Court therefore finds that Olin repudiated end-of-suit protocol for litigation arising after the November Letter.

insured to seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse." N. Star Reinsurance Corp. v. Cont'l Ins. Co., 624 N.E.2d 647, 653 (N.Y. 1993). "As a general rule, an insured who gives an effective release to the person responsible for the loss, thereby destroying the insurer's potential right of subrogation against that person, loses his or her right of action under the policy." 71 N.Y. Jur. 2d Insurance § 2355 (2010); Weinberg v. Transamerica Ins. Co., 62 N.Y.2d 379, 382 (1984).

INA moves for summary judgment holding that Olin breached the Chula Vista Policies by releasing UE from its duty to indemnify.[14] The Franchise Agreement required UE to indemnify Olin for costs arising out of "any act or neglect" of UE in connection with the Chula Vista Site, or any accident or activities originating from the Chula Vista Site. Defs.' Rule 56.1 Statement in Support of Their Opposition to Pl.'s Motion for Summary Judgment ("Defs.' Chula Vista R. 56.1 Statement") ¶ 8, ECF No. 1908. As part of the Baldwin Settlement, Olin agreed that the Baldwins would be "solely responsible" for Olin's costs. Defs.' Chula Vista R. 56.1 Statement ¶ 22. To this end,

---

[14] Both of the Chula Vista Policies contain clauses requiring the insured not to impair INA's subrogation rights. See Defs.' Chula Vista Opp. at 11.

Olin covenanted that UE would "not be a party to or witness in any future any future litigation, arbitration or mediation involving Olin's claim" except for the limited purpose of identifying and authenticating documents. Defs.' Chula Vista R. 56.1 Statement ¶ 22. Olin also executed the settlement for itself and its insurers. See Defs.' Chula Vista R. 56.1 Statement ¶ 18. INA argues that these terms had the effect of an improper release.

Olin responds, principally, that INA cannot claim an impairment of its subrogation rights because INA breached the Chula Vista Policies prior to the Baldwin Settlement. The longstanding rule is that "[w]here an insurer denies liability on a policy, it is estopped from thereafter claiming . . . the insured breached the policy's subrogation provision, by impairing its subrogation rights." 16 Couch on Insurance § 224:148 (3d ed. 2016). Olin's argument here is largely the same as its argument as to why it did not inform INA of the UE Suit: Olin filed a timely request for a defense from INA in May 2004, INA did not grant that defense, and INA therefore breached its duty to defend. The primary difference is that the length of time between the May 2004 Notice and the Baldwin Settlement is significantly longer than that between the May 2004 Notice and the UE Suit — two years as opposed to six months.

30

If INA breached its duty to defend the Federal Suit prior
to Olin's entering into the Baldwin Settlement, then INA would
be estopped from claiming that Olin breached its subrogation
rights. There is a genuine dispute, however, whether Olin gave
INA sufficient information to trigger the duty to defend in the
first place. Assuming that Olin did, the record is devoid of
evidence to determine whether INA constructively denied coverage
by failing to defend Olin prior to the Baldwin Settlement.[15] The
Court therefore holds that genuine disputes of material fact
preclude summary judgment on whether Olin impaired INA's
subrogation rights by agreeing to the Baldwin Settlement.

Olin's remaining arguments concerning INA's subrogation
rights lack merit. Olin argues that INA had no subrogation
rights because UE was effectively an insurer, and, under New

---

[15] New York law is admittedly unclear when such a constructive
denial occurs. In Long Island Lighting Co. v. Steel Derrick
Barge FSC 99, the Second Circuit held that an insurer disclaimed
coverage by failing, inter alia, to respond to two requests from
the insured for payment. 725 F.2d 839, 842 (2d Cir. 1984).
Likewise, in Allstate Ins. Co. v. Sullivan, the insured made
several efforts to obtain the insurer's consent to a settlement
agreement with the tortfeasor, but the insured never responded.
230 A.D.2d 732 (1996). Similarly, in Rosen, the Court of Appeals
reversed and remanded to the district court to determine whether
an insurer's inaction, when it knew of the insured's strained
financial circumstances, waived a policy restriction on
unapproved settlements. 31 N.Y.2d at 348. The court held on
remand that whether the insurer unreasonably delayed was a
question of fact rather than a question of law. Id.

York law, "co-insurers cannot recover from one another on a subrogation theory because they 'are not seeking reimbursement from a third-party wrongdoer.'" Nat. Cas. Co. v. Vigilant Ins. Co., 466 F. Supp. 2d 533, 541-42 (S.D.N.Y. 2006) (quoting Md. Cas. Co. v. W.R. Grace Co., 218 F.3d 204, 211 (2d Cir. 2000)). Olin's argument is misplaced because UE effectively was a third-party tortfeasor. Olin did not own or operate the Chula Vista site. Pl.'s Memorandum of Law in Support of its Motion for Summary Judgment for Defense Costs Associated with the Chula Vista Shooting Range Site ("Pl.'s Chula Vista Mem.") at 3, ECF No. 1900. Rather, UE owned and operated the property and was responsible for the damage that led to the Federal and State Suits. That is why the Chula Vista Plaintiffs added UE as a defendant to their litigation. UE's indemnity obligations arose from its own wrongdoing, unlike those of an insurer, and INA accordingly had a right of subrogation.[16] See Aetna Cas. & Sur. Co. v. Longo Prod., Inc., 247 A.D.2d 497, 497 (1998)(holding that under New York law, an insurer has a right of subrogation

---

[16] Olin argues as well that INA's subrogation rights under the Chula Vista Policies do not come into effect until INA makes a payment. This argument is foreclosed by the Court of Appeals' decision in Weinberg, where the court held that an insured impaired the subrogation rights of its insurer by settling with a tortfeasor prior to the insurer making payment. 62 N.Y.2d at 384.

against a co-defendant against whom the insured has cross-claims).

Olin next claims that INA did not suffer prejudice as a result of the Baldwin Settlement. An insured can avoid forfeiting coverage for having released claims to which its insurer would have a right of subrogation if the insured can demonstrate that its insurer was not prejudiced. Weinberg, 62 N.Y.2d at 382. New York law, however, is unclear concerning what showing suffices. The Court of Appeals has held that there is a presumption of prejudice unless the insured reserves the rights of the insurer against the third-party tortfeasor. Id. at 381–82. The Supreme Court and Second Circuit have held more broadly that an insured may release its claim against a third party if the right is barred by law and therefore "worthless." See Chapman v. Hoage, 296 U.S. 526, 532 (1936)(statute of limitations had run); Gibbs v. Hawaiian Eugenia Corp., 966 F.2d 101, 107 (2d Cir. 1992)(condition precedent was not met).

Olin fails to meet its burden under any applicable standard. Olin argues that it preserved INA's subrogation rights because it did not release UE's indemnification obligations — it merely transferred them to the Baldwins. Olin's position unreasonably privileges form over substance because the effect of the settlement is still that INA lost its right to institute

33

litigation against UE. Olin further fails to show that its claims against UE were barred by law. Although UE contested Olin's indemnification rights, Olin offers no evidence that UE was correct and Olin made no such admission as part of the Baldwin Settlement. See Baldwin Settlement, Recitals, ¶ G ("the Settling Parties do not admit any fact, allegation, liability, or claim asserted in [the UE Suit]"). The Court further finds unavailing Olin's argument that it improved INA's position "because Olin does not seek from INA the six years of fees that the Baldwins paid as a result of the Baldwin Settlement." Defs.' Memorandum in Opposition to Pl.'s Motion for Summary Judgement on its Claim for Defense Costs Associated with the Chula Vista Shooting Range Site ("Defs.' Chula Vista Opp.") at 20, ECF No. 1917. Olin cites no precedent that an insurer who receives some theoretical benefit from a release is no longer prejudiced. Even if this were a cognizable defense under New York law, which is doubtful, Olin fails to offer evidence that UE was incapable of making payment. Indeed, the record demonstrates that the Baldwins had already gone through one bankruptcy prior to the Baldwin Settlement. See Defs.' Chula Vista Opp. at 12. The Court therefore finds that Olin has failed to show a lack of prejudice to INA.

34

Olin lastly claims that INA waived its claim of impairment
because INA did not assert the Baldwin Settlement as a basis for
denying coverage in 2012. INA, however, specifically reserved
its rights concerning this defense in its denial letter. See
Defs.' Reply Memorandum in Support of its Motion for Summary
Judgment as to Olin's Chula Vista Site Claims ("Defs.' Reply")
at 3, ECF No. 1931. This reservation precludes a finding of
waiver. Allstate Ins. Co. v. Gross, 27 N.Y.2d 263, 269 (1970);
Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165 (2d
Cir. 2006).

Based on the foregoing, the Court finds that there are
disputes of material fact precluding summary judgment for either
party on whether Olin impaired INA's subrogation rights by
entering the Baldwin Settlement.

The final issue raised by the parties concerns the
reasonableness of Olin's defense costs.[17] Olin seeks coverage for

---

[17] INA also claims in a lone paragraph that Olin breached its
duty to cooperate by entering the Baldwin Settlement. To
demonstrate such a breach, an insurer must show "(1) that it
acted diligently in seeking to bring about the insured's
cooperation, (2) that the efforts employed by the carrier were
reasonably calculated to obtain the insured's cooperation, and
(3) that the attitude of the insured . . . was one of willful
and avowed obstruction." SCW West LLC v. Westport Ins. Corp.,
856 F. Supp. 2d 514, 522 (E.D.N.Y. 2012). INA fails to show that
it acted diligently in seeking Olin's cooperation to recover
costs from UE, that INA's efforts were reasonably calculated to
obtain such costs, or that Olin willfully obstructed INA's

$2,925,813.60 in legal fees and expenses incurred in defending the Chula Vista litigation: $1,289,691.58 related to the Federal Suit and $1,636,122.02 related to the State Suit. Chula Vista R. 56.1 Statement ¶ 75. INA responds that, after discounting unreasonable or unnecessary fees, Olin's total defense costs were $1,229,834.53. Defs.' Chula Vista Opp. at 19.

A court or jury only reaches the reasonability of Olin's defense costs if it determines that INA breached its duty to defend Olin in the Federal Suit. Otherwise, INA's defenses would preclude Olin from seeking any recovery.  Where an insurer has breached its duty to defend, the insured's fees are presumed to be reasonable and the burden shifts to the insurer to establish that the fees are unreasonable. See Danaher Corp. v. Travelers Indem. Co., No. 10-cv-0121, 2015 WL 409525, at *7 (S.D.N.Y. Jan. 16, 2015) (citing 14 Couch on Insurance § 205:76), report and recommendation adopted, No. 10-CV-121 JPO, 2015 WL 1647435 (S.D.N.Y. Apr. 14, 2015).

INA's expert, David McMahon, argues that Olin's costs were unreasonable because defense counsel's bills show "improper duplication of effort, block billing, excessive time, clerical billing, long billings [sic] days and services for work

---

efforts. The Court therefore denies INA summary judgment on this issue.

unrelated to the defense of the environmental claims, as well as undocumented expenses." Chula Vista R. 56.1 Statement ¶ 80. McMahon also opines that Olin's defense counsel charged an excessive hourly rate because the Chula Vista Site is located in San Diego and Olin's defense counsel should have charged "San Diego rates." See Martin Supp. Decl. Ex. 48 (McMahon Dep.) at 287:9-289:9, ECF No. 1926.

Olin's expert, Stephen Orlofsky, responds that, except for $5,334.75, Olin's defense fees were "reasonable" because Olin regularly monitored and reviewed invoices, Morgan Lewis' staffing was reasonable, the block-billing was sufficiently detailed, and Morgan Lewis did not engage in long billing days. Chula Vista R. 56.1 Statement ¶ 93. Orlofsky also argues that McMahon fails to explain how he came to his conclusions, and faults McMahon for failing to evaluate the legal and factual complexities of the underlying litigation to determine whether the billing was warranted. Chula Vista R. 56.1 Statement ¶¶ 91-92.

On the present record and briefing, the Court finds that disputes of material fact preclude summary judgment for either party on the reasonableness of Olin's defense costs. The Court therefore denies summary judgment to both parties on this issue, but without prejudice to either party filing a pre-trial motion

37

in limine to exclude expert testimony concerning the reasonableness of Olin's defense costs.[18]

In sum, the Court grants Olin summary judgment on its claims relating to the Hamden Site, in the sum of $1,762,595.90, plus prejudgment interest. The parties are hereby ordered to submit to the Court, by no later than November 29, 2016, a written statement of how much that prejudgment interest would be if the Court were to enter judgment on Hamden Site claims as of December 1, 2016. With regard to Olin's claims relating to the Chula Vista Site, the Court grants Olin partial summary judgment holding that it timely notified INA of the State Suit. The parties' motions are otherwise denied and the Court's Order of October 26, 2016 is amended accordingly. A trial on all remaining claims (subject to the determinations made herein) will commence, as scheduled, on November 29, 2016 at 9am.

SO ORDERED.

Dated:     New York, NY
           November 20, 2016           JED S. RAKOFF, U.S.D.J.

---

[18] The Court additionally denies Olin partial summary judgment holding that INA waived its objections to Olin's defense costs. Olin concedes that it never sent INA invoices from Morgan Lewis prior to the 2012, and therefore INA had no opportunity to scrutinize the reasonability of Olin's costs.