UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
OLIN CORPORATION,                      :
                                       :
            Plaintiff,                 :
                                       :
            -v-                        :
                                       :
LAMORAK INSURANCE COMPANY,             :
                                       :
            Defendant.                 :
------------------------------------ x
LAMORAK INSURANCE COMPANY              :
f/k/a OneBeacon America Insurance      :
Company,                               :
                                       :
            Third-Party Plaintiff,     :
                                       :
            -v-                        :
                                       :
CERTAIN UNDERWRITERS AT LLOYD'S,       :
LONDON and LONDON MARKET INSURANCE     :
COMPANIES, et al.,                     :
                                       :
CONTINENTAL CASUALTY COMPANY,          :
                                       :
GENERAL REINSURANCE CORPORATION,       :
                                       :
FIREMAN'S FUND INSURANCE COMPANY,      :
                                       :
MUNICH REINSURANCE AMERICA, INC.,      :
f/k/a AMERICAN-REINSURANCE COMPANY,    :
                                       :
            and                        :
                                       :
GREAT AMERICAN INSURANCE COMPANY       :
                                       :
            Third-Party Defendants.    :
------------------------------------ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:

84-cv-1968 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

        Before the Court are the motions for summary judgment of

plaintiff Olin Corporation ("Olin"), ECF No. 2065, defendant and

third-party plaintiff Lamorak Insurance Company ("Lamorak"), ECF Nos.

2061 & 2062, and third-party defendants Certain Underwriters at Lloyd's London and Certain London Market Insurance Companies (the "London Market Insurers" or "London"), ECF No. 2063, as well as Olin's Daubert motion to exclude the testimony of Lamorak's expert Marc C. Scarcella, ECF No. 2088.

Olin, a manufacturing company, brought this action over three decades ago seeking insurance coverage for environmental contamination at certain of its manufacturing sites throughout the United States. See Olin Corporation's Counterstatement of Material Facts in Opposition to Defendant Lamorak Insurance Company's Motion for Summary Judgment ("Olin Counter to Lamorak's 56.1 Statement") at ¶¶ 1, 3, ECF No. 2109. The overall litigation, having already outlived two federal judges, is now before the lucky undersigned.

After a mere 16 years of litigation, Olin, in 2010, filed the here-operative Third Amended Complaint against Lamorak seeking indemnity for remediation costs and other sums related to five environmental sites – Rochester, Fields Brook, Augusta, Bridgeport Rental & Oil Services ("BROS"), and McIntosh OU2 (the "Five Sites" or "Remand Sites") – under certain excess general liability policies issued. Id. at ¶ 5; see also ECF No. 1403. Specifically, following remand from the Second Circuit, see Olin Corp. v. OneBeacon Am. Ins. Co. ("Olin IV"), 864 F.3d 130 (2d Cir. 2017), the Court is now called upon to calculate Lamorak's liability for these five sites.

2

The Court, after receiving thorough briefing on this issue, held oral argument on February 14, 2018. Thereafter, the Court, by bottom-line order dated February 28, 2018, granted in part Olin's motion to exclude the testimony of Marc C. Scarcella and granted the motion for summary judgment of the London Market Insurers. See ECF No. 2148. With respect to Olin and Lamorak's motions for summary judgment, however, the Court determined that the effect of Olin's prior global settlement with its other insurers on the judgment against Lamorak was that the judgment should be reduced by either (i) the pro rata shares of the settled insurers or (ii) an amount arrived at by first determining what percentage of the policy limits for all the sites released under the settlement was comprised by the policy limits for the five remand sites and then multiplying the total settlement amount by that percentage. See id. Since the latter argument had not been the subject of any briefing, the Court ordered that Olin and Lamorak submit additional briefing, which the Court has now carefully reviewed.

This Opinion and Order both explains the Court's reasons for its February 28, 2018 order and hereby rules that Lamorak is entitled to a set-off of $2,664,486.26 from its $57,729,689.44 liability for the entirety of Olin's costs on the Five Sites, resulting in a judgment against Lamorak of $55,065,203.18. This amount should be held in a third-party escrow account pending the resolution of Lamorak's claims for contribution against London, which are currently

3

pending in New York state court, and then reduced by the amount, if any, London is found liable to Lamorak for contribution. Pre-judgment interest shall be applied to the amount for which Lamorak is liable after application of the setoff accounting for Olin's settlements with prior excess insurers and a reduction for the amount, if any, London owes Lamorak in contribution. Post-judgment interest shall apply after the entry of final judgment on this sum.

## PROCEDURAL HISTORY

A brief review of the relevant procedural history is in order.[1] In fairness to the parties, it should be noted that a primary reason this litigation has gone on for so long is that it ultimately derives from "on-going and progressive" environmental damage to Olin manufacturing sites across the country that, in many cases, "span[] many years." See Olin Corp. v. Insurance Co. of North America ("Olin I"), 221 F.3d 307, 322 (2d Cir. 2000). Because of the volume of claims and locations involved, the first district court to preside over this action (the late Honorable Leonard B. Sand) chose to address coverage on a site-by-site basis. This in turn led to numerous trials before Judge Sand's predecessor on this case (the

---

[1] The Second Circuit's opinion in Olin IV provides a more exhaustive overview of the prior proceedings in this case. See 864 F.3d at 135-142.

4

late Honorable Thomas B. Griesa) as well as numerous trips to the Second Circuit.

The Second Circuit's four decisions in this dispute set forth the general mechanics of Olin's insurance scheme. Olin's insurance policies are "occurrence policies," meaning that they are "triggered by occurrence of the property damage during the policy period." Olin I, 221 F.3d at 321. "[P]roperty damage occurs as long as contamination continues to increase or spread," and includes not only "contamination . . . based on active pollution," but also "the passive migration of contamination into the soil and groundwater." Olin Corp. v. Certain Underwriters at Lloyd's London ("Olin II"), 468 F.3d 120, 131 (2d Cir. 2006). Accordingly, pollution at any individual manufacturing site can trigger coverage under a large number of Olin's policies. Moreover, insurers whose policies contains "Condition C" (discussed below) must indemnify Olin up to the limits of their policies for all property damage that occurred not only during, but also after, the termination of those policies. See Olin Corp. v. American Home Assurance Co. ("Olin III"), 704 F.3d 89, 100 (2d Cir. 2012).

As noted, Olin filed the here operative complaint on June 14, 2010, seeking indemnification for environmental damage at the Five Sites. See ECF No. 1403. The environmental damage at these Five Sites included the discharge of wastewater from plants producing chlorine, caustic soda, and crop chemicals, and mercury contamination of the

groundwater and ecosystem surrounding a plant's intake canal. <u>See</u> <u>Olin IV</u>, 864 F.3d 130 at 136-37.

In April and May of 2015, following a jury trial, Judge Griesa entered two judgments against Lamorak for approximately $87 million (consisting of breach of contract damages plus prejudgment interest), relating to Olin's liability for contamination at the Five Sites (the "Five Sites Judgments"). Olin Counter to Lamorak's 56.1 Statement at ¶ 29.[2] Specifically, on April 6, 2015, the Court entered an Amended Judgment of $81,743,632.18 for the Augusta, Fields Brook, McIntosh OU2, and Rochester sites. <u>See</u> Declaration of Ralph J. Luongo in Support of Lamorak Insurance Company's Motion for Summary Judgment ("Luongo Decl.") Ex. R ¶ 15, ECF No. 2100. On May 28, 2015, following summary judgment and a hearing, the Court entered a Rule 54(b) Judgment in the amount of $5,443,541.45 for the BROS Site. <u>See</u> Luongo Decl. Ex. S at ¶ 10.

In these decisions, the Court, in accordance with numerous prior rulings issued in this case by the Second Circuit, read the

---

[2] The assignment of liability on one of the five sites, the BROS site, was determined at summary judgment, and was 14.29% per year from 1968 to 1974. Olin Counter to Lamorak's 56.1 Statement at ¶ 28. The jury assigned liability for the other four as follows: (1) Rochester – 4.00% per year from 1962 to 1986; (2) Augusta – 3.45% per year from 1965 to 1993 for Augusta's groundwater liability and 2.22% per year from 1965 to 2009 for Augusta's intake canal liability; (3) Fields Brook – variable assignments per year from 1964 to 1978 ranging from as low as 0.29% in 1964 to as high as 9.65% in 1972; (4) McIntosh OU2 – 1.54% per year from 1952 to 2016. <u>Id.</u> at ¶ 27.

provision "Condition C" in Lamorak's policies as requiring Lamorak to pay for damages based on a "pro rata" allocation of liability. See Luongo Decl. Ex. R at ¶ 7, Ex. S at ¶ 5. "Pro rata" allocation, in this case, meant that the total property damage was divided into equal annual shares for each year in which such damage took place. This annual share was then "treated as the total property damage attributable to that occurrence for that year, and the insurer providing coverage for that year [was] then responsible for indemnifying an insured only to the extent of its contractual liability for such deemed property damage." See Olin IV, 864 F.3d at 138.

Condition C provides:

> Prior Insurance. It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Insured prior the inception date hereof, the limit of liability hereon . . . shall be reduced by any amounts due to the Insured on account of such loss under such prior insurance.

> Continuing Coverage. Subject to the foregoing paragraph and to all other terms and conditions of this Policy in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of the Policy, [Lamorak] will continue to protect the Insured for liability in respect of such personal injury or property damage without payment of additional premium.

Olin Counter to Lamorak's 56.1 Statement at ¶ 11. Indeed, at the time the Amended Rule 54(b) Judgment was entered, the Second Circuit had held three times that pro rata allocation was required. Olin I, 221

F.3d at 322-24 (explaining that the appropriate method for "allocating" responsibility for "on-going and progressive injury that spans many years" is to do so "pro rata"); Olin II, 468 F.3d at 131 (reaffirming that pro rata was the proper approach); Olin III, 704 F.3d at 102-03 (finding that the "continuing coverage" provision required an insurer to indemnify Olin up to the limits of its policies for all property damage caused by the pollution that occurred during and after the termination of each policy, while adhering to prior decisions requiring pro rata allocation of damages).

Lamorak and Olin each appealed the Five Sites Judgment. See ECF Nos. 1835 & 1836 (Notices of Appeal). While the appeals were pending, the New York Court of Appeals entered a decision in Viking Pump. See In re Viking Pump, Inc., 52 N.E.3d 1144 (N.Y. 2016). Distinguishing prior New York cases, Viking Pump held that an insurance policy that included language similar to Condition C in Lamorak's policy was subject to an "all sums" allocation of liability rather than "pro rata" allocation. Id. at 1156. The all sums, or joint and several, approach to liability permits the insured to collect its total liability from any policy in effect during the periods that the damage occurred. Id. at 1149.

Accordingly, on July 18, 2017, the Second Circuit vacated the Five Sites Judgment, holding both that the all sums approach governed allocation of loss in this case, in light of In re Viking Pump, Inc.,

8

and that the prior insurance provision of Condition C applied to
insurance policies issued by other insurers (a question that the
court had previously declined to reach, see Olin III, 704 F.3d at 105
n.21). Olin IV, 864 F.3d at 130, 149-50.

As a result, this Court's tasks on remand are to: (i) apply
an all sums allocation that allows Olin to seek indemnification from
Lamorak for the full amount of damage incurred over the relevant
period up to the applicable limits of the Lamorak policies covering
the Five Sites; and (ii) issue a decision in the first instance as to
the effect on the judgment against Lamorak of Olin's prior "global
settlement[s]" with its other insurers, specifically, by determining
the amount of Olin's settlements that are "properly associated" with
the claims arising from the Five Sites and subtracting that amount
from Lamorak's liability. See Olin IV, 864 F.3d at 135 n.1, 150. The
Court of Appeals clarified that this Court should permit discovery
regarding, and then determine, the "amounts paid to settle claims
with respect to the five manufacturing sites at issue." Id. at 150;
see also id. at 151 (the prior insurance provision "allows the
insurer to offset its indemnification obligations by amounts already
paid to cover the loss by another insurer in the same coverage tier"
(emphasis added)).

Following the issuance of the Second Circuit's mandate, Olin
filed a Fourth Amended Complaint, seeking indemnification from
Lamorak on additional sites of damage (the "Additional Sites"), see

9

ECF No. 2001, and Lamorak sought leave to file a third-party party complaint for indemnity and/or equitable contribution (and for declaratory judgment) from the London Market Insurers and other prior insurers of Olin, see ECF No. 1990. The Court permitted Lamorak to file a third-party complaint for indemnity and/or equitable contribution with respect to the Additional Sites, but denied leave to file the complaint with respect to the five Remand Sites. See ECF No. 2024. Subsequently, Lamorak brought a contribution action against the London Market Insurers (and others) in New York State court relating to the Five Sites. See Lamorak Insurance Company f/k/a One Beacon America Insurance Company v. Certain Underwriters at Lloyd's, London and London Market Insurance Companies, et al., Index No. 656466/2017 (N.Y. Sup. Ct.). Based on Lamorak's contribution claims, the London Market Insurers brought claims pursuant to Rule 14(a)(2)(D) against Olin in the instant proceeding. See ECF No. 2011.[3]

## FACTUAL BACKGROUND

Olin's insurance consists of both "primary" and "excess" policies. Its "primary" commercial general liability policy was

---

[3] Olin moved to dismiss the London Market Insurer's claims, see ECF No. 2040, which this Court granted in part, leaving only the London Market Insurers' claim for specific performance of the Judgment Reduction Clause of London and Olin's settlement agreement (Count I), see ECF No. 2123.

provided by the Insurance Company of North America ("INA"). INA's policy covered the first $300,000 of loss attributable to property damage at the manufacturing sites. See Olin Counter to Lamorak's 56.1 Statement at ¶ 6. Each of the Lamorak policies covering the Five Sites under which Olin now seeks indemnification is an "excess," or umbrella, policy that "attaches" at various points, including above the underlying primary INA policy limit of $300,000. See id.

Three of the Lamorak Policies cover the period January 1, 1970 to January 1, 1973. Id. at ¶ 7. The 1970 Lamorak Policy with the lowest attachment point is Policy No. EY-8057-011. It is excess of $300,000 of primary coverage. The occurrence limit of that layer is $1 million. Id. at ¶ 8. At the next layer of coverage, excess of $1.3 million, is Lamorak Policy No. EY-8057-012, with a $4 million occurrence limit. Id. at ¶ 9. At the third layer of coverage, excess of $5.3 million, is Lamorak Policy No. EY-8057-013, with a $15 million occurrence limit. Id. at ¶ 10.

Every one of the 1970 Lamorak Policies is preceded in time by prior insurance at the same level of coverage (the "Prior Excess Policies"). Id. at ¶ 12. The Prior Excess Policies include policies issued by the London Market Insurers, Continental Casualty Company ("Continental") and General Reinsurance Corporation ("GenRe"). Id. at ¶ 13. For example, in the first excess layer (above $300,000), where Lamorak Policy No. EY-8057-011 sits, the London Market Insurers issued prior policies from the 1950s through 1960. Id. at ¶ 14.

11

Similarly, in the second excess layer (above $1.3 million), where Lamorak Policy No. EY-8057-012 sits, the London Market Insurers also issued the prior policies from the 1950s through 1969. Id. at ¶ 15.

Every one of the Lamorak Policies contains the "Condition C" discussed above. Id. at ¶ 11. Some or all of the Prior Excess Policies from March 1, 1961 through January 1, 1970 contain or incorporate Condition C. Id. at ¶ 16; see also Plaintiff Olin Corporation's Corrected Supplemental Brief on the Parties' Cross-Motions for Summary Judgment ("Olin Supp. Mem.") at 13 n.4, ECF No. 2157 ("Olin assumes for purposes of these motions that [Continental and American Reinsurance's] policies contain Condition C"); Lamorak Insurance Company's Opening Brief in Response to the Court's Order dated February 28, 2018 ("Lamorak Supp. Mem.") at 4, ECF No. 2150 (the "settling insurer policies of [London, Continental, and GenRe] incorporate Condition C."). The chart below shows the coverage towers with Condition C policies prior to the 1970 Lamorak policies here at issue, i.e. the policies that cover the years preceding 1970:

**Prior Coverage Towers With Condition C Policies**

| $20MM | | | | |
|---|---|---|---|---|
| | AMERICAN RE (10%) | ELAC (3.33%) | | |
| | POLICY W/O CONDITION C (20%) | GENERAL RE (6.67%) | | |
| | | CONTINENTAL CAS. (3.33%) | | |
| | LLOYDS & LONDON (70%) | | | |
| $15MM | GENERAL RE (20%) | | | |
| | AMERICAN RE (30%) | | | |
| | LLOYDS & LONDON (50%) | LLOYDS & LONDON (81.67%) | LLOYDS & LONDON | |
| $10MM | EMPLOYERS SURPLUS (10%) | | | |
| | CONTINENTAL CAS. (25%) | | | |
| | LLOYDS & LONDON (65%) | | | |
| $5MM | | | | |
| | LLOYDS & LONDON | LLOYDS & LONDON | | |
| $1MM | LLOYDS & LONDON | LLOYDS & LONDON | LLOYDS & LONDON | |
| $300K | | INA | | |
| | 1961  1962  1963 | 1964  1965  1966 | 1967  1968  1969 | |

See Olin Supp. Mem. at 15 (citing Declaration of Stuart N. Roth in Support of Olin Corporation's Supplemental Brief on the Parties' Cross-Motions for Summary Judgment ("Roth Decl.") at Ex. 18, ECF No. 2154).

Lamorak is the only one of Olin's insurers that did not settle its claims with Olin. Therefore, Olin and Lamorak alone tried the issue of coverage for the Five Sites in the year 1970. Olin Counter to Lamorak's 56.1 Statement at ¶ 25. Prior to trial, Olin and Lamorak stipulated as to the amount of Olin's costs at each of the Five Sites, through December 31, 2014. Olin and Lamorak have updated

13

that stipulation through December 31, 2016 for the purposes of these motions. Those amounts are as follows:

| Remand Site | Stipulated Costs Through December 31, 2014 | Stipulated 2015 Costs | Stipulated 2016 Costs | Total Costs Through December 31, 2016 |
|---|---|---|---|---|
| Augusta (groundwater) | $13,754,618.69 | $243,939.63 | $219,160.36 | $14,217,718.68 |
| Augusta (intake canal) | $2,964,074.78 | $0 | $0 | $2,964,074.78 |
| Fields Brook | $5,105,238.27 | $6,230 | $14,062.00 | $5,125,530.27 |
| McIntosh OU2 | $15,656,076.07 | $456,478.50 | $69,836.24 | $16,182,390.81 |
| Rochester | $16,418,746.53 | $670,176.03 | $351,052.34 | $17,439,974.90 |
| BROS | $3,300,000.00 | $0 | $0 | $3,300,000.00 |
| TOTAL | | | | $59,229,689.44 |

See Lamorak Insurance Company's Response to Olin Corporation's Statement of Undisputed Material Facts and Counterstatement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Lamorak Counter to Olin's 56.1 Statement") at ¶¶ 13-15, ECF No. 2112.

Olin's other insurers entered into settlements with Olin prior to the trial on the Five Sites that, subject to the terms and conditions of those settlements, released London (but as to McIntosh OU2 only in part), Continental, and GenRe of liability as to the Five Sites, as well as to hundreds of other sites. Id. at ¶¶ 17-18. In addition to settlements with London, Continental, and GenRe, Olin entered into settlement agreements with American-Reinsurance Company and Century Indemnity Company. See id.

14

In the Continental settlement, Continental agreed to pay Olin
$2 million in exchange for a release from liability under certain
policies for any environmental claim arising out of any of the sites
listed in Appendix A to the Agreement (including the Five Sites) and
for any site that "any Olin Employee (as defined in paragraph 2.7)
knew, or reasonably should have known, was potentially subject to an
Environmental claim." See Luongo Decl. at Ex. D (settlement agreement
between Olin and Continental). The Continental Settlement applies to
indemnification claims relating to more than 185 different sites. See
Lamorak Counter to Olin's 56.1 Statement at ¶ 18(c).

In the GenRe Settlement, GenRe agreed to pay Olin $300,000
and Olin agreed to release GenRe from liability under two policies
for any environmental claim arising out of any of the sites listed in
Appendix A to the Agreement, including the Five Sites. See Luongo
Decl. at Ex. F (settlement agreement between Olin and GenRe). The
settlement with GenRe applies to indemnification claims relating to
more than 106 different sites. See Lamorak Counter to Olin's 56.1
Statement at ¶ 18(d).

In the London Market Insurers' settlement, London agreed to
pay Olin $59 million in exchange for the release of indemnification
claims relating to more than 108 different sites, the Five Sites. See
Luongo Decl. at Ex. C (settlement agreement between Olin and the
London Market Insurers); Lamorak Counter to Olin's 56.1 Statement at
¶ 18(e). The London Market Insurers' settlement agreement also

15

contains a "Judgment Reduction Provision," pursuant to which Olin agreed that if it pursued direct claims against a different insurer, and the other insurer could, as a result, potentially assert a contribution claim against London, Olin would "automatically reduce" any judgment obtained against the other insurer by the amount that London would be liable to contribute to the other insurer, and thereby "satisfy and extinguish" any contribution claim the other insurer could otherwise bring against London. Olin Counter to Lamorak's 56.1 Statement at ¶ 24.[4]

None of Olin's settlement agreements with its other insurers includes an agreed-upon allocation of dollars to the Five Sites. Id. at ¶ 22. The Continental settlement provides that "[t]he Parties agree that each may allocate the Settlement Payment to and among the Policies as each sees fit. . . . Olin intends to allocate the Settlement Payment as follows: US$1,999,990.00 to Morgan Hill Environmental Claims and US$10.00 to Other Known Sites Environmental Claims." Lamorak Counter to Olin's 56.1 Statement at ¶ 19(c).[5] The settlement with General Reinsurance does not contain any language about allocating settlement funds. Id. at ¶ 19(d). Lastly, the London settlement agreement provides

---

[4] Olin settled with American Re-Insurance Company for $1.5 million in exchange for the release of claims relating to more than 185 different sites and with Century Indemnity for $20 million for the release of claims relating to more than 166 different sites. See Lamorak Counter to Olin's 56.1 Statement at ¶¶ 17(a)-(b), 18(a)-(b).

[5] Morgan Hill is a different manufacturing site operated by Olin.

16

that each company "may allocate the Settlement Amount to and among the Subject Insurance Policies as each sees fit." Id. at ¶ 19(e).[6]

In addition, Olin's witnesses stated that settlement payments went into Olin's general corporate account, rather than site-specific accounts. Id. at ¶ 22-24; see, e.g., id. at ¶ 22(b) ("[T]o say that we received $10 million through a settlement and that $10 million was specifically allocated to these particular payments, it is impossible to isolate that type of cash payment." (quoting deposition of Michael Mann)); id. at ¶ 23(b) (Olin did not "apply or set aside any of the London Settlement monies to any particular cost associated with any of Olin's environmental claims." (quoting deposition of George Pain)); id. at ¶ 24(a) ("[A]ny settlement monies that came into Olin . . . went into the general treasury." (quoting deposition of Stuart N. Roth)); see also Luongo Decl. Ex. I (deposition of Michael Mann) at 64:4-11 ("I cannot connect the dots between a recovery and past costs incurred."). Instead, the settlement funds were used to fund Olin's "primary operations, whether it is debt payments, capital

---

[6] Olin's settlement agreement with American Re-insurance Company provides that "[t]he parties agree that each may allocate the Settlement Payment to and among the Policies as each sees fit. . . . Olin intends to allocate the Settlement payment as follows: US$1,499,990.00 to Morgan Hill Environmental Claims and US$1.00 to Other Environmental Claims." Lamorak Insurance Company's Response to Olin's Additional Material Facts in Support of its Opposition to Lamorak's Motion for Summary Judgment at ¶ 34(a), ECF No. 2132. Olin's settlement with Century Indemnity provides that each company "may allocate the Settlement Amount to and among the Policies as each see fit." Id. ¶ 34(b).

expenditure or other short-term cash needs." Lamorak Counter to Olin's 56.1 Statement at ¶ 22(a). Therefore, "there is no basis" from which to determine that when Olin "received money" in a settlement, it "specifically allocate[d] that money for a defined reason." Id. at ¶ 22(f).

Similarly, there is no evidence in the record that Continental Casualty Company, General Reinsurance Corporation, American Re-Insurance, or Century Indemnity Company internally contemplated any apportionment of their settlement payments specifically to the Five Sites. See Memorandum of Law in Support of Olin Corporation's Motion for Summary Judgment on the Amount of the Recalculated Judgments on the Five Remand Sites ("Olin Mem.") at 15, ECF No. 2091; Memorandum of Law in Support of Lamorak Insurance Company's Motion for Summary Judgment ("Lamorak Mem.") at 7, ECF No. 2095 ("Discovery revealed that internally the various parties to these three settlement agreements either did not subjectively allocate dollars to any policies or sties at all, or unilaterally allocated some dollars to only some sites.").

As for the London Market Insurers, Daniel David DeBond stated in his declaration that London allocated only $1,820.31 to the Rochester site, and did not allocate any subset of the funds to the Augusta, BROS, Fields Brook, or McIntosh OU2 sites.[7] Lamorak Counter to Olin's

_____

[7] DeBond reported that the London Market Insurers had allocated $8,173,429.32 of its settlement to the McIntosh OU1 site, of which

18

56.1 Statement at ¶ 26(d)-(h). Lamorak's proffered expert, Marc C. Scarcella, conceded that the allocation of a mere $1,820.31 of the overall gross settlement of $59 million would not result in a policy limit reduction since the Lamorak policy sits in excess of $300,000. Id. at ¶ 32(g).

## DISCUSSION

Olin, Lamorak, and the London Market Insurers now all move for summary judgment. Olin and Lamorak dispute how to account for Olin's settlements with its prior insurers in recalculating the judgment. The London Market Insurers seek specific enforcement of the Judgment Reduction Provision in their settlement with Olin.

Summary judgment is only appropriate under Federal Rule of Civil Procedure 56(c) "if the pleadings, depositions, answers to interrogatories on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (internal quotation omitted). "A genuine dispute exists 'where the evidence is such that a reasonable jury could decide in the nonmovant's favor.'" Walsh v. New York City Housing Auth., 828 F.3d 70, 74 (2d Cir. 2016) (quoting

---

$6,918,431.33 was allocated for indemnity, rather than interest, but explicitly cautioned that they "did not allocate any amount for the McIntosh OU2 portion of the McIntosh site." Lamorak Counter to Olin's 56.1 Statement at ¶ 28(d).

Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014)). The
moving party has the burden of demonstrating the absence of any
genuine disputes of material fact. Adickes v. S.H. Kress & Co., 398
U.S. 144, 157 (1970). In determining whether summary judgment is
appropriate, the court must resolve all ambiguities and draw all
reasonable inferences against the movant. Matsushita Elec. Indus. Co.
v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); see also Walsh, 828
F.3d at 74 (same).

**I.    Olin and Lamorak's Motions for Summary Judgment**

Olin moves for the entry of a revised judgment holding Lamorak
liable for the entirety of Olin's costs on the Five Sites, accounting
for the attachment points of Lamorak's policies, which amounts to
$57,729,689.44 (excluding prejudgment and post judgment interest).
See Olin Mem. at 6. Olin argues that Lamorak is not entitled to any
setoff of its judgment on account of other insurers' settlements
because it has failed to meet its burden to prove how much of those
settlements is properly attributable to the Five Sites.
Alternatively, as between a pro rata set-off and the Court's
proposal, which approximates how much of the settlement agreements is
properly attributed to the Five Sites, Olin argues that only the
latter would be appropriate.

Lamorak, on the other hand, argues that its judgment should be
reduced by the limits of the insurance policies issued by the settled
insurers or the pro rata shares of the damages amount of Lamorak's

20

settled co-insurers who are jointly and severally liable for the Five Sites Judgments. See Lamorak Mem. at 9-23. Lamorak also seeks enforcement of the Judgment Reduction Provision in the London settlement agreement. See Lamorak Mem. at 23-24.

## A.   Accounting for the Prior Excess Insurers' Settlements

Critical to the issue of how much Lamorak's liability should be reduced to account for Olin's settlements with its prior excess insurers is the Prior Insurance Provision, which states:

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Insured prior to the inception date hereof, the limit of liability hereon . . . shall be reduced by any amounts due to the Insured on account of such loss under such prior insurance.

Olin Counter to Lamorak's 56.1 Statement at ¶ 11.

The provision reduces the occurrence limits of each policy containing Condition C by the amounts due to Olin on account of such loss covered in whole or in part by prior insurance in the same excess layer. See Olin III, 704 F.3d at 104 (describing the application as "sweeping a continuing loss into the earliest triggered policy, with that policy then fully indemnifying the insured for that loss"). That is, when an insurer has issued multiple policies in a single layer of coverage and more than one of these policies is triggered by the same, continuing loss, the insurer is only liable for the policy limit of the earliest triggered policy. Per Olin IV, the provision also applies where, as here, the prior policy was underwritten by a different

21

insurer. Olin IV, 864 F.3d at 147–48. "The prior insurance provision works in conjunction with the overarching approach dictated by Condition C to prevent the insured from stacking policies once it has already obtained indemnification for that specific loss from another policy in the relevant coverage layer." Id. at 150 (emphasis in original) (citing Viking Pump, 52 N.E.3d at 1149).

Lamorak first contends that the Court should find that settlements with the London Market Insurers, Continental, and GenRe, for the purposes of the Prior Insurance Provision, constitute a payment of the total amounts due under those settling insurers' policies, i.e. the full limits of each settled policy for each released environmental site, including the Five Sites at issue.[8] Lamorak argues that "[s]uch a ruling prevents the stacking of Lamorak policy limits with prior settled coverage in the same layer, . . . prevents a double recovery by Olin, and is in accord with longstanding Second Circuit precedent." Lamorak Mem. at 13.

This reading is, however, foreclosed by Olin IV, which squarely rejected it. Lamorak argued on that appeal that its judgment should be reduced by the limits of the settled insurers' policies. For example, Lamorak argued that "[t]he Prior Insurance Provision is concerned with covered losses due under prior policies. Covered losses are covered

---

[8] Per the Scarcella Declaration, the result of those calculations is that Lamorak owes $3.8 million. Scarcella Decl., Figure 1.

losses, and the amounts due for such losses are fixed by contract terms at the time of underwriting, irrespective of if and when an insured decides to settle by taking less than it is due under the contract." See Declaration of Craig C. Martin in Support of Olin Corporation's Opposition to Defendant Lamorak Insurance Company's Motion for Summary Judgment ("Martin Decl.") Ex. 12 at 63-65, ECF No. 2110 (Lamorak's Final Brief for Defendant-Appellant-Cross-Appellee OneBeacon American Insurance Company). Confronted with this argument, the Second Circuit held that Lamorak's liability should be reduced by amounts actually paid pursuant to the policies, not by the limits of the policies of the settled insurers.[9]

---

[9] Contrary to Lamorak, see, e.g., Lamorak Mem. at 13-14, this holding is not inconsistent with Zeig v. Mass. Bonding & Ins. Co., 23 F.2d 665 (2d Cir. 1928) and E.R. Squibb & Sons, Inc. v. Lloyd's & Cos., 241 F.3d 154 (2d Cir. 2001), which held that where a policyholder settles with its primary insurer, the liability of the non-settling excess insurers should be determined based on an assumption that the pro rata liability or full policy limits of the settled insurer was fully satisfied by the settlement. Both cases are distinguishable since they involved pro rata liability regimes, addressed the relevance of settlements by primary insurers to the liability of excess insurers, and concerned different policy language. For example, in Zeig, the Court of Appeals explained that "[t]o require an absolute collection of the primary insurance to its full limit would in many, if not most, cases involve delay, promote litigation, and prevent an adjustment of disputes which is both convenient and compendable." Id. at 666. The same concern is not so acute here, where both the settled and non-settled insurers are excess insurers, since an insured can seek recovery from any excess insurer regardless of whether it has received payment from the other excess insurers. Indeed, as discussed below, courts have concluded that a pro tanto regime better encourages settlement than a pro rata regime.

Lamorak's argument the Court should set off its liability by the pro rata shares of the settled insurers is also contrary to Olin IV.[10] A pro rata credit is one that is determined by reference to what the settled policies would have paid had there been no settlement. By contrast, the Second Circuit directed this Court to apply what is known as a pro tanto setoff, which permits non-settling insurers to receive,

---

[10] Lamorak suggests at points that applying a pro rata offset would be consistent with Olin IV because such an offset is equitable, whereas Olin IV was limited to interpreting Condition C. However, "'[i]n determining a dispute over insurance coverage, [courts] first look to the language of the policy.'" Viking Pump, 52 N.E.3d at 1151 (quoting Roman Catholic Diocese of Brooklyn v. National Union Fire Ins. Co. of Pittsburgh, Pa., 21 N.Y.3d 139, 148 (2013). There is no need for the Court to apply equitable principles in determining the appropriate setoff for Olin's prior settlements since the Lamorak's insurance policies, which were entered into by sophisticated parties, address that question. Moreover, it is not obvious that the pro rata set-off is the equitable approach. The majority of courts have adopted the pro tanto approach, which applies a credit in the amount that the policyholder actually obtained from the settled insurers for the claim that is in litigation. The jurisdictions that have chosen to apply a pro tanto setoff include Washington, Ohio, Delaware, and Massachusetts. See Weyerhaeuser Co. v. Commercial Union Ins. Co., 15 P.3d 115 (Wash. 2000); Stonewall Insurance Co. v. E.I. du Pont De Nemours & Co., 996 A.2d 1254, 1260 (Del. 2010); Liberty Mutual Ins. Co. v. Black & Decker Corp., 383 F. Supp. 2d 200, 216-17 (D. Mass. 2004); Goodrich Corp. v. Commercial Union Ins. Co., Nos. 23585 & 23586, 2008 WL 2581579, at *7-9 (Ohio Ct. App. June 30, 2008); Massachusetts Elec. Co. v. Commercial Union Ins. Co., No. 99-00467B, 2005 WL 3489874, at *2 (Mass. Super. Ct. Oct. 25, 2005). The most notable pro rata jurisdiction is the Third Circuit, which, in Koppers Co. v. Aetna Cas. & Sur. Co., predicted that the Pennsylvania Supreme Court would give non-settling insurers credits based upon the settled insurers' "apportioned shares." 98 F.3d 1440, 1453 (3d Cir. 1996); see also Nat'l Union Fire Ins. Co. of Pittsburgh v. Essex Ins. Co., No. 13-32, 2013 WL 6328792, at *9 (W.D. Pa. Dec. 5, 2013); Air & Liquid Sys. Corp. v. Allianz Underwriters Ins. Co., No. 11-247, 2013 WL 5436934, at *57-58 (W.D. Pa. Sept. 27, 2013); Westinghouse Elec. Corp. v. Amer. Home Assurance Co., Nos. A-6706-01T5 & A-6720-01T5, 2004 WL 1878764, at *9-13 (N.J. Super. Ct. App. Div. July 8, 2004).

24

at most, a credit in the amount that the policyholder actually obtained from the settled insurers for the pertinent claims. See Olin IV at 150 (Lamorak's "limits of liability should be reduced by amounts paid to settle claims with respect to the five manufacturing sites at issue"); id. at 149 ("[T]he all sums allocation method . . . requires reducing the limits of liability on the [Lamorak] policy at issue by amounts paid under any prior insurance policy at the same level of coverage that did, in fact, provide coverage for another loss"); id. at 151 (the Prior Insurance Provision of Condition C "allows the insurer to offset its indemnification obligations by amounts already paid to cover the loss by another insurer in the same coverage tier").

The Second Circuit explained that reducing Lamorak's liability by amounts already paid by other insurers served two goals: first, precluding Olin from "recover[ing] multiple times for a single loss by pursuing multiple insurers within the same layer of coverage." Olin IV, 864 F.3d at 149-50 (citing Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co., 996 A.2d 1254, 1260 (Del. 2010), which applied a pro tanto set off); and second, implementing the "'joint and several' principle animating the all sums approach." Id. at 150. The Court does not deny that the pro rata approach has its own virtues.[11] It just is not the one to which the parties agreed.

---

[11] The upside of a pro rata approach is that it ensures that the insured does not double recover while avoiding the possibility that an insured might settle for a small amount with a preferred insurer, knowing that the other insurer(s) will be required to pay the

Furthermore, under Olin IV, it is Lamorak's burden to prove its

entitlement under Condition C, i.e. to prove how much the settled

insurers actually paid to resolve Olin's claims arising out of the Five

Sites. See 864 F.3d at 151 (citing Facet Indus., Inc. v. Wright, 465

N.E.2d 1252, 1254 (N.Y. 1984) (explaining that the burden of proving

that a loss falls within a contractual exclusion is on the insurer)).

Lamorak failed to meet its burden of proving its entitlement in its

moving papers. Indeed, Lamorak did not even try to argue in its motion

for summary judgment that any amount of the settlement agreements could

be properly allocated to the Five Sites.

Nevertheless, in its February 28, 2018 order, the Court, seeking

to carry out the thrust of Olin IV in a factual setting that does not

---

remaining amount. However, the pro rata approach is somewhat at odds
with an all sums regime, since it may result in the insured's
recovering less than it bargained for. By contrast, the upsides of a
pro tanto regime are that it aims to fully compensate an insured
while avoiding double recovery. But the pro tanto approach also has
downsides, including one that is stark here: it can be extremely
difficult to determine the amount of a given settlement that can be
allocated to the claim for which the non-settling insurers have been
found liable. Courts have placed the burden of proving the amount
that the insured recovered on the particular claim on the non-
settling insurer, sometimes with the result that the non-settling
insurer is not entitled to any set-off at all. See, e.g., Goodrich
Corp, 2008 WL 2581579. In addition, although many courts appear to
agree that pro tanto setoffs better encourage settlement than pro
rata setoffs, at least one law review article has found reason to
doubt the proposition, at least in certain circumstances. See Lewis
A. Kornhauser & Richard L. Revesz, Settlements Under Joint and
Several Liability, 68 N.Y.U. L. Rev. 427, 469 (1993) (concluding that
"the pro tanto set-off rule has better settlement-inducing properties
than the apportioned share set-off rule for low litigation costs and
worse settlement-inducing properties for high litigation costs in
cases in which the plaintiff has, sufficient bargaining power.")

easily lend itself to that approach, in effect offered Lamorak another
opportunity, suggesting an approach for determining that amount
notwithstanding evidence that the parties to the settlement agreement
did not allocate the settlement amounts to specific sites: determine
what percentage of the policy limits for all the sites released under
the settlement is comprised by the policy limits for the Remand Sites
and then multiply the total settlement amount by that percentage. This
approach estimates how much the parties subjectively allocated to the
Five Sites.

In its supplemental brief, Lamorak proposes two ways to
apportion the settlement proceeds consistent with the Court's
February 28, 2018 order: (i) compare the total limits applicable to
the Five Sites based on the trigger periods set forth in the Amended
54(b) judgments to the total limits released in the settlements
(excluding policies that contain pollution exclusions) or (ii)
compare the limits of all settled excess policies to the sum of the
limits of policies applicable to the Five Sites (both settled and
nonsettled). See Lamorak Supp. Mem. at 15.

Lamorak's first proposal is problematic because Lamorak does not
actually calculate how much the setoff would be under that approach
(although it does purport to identify all the policies that contain
pollution exclusions, see Lamorak Supp. Mem. at 16 n.9). Olin, for
its part, contends that Lamorak's first proposal is the same as the
second proposal that Olin calculated, but Lamorak disputes that

27

contention. See Lamorak Reply at 9 n.15 ("Olin's method departs from
[the Court's directive] by multiplying the fraction's denominator by
the total number of sites, drastically reducing the setoff value.").
The Court also rejects Lamorak's second proposal, since it is
effectively a proposal for a pro rata setoff. Indeed, Lamorak itself
highlights that the approach is "similar to the mechanism adopted by
the United States District Court for the Western District of
Pennsylvania on remand from the Third Circuit's decision in Koppers,"
which directed the district court to apply a pro rata setoff. Lamorak
Supp. Mem. at 15 (citing Koppers Co. by Beazer East v. Certain
Underwriters at Lloyd's, No. 85-2136, 1997 U.S. Dist. LEXIS 16123
(June 23, 1997)).

Olin suggests three ways to apportion shares of the settlement
proceeds using policy limits. See Olin Supp. Mem. at 4. First, a
ratio of settled policy limits at the Five Sites compared to the
settle policy limits at all settled sites (which comes out to
$2,664,486,26). This approach recognizes that the "triggered periods"
of damage at the Five Sites set forth in the 2015 judgments were not
known at the time of the settlements. See Plaintiff Olin
Corporation's Response to Lamorak Insurance Company's Opening Brief
in Response to the Court's Order dated February 28, 2018 ("Olin Opp.
to Lamorak Supp. Mem.") at 10 n.4, ECF No. 2159. Second, an adjusted
policy-limits ratio that accounts for facts found relevant to
determining what policies were triggered at released sites (which

28

comes out to $1,504,507.49). See Olin Supp. Mem. at 6 ("[F]or a small number of sites (including the Five Sites on remand) that have been litigated in this action, it is known when damage occurred."). Third, a ratio based on Olin's costs incurred at the Five Sites at the time of each settlement compared to Olin's costs incurred at the time of settlement at all released sites (which comes out to $4,768,619.00).

Lamorak objects to all of Olin's proposals – and the Court's proposed approach writ large – on the ground that it might lead to gaming and manipulation of the number of sites and the particular policy limits that are included in similar global settlement agreements. See Lamorak Insurance Company's Opposition Brief in Response to the Court's Order dated February 28, 2018 ("Lamorak Opp. to Olin Supp. Mem.") at 20-21, ECF No. 2160. The Court agrees that an opportunity for manipulation may exist, but the risk of such opportunity for manipulation is mitigated by the fact that the non-settling insurer has an opportunity to prove that the settlement agreement included policies and/or sites that could not result in liability for the non-settling insurer.

Here, Lamorak has not met its burden of demonstrating that the settlement agreement includes certain sites and policies that did not accrue liability. As noted above, Lamorak has not actually calculated the numerical impact of the fact that some policies released under the settlement agreements contain exclusions for pollution damage. Lamorak also objects that Olin's calculations give weight to policy

29

limits that were included in the settlement agreements but have no potential liability for released environmental claims for other reasons. For example, the London Market Insurers "likely" faced no exposure for 43 sites released in its settlement with Olin because the costs incurred by Olin as of 2009 did not exceed the $300,000 attachment point of the London policies. See Lamorak Opp. to Olin Supp. Mem. at 16; see also Lamorak Supp. Mem. at 16 n.9 (listing sites that had limited costs). But these releases were not without value just because the costs incurred at the time of settlement had not yet reached the attachment point of the released policies. Olin released present and future costs at those sites, which is significant given the nature of long-tail environmental liabilities, which continue to accrue over extended periods of time. See Olin Opp. to Lamorak Supp. Mem. at 11; see also Luongo Decl. Ex. I (deposition of Michael Mann) at 43:1-7 (there is active remediation at some of the Five Sites that is currently incurring costs). Therefore, those policies had potential liability and a portion of the settlement amount is properly allocated to them under the Court's approach to estimating how much of the settlement payments can be properly associated with the Five Sites.[12]

---

[12] The Court's proposed approach for determining how much should be set off from Lamorak's liability on account of Olin's settlements with prior insurers is a reasonable estimate. The uncertainty inherent in this approximation sometimes accrues to Lamorak. For example, Olin's proposals for effectuating the Court's approach "fail to account for the fact that in certain of the settlements Olin

30

Similarly, Lamorak argues that the settlements release sites even if the insurer had no potential liability for such sites. For example, Lamorak contends, the London Market Insurers' settlement with Olin released London for liability for costs stemming from the Aberdeen sites, but Olin and London recognized at the time of settlement that following an April 2002 trial on the Aberdeen sites, which were released under the settlement, the verdict was "London owes $0." See Supplemental Declaration of Susannah S. Geltman in Further Support of Lamorak Insurance Company's Motion for Summary Judgment and in Support of its Opening Brief in Response to the Court's Order dated February 28, 2018 at Ex. C, ECF No. 2151 (December 12, 2012 settlement meeting presentation). However, although Aberdeen may not have had damage sufficient to reach the London policies as of the trial in 2002, the settlement resolved future costs at that site that could have triggered London's policies had Olin not provided a release.

Therefore, the Court finds that Olin's general approach to calculating how much of the settlement payments can be properly allocated to the Five Sites is reasonable. As between Olin's three proposed methods of calculation, the Court finds that Olin's first

---

released claims relating to any other site not called out by name that was subject to known or reasonably known claims." See Lamorak Insurance Company's Opposition Brief in Response to the Court's Order dated February 28, 2018 ("Lamorak Opp. to Olin Supp. Mem.") at 20 n.10, ECF No. 2160; see also Olin Supp. Mem. at 5 n.2.

proposal is the best method for approximating how much the settled insurers paid in exchange for releases from any potential indemnification claims relating to the Five Sites.

The second approach is inappropriate because it takes into account information that was not known to Olin or the settling insurers at the time of their settlement, namely the actual periods of damage on the Five Sites, and therefore could not have factored into the settling insurers' decision about how much to pay to settle claims relating to the Five Sites. And Olin's third approach, although intriguing, is not consistent with the Court's order.[13] This approach "compares the past costs that Olin had tracked as incurred at the five sites, as of the time of each settlement (or as near to the time of each settlement that the record reflects, with the total costs that Olin had tracked as incurred as of that same time at all the sites released by the settlement." See Declaration of Stuart N. Roth in Support of Olin Corporation's Supplemental Brief on the Parties' Cross-Motions for Summary Judgment ("Roth Decl.") at Ex. 19,

---

[13] Olin's expert, Professor Kenneth Abraham, explained that there are two advantages to focusing on past costs rather than policy limits. First, in negotiating settlements, parties tend to "focus on past costs when a large number of sites are at issue and hundreds of millions of dollars of cleanup costs have already been incurred. Roth Decl. at 10-12. Second, focusing on past costs follows insurers' and policyholders' tendency "to give equal weight to the probability of the policyholder's succeeding on each coverage claim." Id. at 13-15; see id. (explaining that parties generally do not closely evaluate the likelihood of success of each claim because doing so would be cost-prohibitive).

2-4, ECF No. 2154. And even if the approach were consistent with the Court's order, summary judgment would not be warranted on the calculation. Abraham's opinion is based only on his personal experience as a consulting counsel and an expert witness and not on any study of the insurance industry customs and practices. See Declaration of Bryce L. Friedman in Support of Lamorak Insurance Company's Opposition Brief in Response to the Court's Order dated February 28, 2018 at Ex. B at 69:13-23, ECF No. 2162.

The first approach, which the Court adopts, involves six steps:

(1) Compute the total per-occurrence policy limits for each insurer's released policies issued prior to and that are at the same layer of coverage as Lamorak's 1970 policies;

(2) Multiply that total by five (since those limits were available for each of the Five Sites);

(3) Multiply the total from step one by the minimum number of sites released in that prior insurer's settlement with Olin (since those limits were available for each settled site);

(4) Divide the product from step two by the product from step three to yield the percentage of policy limits for all sites released comprised by the policy limits for the Five Sites;

(5) Multiply the result from step four by the amount of the settlement to determine, for each settled insurer, the share of the settlement that can be apportioned to the Five Sites; and

(6) Sum the result from step 5 for each prior insurer that settled, to obtain the total amount of settlement proceeds apportioned to the Five Sites.

33

Olin Supp. Mem. at 5 (citing Roth Decl. at ¶¶ 9-10, 13-14, 16-17, 19-20). The result of those calculations are as follows:

| Settled Insurer [14] | All released sites total policy limits | Five Sites total policy limits | Total settlement amount | Settlement apportioned to Five Sites |
|---|---|---|---|---|
| London (108 sites) | $8,910,000,000.00 | $412,500,000.00 | $55,201,431.00 | $2,555,826.26 |
| AmRe (185 sites) | $370,000,000.00 | $10,000,000.00 | $1,500,000.00 | $40,500.00 |
| CCC (185 sites) | $462,500,000.00 | $12,500,000.00 | $2,000,000.00 | $54,000.00 |
| GenRe (106 sites) | $212,000,000.00 | $10,000,000.00 | $300,000.00 | $14,160.00 |
| **TOTAL** | | | | $2,664,486.26 |

Olin Supp. Mem. at 5.

Lamorak's objections to this particular calculation are without merit. Lamorak first argues that the resulting ratio "has nothing to do with" the limits of the policies because it results in a ratio comparing the number of remand sites (5) to the total number of sites released in settlement (108). Lamorak Opp. to Supp. Mem. at 19. Lamorak does not, however, explain why this ratio has nothing to do with the limits of the insurers' policies. If each of the insurers' policies covered all of the sites released in the settlement, such that each policy could potentially accrue liability up to its limit for each site - which Lamorak does not seem to contest - then the

---

[14] Lamorak does not dispute that these are the relevant settlements.

"percentage of the policy limits for all the sites released under the settlement comprised by the policy limits for the five remand sites" is just 5/108. Lamorak further objects to the result that "the judgment reduction decreases when the number of sites released increases," id., but that is precisely the point of the approximation: the more sites were released under the settlement agreement, the less of that settlement agreement can be properly allocated to the Five Sites.

Therefore, Lamorak is entitled to a setoff in the amount of $2,664,486.26.

## B. The Judgment Reduction Provision

Lamorak also moves for enforcement of the Judgment Reduction Provision in Olin's settlement agreement with London but this argument hardly merits discussion. See Lamorak Mem. at 23-25. Lamorak does not have standing to enforce that provision. In New York, only the parties to a contract can enforce that contract, unless a non-party is intended to be a third-party beneficiary. Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y., 734 F. Supp. 2d 368, 376 (S.D.N.Y. 2010). To qualify as a third-party beneficiary, here, Lamorak must show that: (1) there is a valid contract between Olin and the London Market Insurers; (2) the contract was intended for Lamorak's benefit; and (3) the benefit of the contract is so immediate that it a creates a duty to compensate Lamorak if the benefit is lost. E.g., Burns Jackson Miller Summit & Spitzer v.

Lindner, 451 N.E.2d 459, 469 (N.Y. 1983). Lamorak has cited nothing to suggest that the Judgment Reduction Clause, or any other portion of that agreement, was intended to benefit it. To the contrary, the settlement agreement expressly disclaims that any other person or entity has a legally enforceable right under the Agreement. See Olin Counter 56.1 Statement at ¶ 21 (citing Luongo Decl. Ex. C).

## C. Pre- and Post-Judgment Interest

Lastly, the parties dispute how the Court should calculate pre- and post-judgment interest on the judgment entered against Lamorak.

First, Lamorak contends that pre-judgment interest should be calculated based on its post-setoff liability, whereas Olin contends that pre-judgment interest should be calculated on the pre-setoff amount. The Court finds that pre-judgment interest is properly calculated on the damages amount that Lamorak is ordered to pay after application of a set-off or judgment reduction. "[I]nterest is not a penalty. Rather, it is simply the cost of having the use of another person's money for a specified period . . . and is not meant to punish defendants for delaying the final resolution of the litigation." Love v. State, 583 N.E.2d 1296, 1298 (N.Y. 1991). Therefore, calculation of interest should be based on the net amount that Lamorak is actually liable to Olin. See also In re N.Y.C. Asbestos Litig., 188 A.D.2d 214, 225 (N.Y. App. Div. 1993) ("[C]alculation of interest . . . [is] based upon the net verdict" (as reduced for settlements pursuant to General Obligations Law § 15-

36

10)). The net verdict is Olin's total costs minus the set-off just calculated and minus the reduction for the amount, if any, London is found liable to Lamorak in contribution for costs relating to the Five Sites.

Next, the parties disagree as to when post-judgment interest should apply. Lamorak argues that it should apply after April 1 and May 28, 2015, when the final judgments were entered, whereas Olin argues that it should not apply until entry of the instant judgment. Post-judgment interest is governed by federal statute. Schipani v. McLeod, 541 F.3d 158, 165 (2d Cir. 2008); see 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."). "Post-judgment interest is designed to compensate the plaintiff for the delay it suffers from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment." Andrulonis v. United States, 26 F.3d 1224, 1230 (2d Cir. 1994) (citing Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835-36 (1990)). "[T]he judgment contemplated by section 1961 is one that is ascertained in a meaningful way and supported by the evidence." Id. at 1233 (internal quotation marks and alterations omitted). The Second Circuit has held that "where the first judgment is vacated because it lacks a legal basis or requires further factual development, the vacated award shall be treated as a nullity and post-judgment interest therefore accrues from the entry of judgment on remand." Lewis v. Whelan, 99 F.3d 542, 545-46 (2d Cir.

37

1996) (collecting cases from other courts of appeal). Here, the first
judgment was vacated both because it was based on a now-invalid legal
theory and because it required further factual development.
Accordingly, post-judgment interest shall be applied only following
the entry of this judgment (and pre-judgment interest shall be
applied until the entry of this judgment).

## II. The London Market Insurers' Motion for Summary Judgment

The London Market Insurers move for summary judgment on their
remaining Rule 14(A)(2)(d) claim, Count I, which seeks specific
performance of the Judgment Reduction Clause in London's settlement
agreement with Olin (the "Settlement Agreement"). See Third Party
Defendants Certain Underwriters at Lloyd's London and Certain London
Market Insurance Companies' Memorandum in Support of their Motion for
Partial Summary Judgment on Counts I and II of Their Rule 14(A)(2)(d)
Claims ("London Mem."), ECF No. 2117. This provision provides, in
relevant part:

> Olin agrees that in any proceeding, suit or action
> involving Olin and any Other Insurer relating to
> Claims that are the subject of a release set forth
> in Section IV, Paragraph A, above, or are the
> subject of the agreements set forth in Section VII
> below, where any Other Insurer has asserted,
> asserts, or could assert any Contribution Claim
> against London Market Insurers, any judgment
> obtained by Olin, or its agents against any such
> Other Insurer shall be automatically reduced by
> the amount, if any, that London Market Insurers
> would have been liable to pay such Other Insurer
> as a result of that Contribution Claim, so that
> the Contribution Claim by such Other Insurer

38

> against London Market Insurers is thereby
> satisfied and extinguished.

Olin Corporation's Counterstatement of Material Facts in Opposition
to Certain Underwriters Lloyd's, London, and Certain London Market
Insurance Companies' Motion for Partial Summary Judgment ("Olin
Counter to London's 56.1 Statement") at ¶ 19, ECF No. 2125. To
effectuate the Judgment Reduction Clause, Olin agreed that, in the
event it pursued a claim against a different insurer and that other
insurer asserted (or could assert) a contribution claim against
London, Olin would "either: (1) obtain a finding from the court of
the amount, if any, London Market Insurers would be required to pay
such Other Insurer under its Contribution Claim; or, (ii) deposit
with a third-party escrow agent any amounts paid by such Other
Insurer to Olin until any Contribution Claims by those Other Insurers
are finally resolved." Id. at ¶ 20.

Olin argues that London is not entitled to summary judgment on
its claim for specific performance for three reasons: (1) London is
not entitled to the equitable remedy of specific performance because
it has failed to establish prior breach by Olin or the unavailability
of legal relief; (ii) London itself committed a prior breach of the
Settlement Agreement; and (iii) the Judgment Reduction Clause does
not apply to Lamorak's contribution claims.

**A. Whether London Is Entitled to the Equitable Remedy of Specific Performance**

Under New York law, "to obtain the remedy of specific
performance, the complaint must show: (1) the making of the contract
and its terms, including a description of the subject matter; (2)
that the plaintiff is ready, willing, and able to perform the
contract and has fulfilled all of the plaintiff's duties to date; (3)
that it is within defendant's power to perform; and (4) that there is
no adequate remedy at law . . . ." Lezell v. Forde, 26 Misc.3d 435,
441 (N.Y. Sup. Ct. 2009) (emphasis omitted). "Whether or not to award
specific performance is a decision that rests in the sound discretion
of the trial court." Van Wagner Adver. Corp. v. S & M Enterps., 67
N.Y.2d 186, 191-92 (1986).

As an initial matter, the Court finds that ordering specific
performance is necessary to prevent Olin's breach of the Settlement
Agreement. Olin alleges any breach is merely hypothetical and
therefore not actionable, but the case Olin relies on for that point
only underscores that Olin's breach is sufficiently immediate that
specific performance is appropriate. In Organic Seed Growers & Trade
Ass'n v. Monsanto Co., the court found that specific performance was
not appropriate because the defendant's potential infringement was
not a "matter of immediate concern" and that plaintiff's concern was
an "intangible worry, unanchored in time." 851 F. Supp. 2d 544, 555
(S.D.N.Y. 2012), aff'd, 718 F.3d 1350 (Fed Cir. 2013). By contrast,
Olin challenges the applicability of the Judgment Reduction provision
to the judgment the Court now enters.

London is eligible to obtain both an order requiring Olin to place any recovery it obtains from Lamorak into a third-party escrow account pending resolution on the merits of Lamorak's claims for equitable contribution from London, see Olin Opp. at 13, and an order stipulating that Lamorak's judgment will be reduced by any amounts for which London is find liable to Lamorak in contribution. See Third Party Defendants Certain Underwriters at Lloyd's London and Certain London Market Insurance Companies' Reply Memorandum in Support of Their Motion for Partial Summary Judgment on Counts I and II of Their Rule 14(a)(2)(D) Claims ("London Reply"), ECF No. 2129.[15]

Olin also argues that London does not lack an adequate remedy at law. It is true that London ultimately seeks monetary relief, namely, the satisfaction of the amount of any equitable contribution remedy awarded against London. Olin contends that any harm from a breach of that alleged obligation therefore would be fully remedied with money damages once London's claim has actually accrued. However, under the

---

[15] In the parties' settlement agreement, Olin agreed to fully release London from all claims relating to four of the five remand sites: Augusta, BROS, Fields Brook, and Rochester. Olin Counter to London's 56.1 Statement at ¶ 7. The fifth remand site, McIntosh OU2, was partially released. See id. at ¶ 9. London argues that the Judgment Reduction Clause applies to the released amounts of the McIntosh OU2 site, which Olin does not appear to dispute. See London Mem. at 14. If Lamorak is found liable in contribution to Lamorak, the judgment should be reduced by: 1) the $18,000,000 released as "Buy-Back Policies"; 2) all pre-July 31, 2009 damages, 3) the $10,000,000 automatic deduction from all claims, and 4) any amount which does not exceed the $13 million attachment point of the London policies in any given year after the remaining claim is allocated pro rata from 1952 to the present. See id. at 15.

41

clear terms of the Settlement Agreement, Olin promised to take certain actions to effectuate the payment of any amounts London may owe in contribution. That is, the benefit of the agreement to London is not merely money, but a release from liability for payment at a particular time and in a particular way. Since it seems likely that Olin will fight its contractual obligation to take these steps, the Court finds it appropriate to order its enforcement now.

### 1. **Whether London Committed Prior Breaches**

It is a basic rule of New York contract law that when "one party commits a material breach, the other party is relieved, or excused, from its further performance obligations." Wechsler v. Hunt Health Sys., Ltd., 330 F. Supp. 2d 383, 414 (S.D.N.Y. 2004) (citing Felix Frank Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 289 (2d Cir. 1997). It thus is axiomatic that "a material breach . . . of [a] settlement agreement [is] a valid defense to a motion to enforce the settlement agreement[.]" Rivera v. Mr. Z Towing, Inc., 2016 WL 6495364, at *3 (E.D.N.Y. Sept. 9, 2016). Olin contends that there is a genuine dispute as to whether London has breached at least three of its material obligations under its settlement agreement with Olin: first, to cooperate with Olin and defend in good faith against Lamorak's equitable contribution claims; second, to keep the terms of the agreement confidential; and third, to adhere to the implied covenant of good faith and fair dealing.

42

First, Olin argues that London has neither defended itself in good faith against Lamorak's equitable contribution claim nor cooperated with Olin in its defense. London, against Olin's request, opted to answer Lamorak's contribution claims on the Remaining Sites rather than moving to dismiss them. See Olin Counter to London's 56.1 Statement at ¶¶ 43-44, ECF No. 2125 (citing Declaration of Craig C. Martin in Support of Olin Corporation's Opposition to Third Party Defendants Certain Underwriters at Lloyd's London and Certain London Market Insurance Companies' Motion for Partial Summary Judgment on Counts I and II of Their Rule 14 Claims ("Martin Decl.") at Exs. 18, 19, ECF No. 2127))[16]; see also Martin Decl. Ex. 23 (letter dated November 13, 2017 from Peter Brennan to Matthew Anderson, reiterating Olin's continued objection to London's intention to file naswers rather than motions to dismiss). Given that, at the time London filed an answer, on November 20, 2017, see Olin Counter to London's 56.1 Statement at ¶ 44, the Court had issued a bottom-line order stating that Lamorak was entitled to seek contribution from London, see ECF No. 2000 (dated October 12, 2017), it was a reasonable strategic decision for London to answer rather than move to dismiss. London's obligations under the settlement agreement to defend itself in good

---

[16] London has not specifically controverted Olin's Additional Material Facts in Support of Its Opposition to London's Motion. See Olin Counter to London's 56.1 Statement at ¶¶ 32-52. Therefore, for purposes of this Opinion and Order, the Court assumes these facts are uncontested and admissible. See Local R. 56.1(c).

faith and cooperate with Olin do not require London to expend
resources on motions that it reasonably believes have little chance
of success.

For similar reasons, London's actions in the state court
contribution action do not give rise to a genuine dispute as to
whether London is defending itself in good faith. In that proceeding,
two of London's co-defendants moved to dismiss Lamorak's claims in
state court on the ground that Lamorak was not entitled, as a matter
of law, to seek contribution from settled insurers. See Olin Counter
56.1 Statement ¶¶ 46-47. London answered rather than moving to
dismiss, asserting twenty-eight affirmative defenses in response to
Lamorak's claim. London Reply at 6; see Lamorak Insurance Company
f/k/a One Beacon America Insurance Company v. Certain Underwriters at
Lloyd's, London and London Market Insurance Companies, et al., No.
656466/2017 (N.Y. Sup. Ct.), Doc. No. 20 (London's answer). While
London did, as it notes, partially join in the other insurers' motion
to dismiss, it also opposed the motion on the ground that a non-
settling insurer can seek equitable contribution from a settling
insurer. Id., Doc. No. 122 (London's partial joinder in and
opposition to the other insurers' motion to dismiss). However, this
opposition does not give rise to a genuine dispute as to whether
London has defended itself in good faith against Lamorak's
contribution claims in light of the affirmative defenses London has
raised in its answer. This is because, as Olin itself has suggested

44

in its communications with London, see Martin Decl. Ex. 23, London likely decided to oppose the motion to dismiss because it would like to be able to seek indemnification from settled policyholders in other litigation, which is a good faith basis for declining to raise that particular defense to Lamorak's contribution claim. A duty to defend in good faith does not override a counsel's duty to her client to consider both its long- and short-term interests (or a counsel's duty to the Court to present only those arguments she believes are correct).

Second, Olin argues that London breached its duty to maintain the confidentiality of the Settlement Agreement. The parties agreed "that all matters relating to the terms, negotiation and implementation of this Agreement shall be confidential and are not to be disclosed except by order of court or administrative order, or agreement, in writing of the Parties[.]" Olin Counter to London's 56.1 Statement at ¶ 49.

Olin cites evidence that, in breach of this confidentiality provision, London permitted the disclosure of the Settlement Agreement's confidential terms to an entity called Resolute Management Inc. ("RMI"), id. at ¶¶ 50-51, which, at the time, was responsible for claims handling on the Olin account with respect to the Lamorak liabilities. Id. at ¶ 50. RMI at that time also was managing London's non-settled liabilities to Olin, pursuant to a delegation from Resolute Management Services Limited ("RMSL"), which,

in turn, had broad authority to manage claims arising from London's pre-1992 liabilities. Id. at ¶¶ 32, 34; see also Martin Decl. Ex. 4 at 145:3-11 (deposition of Simon Wright) (describing Ryan as the "head" of RMSL's "sister claims operation in Boston"); Martin Decl. Ex. 5 at 42:21-23 (deposition of Thomas More Ryan) ("RMSL is a UK company that manages the liabilities that have been reinsured by Equitas Reinsurance Limited"). RMSL delegated claim handling for "US asbestos, pollution, [and] health hazard liabilities" to RMI in 2009. Martin Decl. Ex. 5 at 49:5-9.

Specifically, Tom Ryan, RMI's President, testified that in May or April of 2009 he received documents that "summarized the settlement between Olin and the London Market Insurers" from RMSL. Olin Counter to London's 56.1 Statement at ¶ 50; see Martin Decl. at Ex. 5, 67:14-68:13 (Ryan explaining that "as president of RMI," he was provided with a "PowerPoint presentation which summarized the settlement between Olin and the London Market Insurers"). The summary of the settlement agreement was provided to Ryan because RMI was the agent/administrator for London on the Olin Account. See Martin Decl. at Ex. 13. Ryan stated that he understood when he received the document that it was a confidential communication. Martin Decl. at Ex. 5 at 68:7-9. He also stated that he did not inform the person at RMSL who provided him with a summary of the settlement agreement that RMI was also handling claims on the Olin account with respect to certain OneBeacon or Lamorak liabilities. Id. at 68:17-69:5. Later,

46

in late 2009 or early 2010, after the handling of the Olin account was fully transferred from RMSL to RMI, id. at 130:1-11, RMSL provided RMI with a complete copy of the Settlement Agreement, Olin Counter to London's 56.1 Statement at ¶ 51. In connection with that transfer, "the file or the pertinent documents that were maintained by RMSL were transferred to RMI." Martin Decl. Ex. 5 at 130:1-11.

Olin has not pointed to any evidence in the record indicating that the Settlement Agreement was actually disclosed to anyone at Lamorak, let alone to any other entity that was neither party to the settlement agreement nor an agent to a party of the settlement agreement. The mere fact that Ryan has, at various points, both advised London regarding the approval of the Settlement Agreement and represented Lamorak in handling its present claims and defenses, see Olin Counter to London's 56.1 Statement at ¶ 50, fails to give rise to genuine dispute of material fact as to whether London improperly disclosed the terms of the settlement agreement to Lamorak.

Furthermore, even if this disclosure did constitute a breach of the confidentiality agreement, the breach was not material. The Restatement (Second) of Contracts provides five factors to determine if a breach of contract is material: (a) the extent to which the injured party will be deprived of a benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform will

47

suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure; and (e) the extent to which the party failing to perform comports with the standards of good faith and fair dealing. Restatement (Second) of Contracts § 242 (1979).

Here, even if the confidentiality provision were breached, Olin still would have received the substantial benefits of its settlement agreement with the London Market Insurers. Moreover, Olin identifies no concrete harm it has or could suffer as a result of Lamorak's potentially knowing about the settlement agreement generally and the Judgment Reduction Clause specifically, regardless of whether the clause is a "unique provision," Olin Counter to London's 56.1 Statement at ¶ 52. Lamorak would have had every incentive to seek to file contribution claims absent knowledge of the Judgment Reduction clause (or any other terms of Olin's settlement with London). Finally, the facts in no way support a finding that London's behavior, which consisted of simply sharing the terms of its settlement agreement with entities to which it had delegated the handling of its claims, failed to comport with the standards of good faith and fair dealing. On this record, there is no reason to think that RMSL, let alone London, knew it was disclosing the settlement terms to anyone other than its agent. London simply gave its settlement agreement to an agent who forwarded it to another agent, which happened to also handle claims for Lamorak (and presumably many

48

other insurance companies).

Third, Olin contends that there is reason to believe that Lamorak's lawsuit against London is "wholly collusive," which would violate London's implied duty of good faith and fair dealing under the Agreement. "'This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Fishoff v. Coty Inc., 634 F.3d 647, 653 (2d Cir. 2011) (quoting 511 West 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153 (2002)); see also Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York, 10 N.Y.3d 187, 198 (2008) (explaining that breach of duty of good faith and fair dealing can occur even "where a party has complied with the literal terms of the contract, but has done so in a way that undermines the purpose of the contract and deprives the other party of the benefit of the bargain").

Olin's breach of the good faith and fair dealing argument depends on the fact that Lloyd's, London, some of the other London Market Insurers, and Lamorak are all connected to the Berkshire Hathaway "corporate empire." See Olin Counter to London's 56.1 Statement at ¶ 38. Turning first to London, National Indemnity Company ("NICO"), the "lead reinsurer of the Berkshire Hathaway Group of insurance companies," Martin Decl. Ex. 6 (deposition of Brian Snover) at 13:6-10, "assumed certain financial and administrative responsibilities with respect to liabilities that an entity called

49

Equitas[, which] . . . had itself previously assumed from
underwriters and syndicates at Lloyd's of London, for nonlife
business that Lloyd's had written 1992 and prior," id. at 13:11-17.
RMSL, on NICO's behalf, exercised broad authority to manage claims
arising from London's pre-1992 liabilities and delegated some of this
authority to RMI. RMSL and RMI both are also under the umbrella of
Berkshire Hathaway. Martin Decl. Ex. 4 at 145:5-11 (RMI is a "stand-
alone claims operation in North America that was part of Berkshire
Hathaway"); id. at 145:17-19 ("Resolute Management Services Limited
was a company that was owned by a Berkshire Hathaway entity.").
Lamorak, in turn, also has an agreement with NICO. Martin Decl. Ex. 5
at 177:16-20. NICO has a separate agreement with RMI with respect to
the Lamorak policies, under which NICO delegates certain of its
responsibilities to RMI. Martin Decl. Ex. 5 at 179:7-10; see also
Martin Decl. Ex. 12 (Intercompany Service Agreement between NICO and
RMI). In addition, certain of the London insurers that entered into
the settlement with Olin also have reinsured Lamorak's potential
liability to Olin. Olin Counter to London's 56.1 Statement at ¶ 39.

As a result, from the perspective of Berkshire Hathaway,
London's loss in Lamorak's contribution action is a win: If Lamorak
prevails against London, thereby triggering a judgment reduction,
Lamorak's underlying obligation would be reduced and London could
then recoup from Olin (through a judgment reduction) amounts it
"owed" in contribution, thus reducing the cost to Berkshire

50

Hathaway's overall "Olin account." In addition, because London reinsures Lamorak, a reduced Lamorak obligation means Lamorak passes on a reduced reinsurance claim to its London reinsurers, to those reinsurers' benefit.

Olin's argument fails because the only evidence it has identified of bad faith, after ample opportunity for discovery, is the mere fact of the aforementioned intertwined relationships and London's decision not move to dismiss any of Lamorak's contribution claims. The Court has already found this strategic decision fails to give rise to a breach of the duty of good faith and fair dealing. Lamorak and London have good faith reasons for their actions, filings, and positions. Specifically, as discussed above, regardless of the relationship between Lamorak, London, and Berkshire Hathaway, Lamorak would likely have brought a contribution claim and London thereafter would have sought to enforce the Judgment Reduction Provision. London Reply at 7. And the shared engagement of NICO, RMSL, and RMI, standing alone, does not create a genuine dispute as to whether London has satisfied the duty of good faith and fair dealing.

Finally, as a last ditch effort, Olin argues that at the very least the Court should defer resolution of London's motion until discovery is complete. Under Federal Rule of Civil Procedure 56(d), "[w]hen a party facing an adversary's motion for summary judgment reasonably advises the court that it needs discovery to be able to

51

present facts needed to defend the motion, the court should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion." Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc., 271 F.3d 374, 386 (2d Cir. 2001). Here, Olin alleges, London is seeking to obtain summary judgment before Olin has completed its discovery. London responds, correctly, that discovery on the Five Sites remanded by the Second Circuit is complete. Therefore, London's motion for summary judgment is ripe for review.

## 2. Whether the Judgment Reduction Clause Applies to Lamorak's Contribution Claims

Olin does not dispute that the Settlement Agreement is a binding, enforceable contract. Id. at ¶¶ 2-3. Nor does Olin dispute that it promised to assure and provide London with "peace and freedom" from any and all assertions of rights in connection with the fully released claims. Id. at ¶ 6. Olin does, however, dispute that the Judgment Reduction Clause applies to Lamorak's contribution claims.

Olin's argument is based on Section XX, which states in relevant part:

> Notwithstanding any terms in this Agreement, Olin shall not be releasing or required to indemnify London Market Insurers in their capacity solely as: . . . (ii) reinsurers of any of the policies issued by any Other Insurer set forth in Attachment H provided that it is explicitly agreed by the Parties that nothing contained in this proviso (ii) shall apply to London Market Insurers in their capacity as reinsurers of North River's obligations under the JW Policies, which

52

> obligations are the subject of explicit releases
> in this Agreement.

Olin Counter to London's 56.1 Statement at ¶ 31. Olin alleges that the section covers situations where, as here, the contribution claim is made by an insurer that London reinsures, so that the ultimate effect of the judgment reduction, if applied, would be to reduce London's reinsurance liability.[17] As a last resort, Olin argues that to the extent Olin and London disagree about what Section XX means, that only raises "at most, issues of material fact precluding summary judgment on London's claims." Olin Opp. at 21.

Olin's argument ignores the provision's clear mandate that it applies to the London Market Insurers "in their capacity solely" as reinsurers. Therefore, by its plain terms, Section XX addresses, for example, the scenario where Olin pursues claims against Lamorak and, after paying a valid claim, Lamorak then pursues its reinsurers. In that event, any reinsurers that signed the Settlement Agreement would not be permitted to seek indemnity from Olin for Lamorak's liability, because the claim would have been in their capacity solely as a reinsurer of Lamorak. Lamorak's state court contribution action against London, by contrast, seeks contribution from London solely in its role as direct insurers of Olin from 1950 to 1970. Olin's broad reading of Section XX would lead to the absurd result that any of the London

---

[17] London has conceded that certain of the insurers that entered into the settlement with Olin reinsure Lamorak's full potential liability to Olin. See id. at ¶ 39.

53

Market Insurers who, in addition to directly insuring Olin, also reinsured Lamorak, would be deprived of the releases they bargained for with respect to their own 1950-1970 policies. Therefore, there is no genuine material dispute of fact concerning whether the Judgment Reduction Provision applies in the instant action.

## III. Olin's Daubert Motion to Exclude the Opinion Testimony of Marc C. Scarcella

Olin moves to strike the expert reports and opinions of Marc S. Scarcella, which address the "amounts paid" by other insurers to settle Olin's claims as to the Five Sites at issue on remand from the Second Circuit. See Memorandum of Law in Support of Olin Corporation's Motion to Strike the Expert Reports and Testimony of Marc C. Scarcella ("Olin Scarcella Mem."), ECF No. 2089.

Scarcella offers two overarching opinions in his report: first, the appropriate reduction of the Lamorak policy limits as a result of settlements and/or amounts paid by, and/or allocated to, other policies covering Olin's losses on the Five Sites; and second, the appropriate reduction of the judgment amount calculated as above, as demanded by London, based on equitable allocations of the judgment amounts in London policies. Declaration Of Craig C. Martin In Support Of Olin Corporation's Motion To Strike The Expert Reports And Testimony Of Marc C. Scarcella ("Martin Scarcella Decl."), Ex. 1 ¶¶ 14-18, ECF No. 2090. Scarcella also submitted a declaration in support of Lamorak's motion for summary judgment and in support of

Lamorak's opposition to Olin's motion for summary judgment. See Declaration of Marc C. Scarcella in Support of Defendant Lamorak's Motion for Summary Judgment ("Scarcella Decl."), ECF No. 2098. In this declaration, he lays out calculations for the revised judgment based on three possible scenarios: (1) Lamorak's liability is reduced by the limits of prior excess policies applicable to a particular loss under policies issued by settled insurer; (2) Lamorak's liability is reduced by the settled insurers' pro rata share of the damages; and (3) Lamorak's liability is reduced in accordance with the Judgment Reduction Provision in Olin's settlement agreement with the London Market Insurers. See id.

Federal Rule of Evidence 702 provides that expert testimony is admissible when the expert is qualified and the testimony is relevant and reliable. Fed. R. Civ. Evid. 702; see, e.g., In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 643 F. Supp. 2d 471, 476-77 (S.D.N.Y. 2009); see Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590 (1993). To be admissible, expert testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods" that have been "reliably applied . . . to the facts of the case." Fed. R. Evid. 702(b)-(d). "Daubert and Rule 702 mandate the exclusion of [] unreliable opinion testimony" that is "based on data [and] a methodology" that are "simply inadequate to support the conclusions reached." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265-66 (2d Cir. 2002) (citing Heller v. Shaw

55

Indus., Inc., 167 F.3d 146, 153 (3d Cir. 1999)); see also Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC, 752 F.3d 82, 95 (1st Cir. 2014) ("[A] subjective analysis without any methodological constraints does not satisfy the requirements of Daubert.").

Expert testimony also should be excluded when it applies the wrong legal standard. See Hebert v. Lisle Corp., 99 F.3d 1109, 1117 (Fed. Cir. 1996) (holding that expert testimony should be excluded when it applies wrong legal standard); In re Novatel Wireless Sec. Litig., 846 F. Supp. 2d 1104, 1107-08 (S.D. Cal. 2012) (same); Straumann Co. v. Lifecore Biomedical Inc., 278 F. Supp. 2d 130, 134-35 (D. Mass. 2003) (same). However, the testimony of a party's expert must be evaluated within the context of that party's own theory of the case. See In re Pfizer Sec. Litig., 819 F.3d 642, 659 (2d Cir. 2016). As a result, where the legal or factual sustainability of a party's theory has not yet been decided, the possibility that such theory "may be legally or factually deficient" is "not justification[] for concluding that, in the context of [that party's] theory, [the expert's] testimony is unreliable or unhelpful." Id. at 661.

Scarcella's first opinion is that Lamorak is entitled to a reduction in its policy limits applicable to the McIntosh OU2 site based on the amounts already paid by the London Market Insurers to Olin in connection with a different site, McIntosh OU1. Scarcella

based this opinion "largely on an assumption provided by [counsel for Lamorak] that Olin's McIntosh OU1 and OU2 claims arise from the same occurrence under the terms of the Lamorak 1970 policies and thus are the same loss under the policies' Condition C." Martin Decl. Ex. 2 ¶ 4. Lamorak concedes in its opposition to Olin's motion to exclude Scarcella's testimony that his opinion as to how much the LMI settlement allocated to the McIntosh OU2 site is "not . . . before this Court on summary judgment." See Lamorak Insurance Company's Memorandum of Law in Opposition to Olin Corporation's Motion to Strike the Expert Reports and Testimony of Marc C. Scarcella ("Lamorak Opp.") at 10 n.11, ECF No. 2114. Therefore, the Court excludes this opinion as irrelevant.

The Court also excludes as irrelevant Scarcella's remaining opinions in his expert report, which relate to the so-called judgment-reduction issues, because they are not relevant to any issue before the Court. See Chen-Oster v. Goldman, Sachs & Co., 114 F.Supp. 3d 110, 125 (S.D.N.Y. 2015) ("In order to be admissible under Rule 702 and Daubert, an expert opinion must be 'relevant to the task at hand[.]'" (quoting Amorgianos, 303 F.3d at 265)). Scarcella's second opinion calculates a "judgment reduction" to account for amounts he opines should be "equitably allocated" in connection with Lamorak's equitable contribution claims against the London Market Insurers with respect to the five-sites judgment. Martin Decl. Ex. 2 at ¶¶ 8-12. But those amounts, if any, will be determined in the pending New York

57

State court action and therefore are not relevant to the Court's instant calculation of Lamorak's liability.

Olin lastly moves to dismiss the Scarcella declaration attached to Lamorak's motion for summary judgment on the ground that the opinions are contrary to controlling law. However, an expert's testimony should be excluded on this ground only where an argument has already been rejected by the Court. See In re Refco Inc. Sec. Litig., Nos. 07-md-1902, 08-cv-3065, 08-cv-3086, 2012 WL 7007795, at *5 & n.7 (S.D.N.Y. Nov. 29, 2012); Pakootas v. Teck Cominco Metals, Ltd., No. 04-cv-256, 2012 WL 1833397, at *1 (E.D. Wash. Apr. 4, 2012). Where the legal or factual sustainability of a party's theory has not yet been decided, the possibility that such theory "may be legally or factually deficient" is "not justification[] for concluding that, in the context of [that party's] theory, [the expert's] testimony is unreliable or unhelpful." In re Pfizer Sec. Litig., 819 F.3d 642, 661 (2d Cir. 2016). First, Scarcella calculates a policy limit reduction under the Prior Insurance Provision assuming that any settlement by a prior insurer is treated as though that insurer paid up to its policy limits. Second, Scarcella calculates the effect on Olin's recovery assuming this Court adopts the pro rata set-off approach adopted by the Third Circuit in Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1140 (3d Cir. 1996) (Stapleton, J.). Since the Court had not, at the time Scarcella's declaration was submitted,

decided these legal issues, the Court denies Olin's motion to exclude Scarcella's declaration.

## CONCLUSION

For the foregoing reasons, Olin's motion for summary judgment is granted and Olin's claim against Lamorak is awarded in the amount of $55,065,203.18. The London Market Insurers' motion for summary judgment is also granted, and Olin's motion to exclude the opinions of Marc C. Scarcella is granted in part, as indicated above. The parties are hereby ordered to submit to the Court, by no later than April 23, 2018, a written statement of how much prejudgment interest would be added were the Court to enter judgment on the Five Sites as of April 30, 2018, on which date the Court will enter judgment.

The Clerk is directed to close the entries at docket numbers 2061, 2062, 2063, and 2088.

SO ORDERED.

Dated:    New York, NY

April 17, 2018                    JED S. RAKOFF, U.S.D.J.