UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
OLIN CORPORATION,                     :

         Plaintiff,                   :

         -v-                          :

LAMORAK INSURANCE COMPANY,            :

         Defendant.                   :
------------------------------------- x
LAMORAK INSURANCE COMPANY             :
f/k/a OneBeacon America Insurance
Company,                              :

                                      :
         Third-Party Plaintiff,       :

         -v-                          :

                                      :
CERTAIN UNDERWRITERS AT LLOYD'S,      :
LONDON and LONDON MARKET INSURANCE    :
COMPANIES, et al.,                    :

                                      :
CONTINENTAL CASUALTY COMPANY,         :

                                      :
GENERAL REINSURANCE CORPORATION,      :

                                      :
FIREMAN'S FUND INSURANCE COMPANY,     :

                                      :
MUNICH REINSURANCE AMERICA, INC.,     :
f/k/a AMERICAN-REINSURANCE COMPANY,   :

                                      :
         and                          :

                                      :
GREAT AMERICAN INSURANCE COMPANY,     :

                                      :
         Third-Party Defendants.      :
------------------------------------- x

JED S. RAKOFF, U.S.D.J.



84-cv-1968 (JSR)

OPINION AND ORDER

Before the Court are the motions of Olin Corporation ("Olin") for summary judgment on its claims against Lamorak Insurance Company ("Lamorak") for insurance coverage at the fifteen "Remaining Sites"[1] and for partial summary judgment on Lamorak's third-party claims for contribution and indemnity against Certain Underwriters at Lloyd's, London and London Market Insurance Companies (the "London Market Insurers" or "London"), Continental Casualty, Munich Reinsurance, and General Reinsurance, ECF Nos. 2195, 2186; the motions of Lamorak for summary judgment on Olin's claims at the Remaining Sites and for summary judgment on its own third-party claims, ECF Nos. 2188, 2189; the motions of the London Market Insurers for partial summary judgment on Lamorak's third-party claims and its own claims against Olin under Rule 14, ECF Nos. 2190, 2191; and the motions of General Reinsurance, Continental Casualty, and Munich Reinsurance for summary judgment on Lamorak's third-party claims, ECF Nos. 2205, 2192. Also before the Court are Olin's motion to strike portions of the reports and testimony of

[1] These sites are Assonet, Bethany, Brazier Forest Industry, Central Chemical, Charleston, Crab Orchard, Frontier Chemical-Pendleton, Middletown/Tri-Star, Morgantown Ordinance Works, New Haven, Niagara County Refuse, North Little Rock, Olin Water Services, Pine Swamp, and Wallisville Road.

Lamorak's experts, ECF No. 2222, and Lamorak's motion to strike

Olin's Rule 56.1 statement, ECF No. 2252.

## BACKGROUND

The background of this interminable litigation has been recounted in countless orders, memoranda, and opinions issued over the past several decades, familiarity with all of which is here, of course, presumed. But the following facts are particularly relevant for present purposes:

Predecessors to Lamorak issued three excess insurance policies to Olin providing relevant coverage from January 1, 1970 through December 31, 1970 (the "Policies"). See Olin Corporation's Counterstatement of Undisputed Material Facts in Opposition to Lamorak Insurance Company's Motion for Summary Judgment on Liability, Damages and Other Relief Sought by Olin Corporation for the Remaining Sites ("Olin Counter Remaining Sites 56.1") at ¶ 6, ECF No. 2269. These Policies provide up to $20 million of coverage for each "occurrence" and attach at various points above an underlying INA policy limit of $300,000. Olin Counter Remaining Sites 56.1 at ¶ 7. They are referred to as "excess" policies because they attach above an underlying, or "primary," policy.

Under Lamorak's policies:

3

(1) Olin is entitled to indemnity "for all sums which [Olin] shall be obligated to pay by reason of the liability; (a) imposed upon the Insured by law, (b) assumed under contract or agreement by [Olin] for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of . . . Property Damage . . . caused by or arising out of each occurrence happening anywhere in the World." Id. at ¶ 19.

(2) "Ultimate net loss" is defined in relevant part as "the total sum which the Insured, or any Company as his insurer, or both, becomes obligated to pay by reason of . . . property damage . . . ." Id. at ¶ 21.

(3) A covered "Occurrence" is "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally result in personal injury, property damage or advertising liability during the policy period," and "[a]ll such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence." Id. at ¶ 21.

(4) Covered "Property Damage" constitutes the "loss of or direct damage to or destruction of tangible property (other than property owned by [Olin])." Id. at ¶ 21.

Under Lamorak's policies, coverage is "subject" to certain conditions. For example, Olin must pay a premium, and when there is an occurrence, "notice shall be sent [to Lamorak] . . . as soon as practicable," defined to mean when "[Olin] has information from

4

which [Olin] may reasonably conclude that an occurrence covered [under the Policies] involves injuries or damages which, in the event that [Olin] should be held liable, is likely to involve [the Policies]." See Lamorak Insurance Company's Response to Olin Corporation's Statement of Undisputed Material Facts in Support of its Motion For Summary Judgment on The Remaining Sites and Lamorak's Counterstatement of Undisputed Material Facts ("Lamorak Counter Remaining Sites 56.1") at ¶¶ 9(b), 11, ECF No. 2263. As to this latter requirement, Olin only has "knowledge of an occurrence" or "knowledge of a suit" if "an executive officer . . . shall have received such notice from its agent, servant or employee." Id. at ¶ 10. Olin's "failure to give notice of any occurrence which at the time of its happening did not appear to involve [the Policies], but which, at a later date, would appear to give rise to claims [covered under the Polices], shall not prejudice such claim." Id. at ¶ 9(b).

Endorsement No. 6 of Lamorak Policy EY-8057-011 and Lamorak Policy EY-8057-012 provide in part as follows:

> It is agreed that, notwithstanding anything contained herein to the contrary, this policy shall not indemnify the Insured in respect to any claim made against the Insured by reason of any act committed, prior to February 1, 1964.

Olin Counter Remaining Sites 56.1 at ¶ 22.

5

Olin now seeks coverage from Lamorak under these Policies for the following fifteen Remaining Sites: Assonet, Bethany, Brazier Forest Industry, Central Chemical, Charleston, Crab Orchard, Frontier Chemical - Pendleton, Middletown/Tri-Star, Morgantown Ordnance Works, New Haven, Niagara County Refuse, North Little Rock, Olin Water Services, Pine Swamp, and Wallisville Road.

Olin has entered into settlement agreements with its other excess insurers - London, Continental, General Reinsurance, and Munich Reinsurance - releasing coverage for some of the Remaining Sites (among others). See Third-Party Defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies' Response to Lamorak Insurance Company's Local Rule 56.1 Statement of Undisputed Material Facts in Support of Lamorak Insurance Company's Motion for Summary Judgment on Its Third-Party Claims at ¶ 16, ECF No. 2240; Third-Party Defendant General Reinsurance Corporation's Response to Lamorak Insurance Company's Local Rule 56.1 Statement of Undisputed Material Facts in Support of Lamorak Insurance Company's Motion for Summary Judgment on its Third-Party Claims at ¶ 16, ECF No. 2251; Continental Casualty Company and Munich Reinsurance America, Inc.'s Response to Lamorak Insurance Company's Statement of Undisputed Material Facts and

6

Counterstatement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 at ¶ 16, ECF No. 2242; Olin Corporation's Counterstatement of Undisputed Material Facts in Opposition to Lamorak Insurance Company's Motion for Summary Judgment on Its Third-Party Claims at ¶ 16, ECF No. 2248.

The Court first addresses Olin's motion to strike Lamorak's expert opinions relating to costs and Lamorak's motion to strike Olin's 56.1 statement. The Court then turns to Olin and Lamorak's motions for summary judgment on the Remaining Sites. Next, the Court considers the motions of Olin, Lamorak, London, Continental Casualty, Munich Reinsurance, and General Reinsurance for summary judgment on Lamorak's third-party claims. Finally, the Court addresses London's motion for summary judgment on its Rule 14 claims.

## Olin's Motion To Strike

Olin moves to strike portions of the expert reports and testimony of Lamorak's experts Douglas J. Swanson, Sin Senh, and Kelly Coulon of Roux Associates Inc. (the "Roux Experts" and the "Roux Report") and Scott A. Recker of the Antea Group (the "Recker Reports"). Specifically, Olin moves to strike the experts' opinions that relate to the costs incurred by Olin for

the investigation and remediation of contamination at the
Remaining Sites.

## I. Background

The Roux Report is a joint report authored by Swanson,
Senh, and Coulon. See Declaration of Craig C. Martin in Support
of Olin Corporation's Motion to Strike the February 9, 2018
Expert Report and Testimony of Douglas J. Swanson, Sin Senh, and
Kelly Coulon of Roux Associates and Scott A. Recker ("Martin
Motion to Strike Decl.") Ex. A, ECF No. 2224 [hereinafter Roux
Report].[2] Among other things, the Roux Report "evaluate[s] data
and provide[s] opinions regarding environmental contamination
allegedly caused by Olin" at twelve of the Remaining Sites and
addresses "whether Olin was aware prior to 1970 that their site
operations were causing the resulting environmental harm." Id.
at 1. The Recker Reports similarly discuss, among other things,
"[t]he causes of environmental impacts at, around and
underneath" the Central Chemical, North Little Rock, and
Wallisville Road Sites and, for each of those sites, "[t]he
practices at the Site that resulted in the releases of chemicals
and the migration of certain chemicals." Id. Ex. B at 1; id. Ex.

---

[2] This report is also included in the record at ECF No. 2214 Ex.
13.

8

C at 1; id. Ex. D at 1. Olin does not object to the admission of
these opinions.

Rather, Olin objects only to the admission of opinions of
Lamorak's experts concerning costs Olin incurred to address
contamination at the Remaining Sites. Olin asserts three grounds
for its motion to exclude these opinions. First, Olin asserts,
Roux and Recker's opinions are irrelevant because the costs they
categorized and opined on are not the same as the costs Olin
seeks as damages in this case. Second, Olin asserts, the cost
analyses are irrelevant because the categories applied by the
experts have no legal significance to Olin's damages. Third,
Olin asserts, Coulon, who is a professional engineer, is not
qualified to offer an opinion as to whether the secondary
sources of cost backup information that Olin's expert used to
support Olin's damages claim are unreliable sources.

## II. **Analysis**

To be admissible under Federal Rule of Evidence 702, expert
opinion testimony must come from someone who is "qualified as an
expert by knowledge, skill, experience, training, or education,"
and whose resulting testimony "will help the trier of fact to
understand the evidence or to determine a fact in issue." Fed.
R. Evid. 702; see also, e.g., Nora Beverages, Inc. v. Perrier
Grp. Of Am., Inc., 164 F.3d 736 (2d Cir. 1998). "The Second

Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience." In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004). "Courts have long held that an expert testifying about damages need not be 'trained as an economist.'" Arista Records LLC v. Lime Grp. LLC, No. 06-cv-5936, 2011 WL 1674796, at *16 (S.D.N.Y. May 2, 2011) (quoting In re MBTE Prods. Liab. Litig., No. M21-88, 2008 WL 1971538, at *5 (S.D.N.Y. May 7, 2008)). However, "[c]ourts in this Circuit have stricken extraneous testimony 'where an expert is admitted under Rule 702 and then purports to offer opinions beyond the scope of his expertise . . . . . '" 523 IP LLC v. CureMD.Com, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2014) (quoting Davis v. Carroll, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013)).

To be admissible, in addition to "rest[ing] on a reliable foundation," expert testimony must be relevant to the task at hand." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993); see also Oster v. Goldman, Sachs & Co., 114 F. Supp. 3d 110, 125 (S.D.N.Y. 2015). The proffered expert must also demonstrate that there is "a reliable linkage between the facts . . . and the conclusions" in his or her report. R.F.M.A.S, Inc.

10

v. So, 748 F. Supp. 2d 244, 252-53 (S.D.N.Y. 2010) (citing

Daubert, 509 U.S. at 592; Kumho Tire Co., Ltd. v. Carmichael,

526 U.S. 137, 158 (1999)). The relevant "task at hand" with

respect to Olin's costs is whether Olin is entitled to recover

the costs it claims as damages if Lamorak is found liable for

breaching its policies.

### A. Whether Coulon Is Qualified To Opine on the Reliability of Accounting and Financial Information

Olin argues that Chapter 16 of the Roux Report must be

excluded because its author, Kelly Coulon, is not qualified as

an expert to offer the cost opinions contained in that chapter.

The main conclusion of Chapter 16 is that the "secondary backup

documentation" supporting Olin's claimed damages – including

accounts payable data, general ledger data, and other records,

see Martin Motion to Strike Decl. Ex. E at 2-5 – are "not

reliable evidence of the actual environmental response costs

incurred" at the sites at issue, see Roux Report at 145-46.

Coulon's primary training is not in cost accounting. She

graduated from Cornell University with a Bachelor of Science in

Biological Engineering. See Declaration of Elaine Whiteman

Klinger in Support of Lamorak Insurance Company's Response to

Olin's Motion to Strike Portions of the Expert Reports and

Testimony of Douglas J. Swanson, Sin Senh, Kelly Coulon, and

11

Scott A. Recker ("Klinger Motion to Strike Decl.") Ex. A at 24:10-12, ECF No. 2246. She then earned a Master of Science in Environmental Engineering from Johns Hopkins University. See id. at 24:13-15. Her professional training is in the areas of "environmental investigation, remediation and restoration of contaminated sites, and wastewater treatment." Roux Report at 3.

Moreover, Coulon has never been qualified by a court to testify on account issues. See Martin Motion to Strike Decl. Ex. G at 30:21-24. She is not a certified public accountant or certified fraud examiner. Id. at 29:11-18. She is not certified in financial forensics. Id. at 29:22-30:15. She has never taken a class, or otherwise received formal training, in accounting, finance, or auditing, and she lacks any formal education in accounting. Id. at 24:18-21, 25:1-15, 26:23-27:19. She has never prepared SEC filings and she has never been involved in any audit behind SEC filings. Id. at 31:12-22. She has never had any role in a corporate accounting audit. Id. at 31:23-32:1.

However, in the course of her career as an engineer, Coulon has "evaluated the nature and extent of contamination, timing of contamination, methods of releases of contamination and fate and transport; estimated costs to investigate and remediate sites across many industries; and evaluated the reasonableness of past and future environmental response costs." Roux Report at 3-4. In

12

this context, a significant portion of Coulon's day-to-day responsibilities include evaluating environmental investigation and remediation costs, and reviewing subcontractor invoices, engineering submittals and bids and cost-estimating. See Klinger Motion to Strike Decl. Ex. A at 25:1-28:24 (Coulon deposition). With regard to cost categorization, Coulon has been involved in similar matters where the same methodology used here has been used to analyze and evaluate environmental costs. See id. at 34:7-20 and 40:11-42:20 (stating that she has reviewed reports made from SAP software in the context of reviewing past environmental response costs and that the methodology she used in this case was similar to the methodology she has used in prior litigation).

Turning next to the opinion Coulon proffers, Coulon opines on the reliability of the sources that Olin's expert, Thomas Zetlmeisl, used to substantiate a spreadsheet tracking costs incurred by Olin (the so-called "Lutz Report"). Specifically, she challenges Zetlmeisl's conclusion that the Lutz Report is reliable and sufficient evidence of Olin's cost claim. She argues that (1) Zetlmeisl was unable to find invoice support for over 50% of the costs in the report and (2) the secondary sources he relied upon do not identify the scope of the services rendered or the relationship (if any) of the services to the

13

environmental response action. Additionally, Coulon opines that the "indemnity" start dates used by Zetlmeisl are incorrect for certain sites because he did not make any determinations regarding the nature of the invoices. Roux Report at 144-51.

It is difficult to discern from Coulon's report what expertise she even purports to rely on with respect to the challenged opinions. She simply asserts that the secondary sources of backup used by Zetlmeisl are not reliable evidence of past response costs because "(1) the scope of services is not known and (2) the relationship of the services to the environmental response action is not known. . . . . None of this information includes the actual invoices that comprise the alleged costs, or the specific scope of the services performed." Id. at 147. She does not, for example, explain that she knows that this evidence of past costs is unreliable because, in her experience reviewing subcontractor invoices, invoices generally contain more detail.

Nevertheless, the Court cannot hold on this record that Coulon's prior experience is entirely irrelevant to the opinions here challenged or that they are otherwise totally outside the bounds of Rule 702. Accordingly, the Court does not exclude Coulon's testimony for purposes of these motions for summary

14

judgment but will hold, prior to trial, a Daubert hearing regarding the admissibility of Coulon's cost opinions.

## B. Whether the Cost Opinions Are Unhelpful and Prejudicial

Olin asserts that Lamorak's Roux and Recker Reports are "unhelpful" because they are not directly responsive to the costs that Olin has claimed as damages. Instead of addressing only the costs that Olin actually is seeking to recover, the Roux Experts compiled their own cost information from discovery materials. See, e.g., Martin Motion to Strike Decl. Ex. G (Coulon deposition) at 51:19-24 ("Q: Are you aware that every invoice that was produced in this case is not necessarily the subject of Olin's claims for damages? A: I'm not aware which invoices are subject to Olin's claim and which ones are not."). As a result, Olin contends, there is a "disconnect" between what Olin seeks to recover and what the Roux Experts reviewed,[3] rendering the opinions confusing and misleading. For example, the Roux Report concludes that $11.2 million of the invoices

---

[3] Olin treats as significant the fact that Senh, Coulon, and Swanson did not review the actual policies in the course of reviewing Olin's claimed costs. See Martin Motion to Strike Decl. at Ex. G at 84:24-85:3 (Coulon testifying that she did not review the policies); id. at Ex. H at 357:10-16 (Swanson testifying the same); id. at Ex. J at 55:6-7 (Recker testifying the same). However, Lamorak's experts do not need to have personally read Lamorak's policies in order to provide relevant opinions about Olin's claimed costs.

15

produced in discovery should be categorized as duplicate costs
(i.e., costs that are "identical, yet appear separately with
different Bates numbers," Roux Report at 9) and $7.5 million of
the invoices produced in discovery are unrelated to
environmental remediation. Roux Report at 1, 9. However, the
Roux Report makes no effort to identify how many of those
allegedly "duplicate" or "unrelated" costs Olin is actually
seeking.

Olin also objects that the Recker Report on the Central
Chemical Site is overinclusive since it evaluates Olin's cost
claim "covering the period of 1984 through 2016," Martin Motion
to Strike Decl. Ex. B at 13, yet the costs included in Olin's
damages claim at Central Chemical begin in January of 2003. Id.
at Ex. F, Ex. K.[4]

Since Olin's primary objection to Lamorak's cost opinions
is that they are overbroad, the Court declines to strike
Lamorak's opinions at this stage in the proceeding. Lamorak

---

[4] Olin also seeks to exclude the Recker Reports as unhelpful on
the ground that Recker's opinions do not include any analysis of
individual costs. However, Recker stated that, with respect to
some of the sites, he would expect to cover that analysis at
trial and explained that he did not include it in his expert
report because "we thought we would at some point get the backup
information that we needed." Martin Motion to Strike Decl. Ex. J
at 137:7-15; see also id. at 172:2-18.

16

asserts that its experts "are prepared to explain and rebut whatever cost claim is ultimately put on trial by Olin." Lamorak Insurance Company's Response to Olin Corporation's Motion to Strike Portions of the Expert Reports and Testimony of Douglas J. Swanson, Sin Senh, Kelly Coulon, and Scott A. Recker ("Lamorak Motion to Strike Mem.") at 20, ECF No. 2245.[5] While it is true that experts must disclose their opinions in discovery, see Fed. R. Civ. P. 26(a)(2)(B), (D), Lamorak's experts have disclosed the relevant opinions (and more). Olin's motion to strike Lamorak's expert cost opinions as "unhelpful" is denied without prejudice to Olin's raising the issue again at trial if and when Lamorak seeks to introduce expert testimony on costs that Olin is not in fact claiming.

## C. Whether Lamorak's Categorization of Costs Is Relevant

Finally, Olin argues that the categories into which the Roux Report classifies Olin's costs are irrelevant and therefore should be excluded.

First, the Roux Experts categorized certain costs as related to "Onsite Activities - not Groundwater-Related Response Actions," and other costs as related to "Offsite Activities

---

[5] According to Lamorak, its experts undertook a comprehensive review "in part" because "Olin opted not to provide Lamorak with a detailed cost claim for the Remaining Sites." Id. at 16 n.9.

17

and/or Groundwater-Related Response Actions." See, e.g., Roux
Report at 1 & App'x D. Likewise, Recker categorized "the vast
majority of costs" at the North Little Rock site as "onsite soil
and sediment" work. See id. at Ex. C at 13-14. According to
Olin, the experts placed costs into the onsite and offsite
categories based primarily on the location of where the
remediation occurred, such that excavation or capping of soils
on Olin's property was deemed "onsite," even though these types
of onsite remediation were undertaken to prevent offsite
property damage. See Roux Report at 8. According to Olin, this
simplistic onsite/offsite distinction is not relevant where a
cleanup was done to protect the public and to address or prevent
offsite impacts at least in part, as all the on-site cleanups at
issue here were.

However, Lamorak disagrees with Olin's view of the law.
Lamorak has taken the position that costs arising out of
remediation of on-site property damage are not covered by its
policies. As the Court has previously explained, see Opinion and
Order dated April 17, 2018, ECF No. 2176, the testimony of a
party's expert must be evaluated within the context of that
party's own theory of the case, see In re Pfizer Sec. Litig.,
819 F.3d 642, 659 (2d Cir. 2016). Therefore, the Court finds
that these categorizations are not irrelevant.

Second, the Roux Report assigns costs to categories such as "Legal," "Regulatory," "Employee Expenses," "Unspecified," and "Unrelated." The "legal" category includes "costs to support or perform legal work regarding [the] environmental response action[s]" taken by Olin. Roux Report at 8-10. The "regulatory" category includes "costs for the oversight regulatory agency . . . response costs to oversee and/or implement environmental response actions at the Sites." Id. at 9. The Employee Expenses category includes "Olin employee expenses incurred to further the environmental response action[s]" taken by Olin. Id. The "unspecified" category includes costs for which "[i]nsufficient information" was provided to enable "any further categorization." Id. And "unrelated" includes invoiced costs that the Roux Experts considered to be unrelated to the contamination environmental response actions taken by Olin at the Remaining Sites. Id. at 10.

Olin argues that these categories are irrelevant because Lamorak's policies do not exclude coverage for these categories of costs. Rather, in Olin's view, these are costs are recoverable as "sums which [Olin] shall be obligated to pay by reason of the liability[;] (a) imposed upon the Insured by law, or (b) assumed under contract or agreement by [Olin] for damages, direct or consequential and expenses on account of . .

19

. Property Damage." see Martin Motion to Strike Decl. at Ex. N §
I; Ex. O § I; Ex. P § I. Lamorak does not vigorously defend the
relevance these categories. Nevertheless, since Olin has not
adequately proven their irrelevance,[6] the Court finds that these
categories are relevant to Lamorak's theory of the case and
denies Olin's motion to exclude them, without prejudice to
Olin's renewing the motion at trial.

Third, the Roux Report uses the categories "Unspecified,"
"Unrelated," and "Duplicate." Roux Report at 9-10. Olin argues
that these categories are "meaningless" because the report has
failed to identify what portion of the costs placed in these
categories are actually part of Olin's damages claim. Plaintiff
Olin Corporation's Motion To Strike Portions of the Expert
Reports and Testimony of Douglas J. Swanson, Sin Senh, Kelly
Coulon, and Scott A. Recker at 14, ECF No. 2223. A cost is only
truly a "duplicate" if Olin is actually seeking to recover both
the costs. Similarly, Olin argues it makes no difference if an
invoice is "unspecified" or "unrelated" if Olin is not seeking
to recover for that invoice. Olin contends that it would be

_____

[6] With respect to the "legal" category, Olin argues that Lamorak
is obligated to cover defense costs that Olin incurred after
settling with its primary insurer, INA. See Olin Corp. v.
Certain Underwriters of Lloyd's, 347 F. App'x 622, 628 (2d Cir.
2009). This does not, however, resolve whether Lamorak has to
cover all of Olin's legal costs.

20

confusing and/or misleading to the jury to present them with a sorting of Olin's expenses that is irrelevant to Lamorak's coverage obligations.

However, experience suggests that testimony that may appear overbroad at this stage may prove to be relevant at the time it is offered at trial. Accordingly, the Court will not exclude the testimony now but will reconsider the matter if and when it is offered at trial, after the Court has had the benefit of hearing testimony on Olin's costs and Lamorak has had the opportunity to tailor its own expert testimony in response.

In sum, for the foregoing reasons, the Court denies Olin's motion to strike Lamorak's cost opinions for purposes of these motions for summary judgment, without prejudice to Olin's renewing these motions at trial.

## Lamorak's Motion To Strike Olin's 56.1 Statement

Lamorak for its part moves to strike those portions of Olin's 56.1 statement that: (1) rely on expert opinions; (2) are conclusory; or (3) are argumentative. Lamorak alternatively moves to strike Olin's 56.1 statement in its entirety because it does not comply with the requirement that such statements be "short and concise." See Lamorak Insurance Company's Motion to Strike or Disregard Olin Corporation's Statement of Undisputed

21

Material Facts in Support of its Motion for Summary Judgment on the Remaining Sites ("Lamorak Strike Mem."), ECF No. 2252.

Pursuant to Local Civil Rule 56.1, upon any motion for summary judgment under Federal Rule of Civil Procedure 56, there "shall be annexed to the notice of motion a separate, short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried." S.D.N.Y. Local Civ. R. 56.1. This rule further requires that "[e]ach statement by the movant or opponent pursuant to Rule 56.1(a) and (b), . . . be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." Id. That is, "[t]he principles governing admissibility of evidence do not change on a motion for summary judgment and "only admissible evidence need be considered on summary judgment." Faulkner v. Arista Records LLC, 797 F. Supp. 2d 299, 305 (S.D.N.Y. 2011) (internal citations and quotations omitted).

Expert Opinion.[7] Lamorak advances several arguments to strike the portions of Olin's 56.1 statement that rely exclusively on expert testimony.

---

[7] Some of Lamorak's arguments concerning the propriety of Olin's reliance on expert reports appear additionally, or exclusively, in Lamorak's opposition to Olin's motion for summary judgment, but the Court addresses them here.

22

First, Lamorak argues that although experts can rely on certain inadmissible evidence to render opinions, they cannot disclose otherwise inadmissible evidence to establish facts. See Glowczenski v. Taser Int'l, Inc., 928 F. Supp. 2d 564, 576 (E.D.N.Y. 2013) ("Although [an expert] may rely upon certain hearsay in rendering his opinion, he may not cite that hearsay to the jury."); see also Louis Vuitton Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 678 (S.D.N.Y. 2007) ("Louis Vuitton I"), recommendation adopted in Louis Vuitton Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007). One example Lamorak provides of an improper use of an expert opinion to admit facts is paragraph 50 of Olin's 56.1 statement: "Olin owned Assonet, located in Freetown, Massachusetts, from 1968-1976, and operated Assonet as a PVC resin manufacturing facility from 1967-1974." Lamorak Strike Mem. at 3. The citations given in support of this paragraph are the expert reports of William Hall and Neal Brody.

Lamorak's conclusion that this statement is unsupported by admissible evidence does not follow, however, since Lamorak has not contended, let alone established, that any of the underlying evidence on which these experts rely is inadmissible. Nor does it appear that many of these predicate facts that Lamorak contends cannot be established through expert opinion are

23

actually in dispute in any material respect. See Transcript
dated June 18, 2018 at 49:25-50:2. For example, with respect to
Assonet, Lamorak's expert agreed that the Assonet Site is
located in Freetown, Massachusetts, that contamination
attributable to Olin began in 1968 and continued through 1974,
and that Olin manufactured PVC at the facility. Roux Report at
81, 86-87.

Second, Lamorak argues that Olin improperly relies on
expert opinions to establish facts because none of Olin's
experts has personal knowledge about how and/or when any of the
Remaining Sites came to be contaminated." See Lamorak Insurance
Company's Response to Plaintiff Olin Corporation's Memorandum in
Support of its Motion for Summary Judgment on the Remaining
Sites ("Lamorak Remaining Sites Opp. Mem.") at 16, ECF No. 2261;
see also Lamorak Strike Mem. at 4 (contending that Olin cannot
rely on Zetlmeisl's opinion to establish when payments were made
because Zetlmeisl "did not testify that he has personal
knowledge that any payment was made"). "Olin's experts concede
that they did not visit any of the Remaining Sites. They
certainly were not at the sites when the sites were owned,
operated, or used by Olin." Lamorak Remaining Sites Opp. Mem. at
16. Therefore, Lamorak contends, their testimony is not
admissible as "factual statement[s]" Id.

24

However, an expert's lack of contemporaneous personal knowledge does not render his or her opinions inadmissible. While "[s]imply rehashing evidence about which an expert has no personal knowledge is impermissible under Rule 702," Sharkey v. J.P. Morgan Chase & Co., 978 F. Supp. 2d 250, 252 (S.D.N.Y. 2013) (quoting Ridge Clearing & Outsourcing Sols., Inc. v. Khashoggi, 2011 WL 3586468, at *2 (S.D.N.Y. Aug. 12, 2011)), a party can use an expert report to synthesize and digest reams of otherwise admissible evidence, see Louis Vuitton Malletier S.A. v. Sunny Merch. Corp., 97 F. Supp. 3d 485, 504-07 (S.D.N.Y. 2015) (explaining that it is perfectly legitimate for experts to "synthesize" or "summarize" materials for the purpose of "streamlin[ing] the presentation of that data . . . , saving . . . . time and avoiding unnecessary confusion"). Indeed, Lamorak concedes that "the majority of the 'facts' and contentions of the parties will be presented through expert testimony" if this case reaches trial. Lamorak Remaining Sites Opp. Mem. at 3.[8]

Third, Lamorak argues that the Court should strike references to its own experts as well as Olin's, seemingly

_____

[8] Lamorak relies primarily on Louis Vuitton Malletier, 525 F. Supp. 2d at 573. In that case, the court excluded the "background facts" of an expert report that provided a "short introductory statement of the underlying facts of the case," id. at 677, which would presumably be established through some other witness during the trial. That is not the case here.

suggesting that expert opinion is inadmissible evidence on a motion for summary judgment. See Lamorak Strike Mem. at 5-6; see also id. at 5 ("[M]any of these statements are simply expert opinions and are not facts."). The Court rejects this argument. "The summary judgment standard requires a court to 'consider all relevant, admissible evidence,'" Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016) (citation omitted), and there can be no question that expert opinions, as a general matter, are admissible so long as they meet the criteria set forth in Federal Rule of Evidence 702.[9]

Conclusory Statements. Lamorak also asks the Court to strike conclusory and argumentative statements from Olin's 56.1 statement. The Court can disregard legal conclusions in a Local Rule 56.1 statement. See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 138 F. Supp. 352, 394 (S.D.N.Y. 2015).

Lamorak argues that the statements in Olin's 56.1 statement as to various amounts it has purportedly incurred in

---

[9] Lamorak complains that "[a]nother way in which Olin has submitted 'factual' statements that are unsupported by admissible evidence is by simply reciting, at length, what the opinions of its experts are with regard to each of the Remaining Sites." Lamorak Strike Mem. at 4. Lamorak does not explain why the length of the quotations matters for purposes of admissibility. The Court sees no reason why it does.

26

"recoverable" costs are legal conclusions, since whether or not any costs are recoverable remains in dispute. See Statement of Undisputed Material Facts in Support of Olin Corporation's Motion for Summary Judgment on the Remaining Sites at ¶¶ 65-66, 104-105, 131-132, 157-158, 178-179, 200-201, 227-228, 252-253, 278-279, 301-302, 330-331, 353-354, 383-384, and 410-411, ECF No. 2221. Similarly, Lamorak argues that the 56.1 statement's numerous references to "relevant occurrence" call for a legal conclusion since whether or not there was an "occurrence" at the sites is one the issues in dispute in this action. See id. at ¶¶ 90, 111, 137, 163, 185, 233, 258, 285, 309, 359, and 389. Finally, Lamorak objects to the statements that the "Lamorak Policies cover Olin's claim for environmental damage" in connection with each of the sites. See id. at ¶¶ 67, 85, 107, 134, 160, 181, 203, 230, 255, 281, 304, 333, 356, 386, and 413.[10]

---

[10] Lamorak additionally points out that, in connection with statements about whether Olin expected or intended the damage at various sites, Olin misstates that standard as being whether Olin expected and intended the damage rather than whether Olin expected or intended the damage, as the policies provide. See, e.g., Olin Remaining Sites 56.1 at ¶ 155. In addition to objecting to these as conclusory, Lamorak contends that this "critical distinction" makes "all of the representations in Olin's Rule 56.1 Statement addressing its burden to prove a covered 'occurrence' a nullity." Lamorak Strike Mem. at 7. The Court agrees with the former but not the latter. However, the Court has reviewed the documents underlying the statements touching on this issue in Olin's 56.1 statement and concludes that they evaluate whether Olin expected or intended the damage.

The Court agrees that these statements include legal conclusions and will disregard them to the extent that they assert legal conclusions rather than facts.

Argumentative. Lamorak also identifies a number of statements in Olin's 56.1 statement that are improperly argumentative. See, e.g., id. at ¶¶ 54, 94, 116, 142, 168, 190, 211, 238, 265, 290, 314, 340, 367, and 394 ("Lamorak has admitted that, because of its failure to respond appropriately to Olin's notice letters, 'waiver currently remains a viable argument for Olin in response to [Lamorak's] late defense notice.'"). "Rule 56.1 statements are not argument. They should contain factual assertions . . . " Rodriguez v. Schneider, No. 95-cv-4083, 1999 WL 459813, at *1 n.3 (emphasis in original). The Court agrees and will disregard these and any other argumentative statements in Olin's 56.1 statement.

Short and Concise Requirement. Finally, Lamorak argues that the Court should strike Olin's entire 56.1 statement for failure to comply with the "short and concise" requirement of Local Rule 56.1. See Primmer v. CBS Studios, Inc., 667 F. Supp. 2d 248 (S.D.N.Y. 2009) (courts have discretion to either disregard or strike statements that do not comply with the Local Rule's requirements).

However, "[t]he appropriate length of the 'short and concise' statement contemplated by Local Civil Rule 56.1 varies by case complexity," and there is no hard and fast page limit. In re Namenda Direct Purchaser Antitrust Litig., No. 15-cv-7488, 2017 WL 6606629, at *1 (S.D.N.Y. Dec. 20, 2017). Accordingly, courts in this district have denied motions to strike lengthy statements. See, e.g., id. (denying motion to strike 405-paragraph, 134-page statement; opposing statement: 494 paragraphs, 149 pages); Capitol Records, LLC v. Vimeo, LLC, 972 F. Supp. 2d 500, 509 (S.D.N.Y. 2013) vacated in part on other grounds, 826 F.3d 78 (2d Cir. 2016) (403-paragraph, 90-page statement). This case is sufficiently complex to warrant the length of Olin's 56.1 statement.

In sum, the Court denies Lamorak's motion to strike Olin's 56.1 statement, though the Court will disregard the argumentative and conclusory statements therein.

## Olin's and Lamorak's Competing Motions for Summary Judgment on the Remaining Sites

Olin moves for summary judgment in its favor as to all the Remaining Sites. Lamorak moves for summary judgment on the Middletown, Olin Water Services ("OWS"), Morgantown Ordnance Works ("Morgantown"), Assonet and Brazier sites and for partial

29

summary judgment on the North Little Rock ("NLR") and Wallisville Road sites.

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by either: "(A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). Where the moving party has documented particular facts in the record, the burden shifts to the opposing party to adduce contrary record evidence sufficient to create a genuine dispute of material fact. Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). To do so, the opposing party cannot merely make conclusory assertions to the contrary – it "must proffer admissible evidence that 'set[s] forth specific facts' showing a genuinely disputed factual issue that is material under the applicable legal principles." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (quoting Fed.

R. Civ. P. 56(e)); see also Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986).

Under New York law, Olin "must prove four elements to prevail on a breach of contract claim: (1) the making of a contract; (2) plaintiff's performance; (3) defendant's breach; and (4) damages." Evolution Markets, Inc. v. Alpental Energy Partners, LLC, 221 F. Supp. 3d 361, 369 (S.D.N.Y. 2016); see 17A Couch on Ins. § 254:11 (policyholder must show "existence of a policy, payment of applicable premiums, compliance with policy conditions, the loss as within policy coverage, and the insurer's refusal to make payment"). That is, the policyholder bears the burden to prove that the insurance contract covers the loss. See Morgan Stanley Grp. Inc. v. New England Ins. Co., 225 F.3d 270, 276 (2d Cir. 2000).

"The rule that insurance policies are to be construed in favor of the insured is most rigorously applied in construing the meaning of exclusions incorporated into a policy of insurance or provisions seeking to narrow the insurer's liability." Ingersoll Mill. Mach. Co. v. M/V Bodena, 829 F.2d 293, 306 (2d Cir. 1987); see also Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co., 908 N.E.2d 875, 876-77 (N.Y. 2009) ("The law governing the interpretation of exclusionary clauses in insurance policies is highly favorable to insureds."); id. at 877 (such clauses "are not

31

to be extended by interpretation or implication, but are to be accorded a strict and narrow construction").

In addition to seeking, through its breach of contract claims, past costs covered by Lamorak's Policies through 2016, Olin is seeking, through claims for declaratory judgment, coverage of all covered costs incurred or allocated after 2016 for environmental remediation at the Remaining Sites. See Memorandum of Law in Support of Olin Corporation's Motion for Summary Judgment on the Remaining Sites ("Olin Remaining Sites Mem.") at 25, ECF No. 2220. Lamorak only argues that Olin is not entitled to a declaratory judgment for future costs at the Remaining Sites to the extent that Olin has not met its burden to prove its entitlement to such coverage in the first instance under the Lamorak Policies. See Lamorak Remaining Sites Opp. Mem. at 25. Therefore, Olin is entitled to a declaratory judgment for future costs at any site for which Olin establishes Lamorak's liability under the Policies. See, e.g., Beazley Ins. Co. v. Ace Am. Ins. Co., 150 F. Supp. 3d 345, 355 (S.D.N.Y. 2015); see also Employers Ins. of Wausau v. Fox Entm't Grp., Inc., 522 F.3d 271, 278 (2d Cir. 2008).

## I.    **Whether Olin Performed**

Under the Policies, Olin's notice obligation is triggered when "an executive officer" of Olin "has information from which [he/she] may reasonably conclude that an occurrence covered

32

hereunder involves injuries or damages which . . . is likely to involve this policy." Lamorak Counter Remaining Sites 56.1 at ¶ 10. That standard accounts for where that policy sits in a stack of coverage. Olin v. American Re-Insurance, 74 F. App'x 105, 108 (2d Cir. 2003). The Policies also provide that "failure to give notice of any occurrence which at the time of its happening did not appear to involve this Policy, but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claim." Lamorak Counter Remaining Sites 56.1 at ¶ 9(b).

Moreover, because notice provisions exist to allow "insurers to make a timely investigation of relevant events and exercise early control over a claim," Commercial Union Ins. Co. v. Int'l Flavors & Fragrances, Inc., 822 F.2d 267, 271 (2d Cir. 1987), notice is still adequate so long as "any delay between acquiring that knowledge and giving notice to the excess carrier was reasonable under the circumstances," Morris Park Contracting Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 33 A.D.3d 763, 764-65 (App. Div. 2006) (explaining that "notice requirements are to be liberally construed in favor of the insured").

Lamorak does not challenge the timeliness of Olin's notices pertaining to the Remaining Sites. See Lamorak Remaining Sites Opp. Mem. at 1, 5. Nor does Lamorak actually argue that Olin

33

failed to perform in any other respect.[11] Accordingly, the Court finds that Olin has performed its obligations under the Policies.

## II.  **Whether Lamorak Breached**

Lamorak is in breach of its Policies if it has failed to indemnify Olin for costs incurred in connection with covered property damage. In determining whether Lamorak was obliged to cover the costs of Olin's liability at the Remaining Sites, the Court considers each site in turn. However, the Court first addresses several legal issues that are pertinent to multiple sites.

### A. **Legal Principles**

Under the Policies, an occurrence is "an accident or a happening or a continuous or repeated exposure to conditions which unexpectedly and unintentionally result in personal injury [or] property damage . . . during the policy period." Lamorak Counter Remaining Sites 56.1 at ¶ 8. Moreover, the Lamorak

---

[11] Lamorak does assert, in its opposition to Olin's motion for summary judgment, that it contends therein and in its separate motion for summary judgment "that Olin's multiple failures of 'performance' under the Lamorak Policies defeat coverage." Lamorak Opp. Mem. at 1. However, Lamorak only argues in those motions that Olin has not met its burden to prove its entitlement to coverage under the terms and conditions of the Lamorak policies and that there are genuine issues of material fact as to Olin's damages claim. While Lamorak does argue that it has not waived or forfeited any of the affirmative defenses, with the exception of the 1964 Endorsement, Lamorak does not cite any record evidence substantiating those defenses.

Policies only provide coverage for "sums which the Insured [Olin] shall be obligated to pay by reason of liability." Olin Counter Remaining Sites 56.1 at ¶ 19.

Therefore, to recover under the Policies, Olin must show for each site: (1) property damage occurred or continued to spread during the policy period; (2) by the time of the policy period of 1970, Olin did not expect or intend the property damage that it was obligated to remediate; (3) Olin is legally liable for certain sums on account of the property damage; and (4) the amount of those sums.

### 1. **Property Damage**

Neither Olin nor Lamorak disputes that it is the law of the case that "property damage occurs as long as contamination continues to increase or spread, whether or not the contamination is based on active pollution or the passive migration of contamination into the soil and groundwater." Olin Corp. v. Certain Underwriters at Lloyd's London, 468 F.3d 120, 131 (2d Cir. 2006). Thus, property damage at a site will continue even after Olin ceased its disposal activities, so long as the previously disposed-of contamination continues to increase or spread through any media, including soil, surface or groundwater, or ecological receptors. See id. at 131-132.

35

However, the parties do have two disagreements regarding the property damage component of Lamorak's liability:

## a. Settlements

Olin argues that it also is the law of the case that it does not need to prove actual damages if it reasonably settled with a party to whom it was liable for damage during the policy period. This Court (per Judge Griesa) previously held that when Olin reasonably settles claims that alleged covered property damage, Lamorak's policy is triggered. See Olin Corp. v. Ins. Co. of N. Am., No. 84-cv-1968, 2015 WL 1782194, at *3 & n.1 (S.D.N.Y. Apr. 15, 2015), vacated in part on other grounds, Olin Corp. v. One Beacon Am. Ins. Co. ("Olin IV"), 864 F.3d 130 (2d Cir. 2017) ("The court has already held that, in light of Olin's reasonable settlement of the NJDEP's [New Jersey Department of Environmental Protection] claim for covered losses during the policy period, Olin is not required to prove the truth of NJDEP's allegations" – that is, that any damage actually occurred during the policy period); see also id. at *3-4 ("OneBeacon argues . . . it is entitled to litigate Olin's liability at the BROS Site even after Olin's settlement with regulators. . . . The court disagrees."); see also Lamorak Counter Remaining Sites 56.1 at ¶ 429(a) ("I'm going to hold that if a claim is made against Olin for liability for

36

contamination damage to property, environmental damage, and if there is a claim that that occurred during the policy coverage period, and if Olin settles that claim, then the insurance company is liable.").

Lamorak did not challenge that ruling before the Second Circuit, even though it appealed other rulings concerning the BROS site, and accordingly, the Court's ruling is now law of the case. See Wright v. Poole, 81 F. Supp. 3d 280, 287 (S.D.N.Y. 2014) ("The law of the case doctrine . . . bars re-litigation in district court of matters implicitly decided by an appellate court, as well as re-litigation of matters that could have been raised on appeal but were not.").

Lamorak urges the Court to reconsider Judge Griesa's decision. "The law of the case doctrine is . . . discretionary and does not limit a court's power to reconsider its own decisions. . . ." Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992). "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Id. (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478 at 790). Lamorak argues that reconsideration is

warranted here because Judge Griesa's decision was plainly wrong.

Judge Griesa's opinion rested on Luria Bros. & Co, Inc. v. Alliance Ass. Co., Ltd., 780 F.2d 1082 (2d Cir. 1986). To be sure, Judge Griesa's conclusion was an extension of the logic in Luria. In that case, the insurer, like Lamorak, had provided the insured with liability insurance. Id. at 1085. The insurer contested that the insured in fact was liable to the third parties with whom it settled. The Second Circuit held that, in order to establish liability, "[t]he insured need not establish actual liability to the party with whom it has settled 'so long as a potential liability on the facts known to the [insured is] shown to exist, culminating in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the [insured].'" Id. at 1091. The Court separately addressed the question of whether the particular damage that triggered the insured's liability was covered by the insurer's policy. The nature of the damage was not seriously in dispute and the court easily determined that the policy covered liability for that type of damage by looking at the language of the policy. Id. at 1092-93.

Nevertheless, the extension of Luria's reasoning to find that a settlement reasonably entered into suffices to establish

38

not only the fact of liability but also the fact of a particular type of damage triggering that liability is not plainly erroneous. Therefore, the Court declines to exercise its discretion to reconsider Judge Griesa's ruling and finds it is the law of the case that, if Olin reasonably settled claims against it alleging covered property damage in 1970, then Olin is not required to prove that covered property damage actually occurred.

### b. Onsite Property Damage

Lamorak argues that remediation of property damage that occurred only on Olin's own property cannot trigger coverage. On the other hand, Olin contends that onsite remediation activities are covered by Lamorak's policies if they are undertaken for the purpose of preventing or stopping the migration of contaminants from onsite sources to third-party property.

Lamorak agreed to indemnify Olin for all sums it is obligated to pay by reason of liability for damages on account of property damage caused by or arising out of an occurrence. See Lamorak Counter Remaining Sites 56.1 at ¶ 6. Lamorak's policies define property damage as the "loss of or direct damage to or destruction of tangible property (other than property owned by the Named Insured)." Id. at ¶ 7.

39

In interpreting the scope of this owned property exclusion, this Court does not write on a blank slate. In Gerrish Corp. v. Universal Underwriters Ins. Co., considering similar contract language, the Second Circuit found an insurer liable for onsite cleanup costs undertaken "for the purpose of abating seepage to neighboring property" and addressing a "substantial threat to the environment." 947 F.2d 1023, 1030-31 (2d Cir. 1991) (internal quotation marks omitted).[12] In that case, the insured had proven "actual damage to the surface and groundwater and deterioration of the groundwater quality both on and off the [insured's] property." Id. at 1030. In other words, Gerrish does not hold that an insured does not need to prove any actual damage to third-party property to recover damages under an insurance policy containing an owned property exclusion. Rather, Gerrish indicates that if an insured can prove such actual damage to third-party property, then the "damages" that the insured can recover includes on-site cleanup costs undertaken to prevent further damage to neighboring property.

Nevertheless, numerous district courts in this Circuit have found that the owned property exclusion does not apply where

---

[12] The court technically applied Vermont law but was guided by New York law in its analysis. See Gerrish Corp., 947 F.2d at 1029-30.

cleanup of the insured's property is required to prevent damage
to property of a third party or to protect public health,
regardless of whether third party property damage has already
occurred. See, e.g., Agway, Inc. v. Agway Petroleum Corp., 93-
cv-557, 1993 WL 771008, at *8 (N.D.N.Y. Dec. 6, 1993) (the owned
property "exclusion does not apply where cleanup of the
insured's property is required to remedy or prevent damage to
property of a third party or to protect the public health"
(emphasis added)); Savoy Med. Supply Co. v. F & H Mfg. Corp.,
776 F. Supp. 703, 708 (E.D.N.Y. 1991) (finding that where work
is done to prevent damage to property of third parties, the
owned property exclusion does not apply); Kirchner v. Fireman's
Fund Ins. Co., 1991 WL 177251, at *8 (S.D.N.Y. Sept. 4, 1991)
("Even if off-site migration had not yet occurred, we do not
believe that the standard 'owned property' exclusion . . . is
applicable to suits alleging 'abatement remedies' designed to
prevent damage to the public and third parties."); Boyce
Thompson Inst. For Plant Res., Inc. v. Ins. Co. of N. Am., 751
F. Supp. 1137, 1141 (S.D.N.Y. 1990) (if "off-site contamination
exists or . . . the clean-up work was performed to prevent
damage to the property of third properties, the owned property
exclusion would not be applicable to work done on the property"
(emphasis added)).

41

There is good reason to follow the reasoning of these other district courts and narrowly construe the exclusion: "[I]nterests in a swift cleanup warrant creating incentive for the insured to stop the pollution as soon as possible," and "if coverage is only triggered when waste seeps onto third-party property, the incentive remains with the insured to delay cleanup until it affects third-party property." Savoy Med. Supply Co., 776 F. Supp. at 708.

Lamorak's cases do not persuade the Court to depart from the well-reasoned decisions of its colleagues. First, Gap, Inc. v. Fireman's Fund Ins. Co., 11 A.D.3d 108 (N.Y. App. Div. 2004), is easily distinguished. The main question the court resolved in that case was whether the "you" and "insured" in the owned property exclusion applied only to the named insured or also to an additional insured. Second, Castle Village Owners Corp. v. Greater N.Y. Mutual Insurance Co., 64 A.D.3d 44 (N.Y. App. Div. 2009), involved a broader owned property policy exclusion than the one the Lamorak's policies contain. There, the policy excluded coverage for "property you own, rent, or occupy, including any costs or expenses incurred by you . . . for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to

42

a person or damage to another's property." Id. at 46 (internal quotation marks omitted).[13]

Therefore, the Court finds that Lamorak is obligated to indemnify Olin for clean-up work conducted on-site to prevent damage to third-party property.

## 2. **Whether Olin Expected or Intended the Damage**

Courts construe "expected or intended" provisions "narrowly, barring recovery only when the insured intended the damages." Continental Cas. Co. v. Rapid-American Corp., 80 N.Y.2d 640, 649 (1993) (emphasis added). The "[r]esulting damage can be unintended even though the act leading to the damage was intentional." Id. Thus, the focus is on whether Olin subjectively expected and intended the specific damage that resulted from its waste-disposal practices. See id.; City of Johnstown v. Bankers Standard Ins. Co., 877 F.2d 1146, 1149-51 (2d Cir. 1989).

Olin argues that Lamorak cannot rely on "newspaper articles, textbooks, and/or industry publications that discuss pollution or waste disposal generally to show the environmental

---

[13] To the extent that court understood itself to be expounding on the scope of owned property exclusions more generally, see, e.g., id. at 48-49, the Court does not think the New York Court of Appeals would adopt that court's reasoning.

awareness of the general public," or "Olin's membership in the Manufacturing Chemists' Association ("MCA") and attendance at industry conferences" to establish that Olin knew about the hazards of certain wastes at Assonet, Charleston, Morgantown, New Haven, Pine Swamp (based on Swanson's report), and North Little Rock and Wallisville Road (based on Recker's report). See Memorandum of Law in Support of Olin Corporation's Motion for Summary Judgment on the Remaining Sites ("Olin Remaining Sites Mem.") at 13, ECF No. 2220.

### a. Collateral Estoppel

Olin first argues that Lamorak is collaterally estopped from re-litigating "the factual finding that general industry knowledge and Olin's membership in trade associations does not show that it expected or intended the property damage." Id. at 13-14. "Under the doctrine of collateral estoppel, 'when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" United States v. U.S. Currency in Amount of $119,984.00, More or Less, 304 F.3d 165, 172 (2d Cir. 2002) (quoting Schiro v. Farley, 510 U.S. 222, 232 (1994)). "Generally, for collateral estoppel to apply, four prerequisites must be satisfied: (1) the issues in both proceedings must be identical; (2) the issue must have been

44

actually litigated and actually decided in the prior proceeding; (3) there must have been a full and fair opportunity to litigate the issue in the prior proceeding; and (4) the resolution of the issue must have been necessary to support a valid and final judgment on the merits." Id.

As an initial matter, the jury in the Five Sites trial did not actually find that "general industry knowledge and Olin's membership in trade associations does not show that [Olin] expected or intended the damage." Instead, the jury found that "[]by the time of the policy period of 1970," Olin did not expect or intend the property damage that it was obligated to remediate at the Augusta, Fields Brook, McIntosh OU2, and Rochester Sites. See Declaration of Craig C. Martin in Support of Olin Corporation's Motion for Summary Judgment on the Remaining Sites ("Martin Remaining Sites Decl.") Ex. 150 (jury verdict sheets), ECF No. 2214. Nor does Olin genuinely argue that the jury "necessarily" decided that broad, evidentiary principle in rendering its verdict. Accordingly, Lamorak cannot be collaterally estopped from relying on materials showing general industry knowledge or Olin's membership in a trade organization.

Lamorak could, however, be collaterally estopped from arguing that the same evidence establishes that Olin expected or

45

intended the damage if the waste disposal practices at any of the Remaining Sites were "identical" to the waste disposal practices at the previously litigated sites.

Lamorak does here rely on some of the same evidence it relied on during the Five Sites trial. In that trial, Lamorak disclosed the report of Robert Karls, who opined that Olin expected and intended the damage it remediated at those sites. Lamorak Counter Remaining Sites 56.1 at ¶ 418. He based his opinion, in part, on industry knowledge about pollution and waste disposal, Olin's membership in chemical industry trade groups such as MCA, and proceedings at the Purdue Industrial Waste Conference related to waste disposal and water damage. See id. at ¶¶ 419, 421. He also testified at trial that the knowledge Olin gained through participation and membership in the MCA and attendance at the Purdue Industrial Waste Conference showed that Olin expected and intended the damage it remediated. Id. at ¶¶ 420-21. Sections of the Recker's reports on North Little Rock and Wallisville – but not the Roux Report – are substantially similar to the Karls Report disclosed as part of the Five Sites litigation. See Lamorak Counter 56.1 at ¶¶ 327-28, 407-08. In drafting his report, Recker confirmed that, where included, these sections were relevant to the sites at issue here. See, e.g., Declaration of Ralph J. Luongo in Response to

Olin Corporation's Statement of Undisputed Material Facts and in Support of Lamorak Insurance Company's Response to Olin Corporation's Motion for Summary Judgment on the Remaining Sites and Lamorak's Counterstatement of Undisputed Material Facts ("Luongo Remaining Sites Opp. Decl.") Ex. B at 68:25-71:15, ECF No. 2259. Recker's report also includes sections addressing the specific facts relevant to the North Little Rock Site.

However, Olin does not claim that its waste practices at the sites on which Recker opines were similar to the waste practices at the Five Sites. Olin only contends that the practices at Charleston, North Little Rock, and Wallisville Road Sites are materially indistinguishable from the practices at previously litigated sites. Specifically, Olin asserts that Charleston is materially indistinguishable from Augusta and that North Little Rock and Wallisville Road are materially indistinguishable from Aberdeen. Olin Remaining Sites Mem. at 18. As to North Little Rock and Wallisville, Lamorak was not a participant in the Aberdeen Sites trial and so cannot be collaterally estopped from litigating disputes resolved in that proceeding. See Lamorak Counter Remaining Sites 56.1 at ¶ 446. As for Charleston, Olin cannot establish that its waste disposal practices there were "identical" to those at Augusta simply because at both sites mercury-contaminated wastes from plant

47

operations were disposed of in landfills and/or a retention
pond. See id. at ¶¶ 144, 146, 426, 429. In addition, the Roux
Report on the Charleston Site relies on different evidence than
the Karls Report.

### b. **Whether Lamorak's Evidence Implies Subjective Knowledge**

Olin argues that even if Lamorak is not collaterally estopped
from relying on this evidence, the evidence Lamorak proffers cannot
establish that Olin subjectively knew and intended that its actions
would cause the specific, latent property damage that required
remediation. The general publications identified by the experts do
not discuss specific property damage resulting from specific waste
handling practices at any Olin site. They also do not purport to
identify Olin's subjective understanding about its operations.
Rather, these publications indicate that "instances of
environmental pollution were gaining national attention as they
were increasingly reported to the general public in newspapers,
magazines, and other general periodicals." Martin Remaining Sites
Decl. Ex. 13 at 120 [hereinafter Roux Report]. "By 1950, the
technical aspects of surface water and groundwater pollution had
been extensively studied." Id. "By 1960, the technical aspects of
landfills and liquid waste disposal ponds/lagoons had also been
extensive studied." Id.

Although these publications may not concern the fine details of the waste handling practices at Olin's various sites, a reasonable juror could find that their discussions of waste handling and pollution in general are applicable to Olin's practices. In addition, while these secondary sources do not directly establish Olin's subjective knowledge, a reasonable juror could infer from them that Olin had such subjective knowledge. Moreover, Lamorak does identify some evidence speaking more directly to Olin's subjective awareness: Olin's participation in MCA activities regarding pollution: "Olin executives frequently participated in MCA meetings where pollution was discussed. Specifically, review of MCA meeting minutes reveals that approximately 30 Olin executives participated in over 140 MCA meetings from the 1950s and 1960s where the subject of either water pollution, lagoons, ponds, landfills, dumps, and/or waste burial were discussed." Id. at 121. In addition, "Olin maintained an Industrial Environmental Control Department in the late 1950s that would perform analytical testing of its wastewaters and effluent." Id.

Olin also argues that Lamorak's site-specific evidence at best shows that Olin knowingly disposed of waste, not that Olin knew in 1970 that it was causing the resulting damage. That is not enough, Olin contends, to establish that it expected or intended

49

the damage. Olin Remaining Sites Mem. at 15-16. For example, the evidence includes "only a handful" of documents from 1970 or earlier. Id. at 16. Such evidence includes a 1968 letter from Olin stating that there "may be a pollution and/or drainage problem" at the Assonet Site and that "[l]eachate emanating from the toe of the landfill was . . . visibly obvious" at the Morgantown site. Lamorak Counter Remaining Sites 56.1 at ¶¶ 61, 63, 247. However, when considered in connection with the secondary just sources described, this site-specific evidence could lead a reasonable juror to conclude that Olin expected or intended the damage.

### 3. Liability

Lamorak's policies cover all sums Olin shall be obligated to pay by reason of liability imposed upon it by law or assumed under contract or agreement by Olin for damages and expenses on account of property damage caused by or arising out of an occurrence.

Where no complaint, pleading, or adversarial action has been taken against the insured, courts interpreting New York law have found that there is not even a duty to defend insureds against these claims, let alone a duty to indemnify. For example, the New York Appellate Division has found that mere letters from the EPA were not the equivalent of the commencement of a formal proceeding within the meaning of the subject comprehensive general liability policies. See Technicon Elecs. Corp. v. Am. Home Assurance Co.,

141 A.D.2d 124, 145-46 (App. Div. 1988), aff'd 544 N.Y.S.2d 531 (1989). The First Circuit, applying New York law, has similarly found that "something more than an invitation to voluntarily initiate cleanup activities is required to animate [an] insurer's duty" to defend a pollution case. See Ryan v. Royal Ins. Co., 916 F.2d 731, 741 (1st Cir. 1990). Accordingly, Olin is only "liable" for damages arising out of an occurrence where it received some adversarial communication or it was the object of an adversarial action.

## B. Factual Disputes[14]

As a preface to discussion of the parties' factual disputes, the Court notes that for any site where a component of Lamorak's liability – other than damages – is genuinely disputed, the Court denies summary judgment at that site. That is, with the exception of sites where Lamorak's liability is not genuinely disputed but the amount of damages is, the Court declines to grant partial summary judgment at any of the sites.

### 1. Site for Which Summary Judgment is Warranted

---

[14] In support of their motions for summary judgment, Olin and Lamorak each submitted multiple expert reports in addition to their statements of undisputed facts pursuant to Federal Rule of Civil Procedure 56.1. Olin's experts are Neal Brody, William Hall, William L. Goodfellow, Jr., Frank Rovers, and Thomas Zetlmeisl. See Martin Remaining Sites Decl. Exs. 4-8. Lamorak's experts are Scott A. Recker and Douglas J. Swanson, Sin Senh, and Kelly Coulon. See id. Exs. 9-11, 13.

### a. **Olin Water Services**

Olin and Lamorak both move for summary judgment on the Olin Water Services ("OWS") Site, which Olin operated as a water treatment chemicals manufacturing plant from 1970 to 1989. See Olin Counter Remaining Sites 56.1 at ¶ 59; see also Roux Report at 90.

Lamorak argues that Olin is not entitled to coverage for this site on three grounds: (1) there is no coverage for groundwater contaminated by Trichloroethene ("TCE") because it was caused, not by Olin's operations, but rather by the operations of a third party who has accepted responsibility for it; (2) the only damage other than the TCE-groundwater contamination was on-site soil contamination; and (3) Olin is not entitled to coverage from Lamorak, an excess insurer, for the defense costs it seeks because Olin did not settle the OWS site with its primary insurer, INA. The Court finds that Olin is not entitled to coverage from lamorak because Olin did not settle claims at the OWS site with its primary insurer, INA. The Court therefore does not need to reach Lamorak's other arguments.

Primary insurance policies provide the first layer of insurance coverage, which attaches immediately upon the occurrence of a policy-defined liability or loss. Ali v. Fed.

52

Ins. Co., 719 F.3d 83, 90 (2d Cir. 2013). Excess liability

policies, like the Lamorak Policies, by contrast, provide

coverage for losses that exceed the limits of the primary

policy. Id. Coverage under an excess policy thus is triggered

only after the liability limits of the underlying primary

insurance policy have been exhausted. Id. at 91. The "very

nature of excess insurance coverage is such that a predetermined

amount of underlying primary coverage must be paid before the

excess coverage is activated." Id.

The primary policy underlying the Lamorak Policies was

issued by INA, Policy No. SRL 2217 (the "INA Policy"). See

Declaration of Ralph J. Luongo in Support of Defendant Lamorak

Insurance Company's Motion for Summary Judgment on Liability,

Damages and Other Relief Sought by Olin Corporation for the

Remaining Sites ("Luongo Remaining Sites Decl.") Ex. R, ECF No.

2219. From January 1, 1969 to January 1, 1973, the INA Policy

contained a limit of liability for property damage in the amount

of $300,000 per occurrence. See id. There is no aggregate limit

applicable to the environmental claim at issue in this

litigation. See id. The INA Policy had a duty to defend and the

costs incurred in the defense were in addition to the policy

limits. See id. INA's obligations, as set forth in the INA

Policy and which included a duty to defend, applied to the claims arising from the OWS site. See id.

Lamorak contends that, unlike the other Remaining Sites, Olin did not release its claims against INA arising from OWS. See Luongo Remaining Sites Decl. Ex. Q (settlement agreement between INA and Olin). The phrase "Claims Released By Olin" was defined in the Agreement to generally include all "Known Sites," which were specifically listed on Exhibit B. See id. OWS is not listed on Exhibit B of the Settlement Agreement. See id. The term "Non-Released Claims" was defined as including claims for "remediation of sites other than the Known Sites." See id.

Olin argues that Lamorak misreads the terms of its settlement with INA and that, properly construed, the settlement did release claims at OWS. The settlement covers all "Known Sites," defined as "those sites involved in the Coverage Litigation, as well as all sites for which Olin has given notice of an Environmental Claim to Century Indemnity [INA] as of" September 30, 2005. See id. "Notice" is not defined in Olin's settlement with INA. See Luongo Remaining Sites Decl. Ex. Q.

Olin contends that it gave notice to its claim for coverage at the OWS to its insurers in 1986. Olin's present OWS claim relates to environmental conditions at the formerly owned Kansas City Site. In support of its contention that it provided notice

to all of its insurers, including INA, of an occurrence relating to Olin Water Services no later than December 17, 1986, Olin points to a notice that discusses Olin Water Services with respect to a site in Kansas named "Doepke Disposal Service," with respect to a "Miami Drum" site, and with respect to a site in Missouri. See Martin Remaining Sites Decl. Ex. 118 at OLIN-CT 3765284, OLIN-CT 3765289, OLIN-CT 3765310; see also Declaration of Craig C. Martin in Support of Plaintiff Olin Corporation's Opposition to Lamorak's Motion for Summary Judgment on Liability, Damages, and Other Relief Sought by Olin Corporation for the Remaining Sites ("Martin Remaining Sites Opp. Decl.") at Ex. 46 at OLIN-CT 3765313, ECF No. 2260. These are sites to which the Olin Water Services plant allegedly sent waste. This is clear both from the cited pages describing those third-party disposal sites, and from the titles of the corresponding tables of contents: "OLIN SITES FOR WHICH OLIN NOTIFICATIONS HAVE BEEN MADE," id. at OLIN-CT 3765273, and "OLIN SITES FOR WHICH INSURANCE NOTIFICATIONS HAVE BEEN MADE," id. at OLIN-CT 3765295. OWS is not listed in those tables. That is, this omnibus letter does not provide Olin's insurers, including INA, with notice

about claims at Olin Water Services, i.e. the claims for which

Olin now seeks coverage from Lamorak.[15]

Therefore, the Court finds that Olin did not settle its

claims with INA, such that it is not entitled to coverage of its

defense costs by Lamorak.[16]

---

[15] Olin also points to Lamorak's concession that the excess
insurers received timely and effective notice of Olin's claim at
the Remaining Sites, including OWS. See Memorandum of Law in
Support of Lamorak Insurance Company's Motion for Summary
Judgment on Its Third-Party Claims, ECF No. 2209 at 5, 11 n.5
("The Co-Insurers have asserted late notice as an affirmative
defense to Lamorak's contribution claim."). Olin suggests that
this concession entails a concession that INA also received
timely and effective notice of Olin's claim at the Remaining
Sites. The Court disagrees.

[16] The Settlement Agreement provided that INA would pay up to $2
million for each Non-Released Claim. See Luongo Remaining Sites
Decl. Ex. Q. Therefore, while Lamorak does not have an
obligation to pay Olin's defense costs at the OWS Site, it would
be obligated to pay Olin's other costs. To the extent that Olin
is seeking costs other than defense costs, summary judgment is
not warranted because there is a genuine dispute as to whether
Olin reasonably settled claims brought against it for covered
property damage. In 1995, KDHE accused Olin of being the
"primary source" of TCE contamination at the Olin Water Services
site. See Martin Remaining Sites Opp. Decl. Ex. 47 at
2018OLINFACSITES_0052697600536976-82. In response, Olin
repeatedly asserted that the operations of the neighboring
property owner, Gardner Asphalt, were the only source of the
contamination. See Luongo Remaining Sites Decl. at Ex. E at
58:1-25, 63:13-64:2; see also Luongo Remaining Sites Decl. at
Ex. N. at 2018OLINFACSITES_00659608, _00659616. Eventually, Olin
and KDHE engaged in a dispute resolution proceeding in which the
presiding officer concluded, in late December 2007, that it was
"reasonable for KDHE to suspect the Olin site as a source of the
TCE" and ordered Olin to "participate in activities to eliminate
the former Olin real property site from suspicion as a potential

56

## 2. Sites for Which Only Damages Are Genuinely Disputed

### a. Bethany

Only Olin moved for summary judgment at the Bethany Site. Lamorak does not seriously dispute that summary judgment is warranted, except with respect to damages.

Olin owned and operated Bethany, located in Bethany, Connecticut, as a shooting range from at least 1951 to 1981. See Martin Remaining Sites Decl. Ex. 5 at Bethany 1-3 [hereinafter Hall Report]; Hall Report at Overview, Table 6-1; see also Roux Report at 116. Both Olin's experts and Lamorak's experts concluded that there was damage at the site, in the form of lead and polycyclic aromatic carbons ("PAHs"), throughout Olin's operation of the site. See Hall Report at Bethany 1, 5-9; Hall Report at Overview, Table 6-1; Martin Remaining Sites Decl. Ex. 7 at 29-30 [hereinafter Goodfellow Report]; Roux Report at 118; Martin Remaining Sites Decl. Ex. 33 at 229:12-230:6 (Coulon deposition).

There also is no genuine dispute that Olin is legally liable at this site. See Lamorak Counter Remaining Sites 56.1 at

---

source of the contamination." Martin Remaining Sites Opp. Decl. Ex. 50 at 5, 8. However, Gardner Asphalt has now entered into the Kansas voluntary remediation program and, according to James Brown, Olin's corporate designee, KDHE "finally . . . understands that it was the third-party source all along." Luongo Remaining Sites Decl. Ex. E at 58:1-25.

¶ 80 (October 31, 2017 Connecticut Department of Environmental
Protection's "List of Significant Environmental Hazards Reported
to the DEEP" that includes Bethany and notes that DEP directed
the property owner to provide a work plan to sample a subset of
wells identified in the vicinity of the site).

Nor is there any genuine dispute that Olin did not expect
or intend the damages. Olin's experts concluded that Olin did
not expect or intend the damages, see Hall Report at 12;
Goodfellow Report at 25, 31, and Lamorak's experts do not
contend otherwise, see Lamorak Counter Remaining Sites Decl. at
¶¶ 77-79 (citing Roux Report at 139-42).

## b. Brazier Forest

Olin and Lamorak both move for summary judgment on the
Brazier Forest Site. The site is a manufacturing operation
located in Puyallup, Washington. See Olin Counter Remaining
Sites 56.1 at ¶ 219. From 1956 to 1963, Olin owned and operated
the site as an explosives manufacturing facility. Id. at ¶ 220;
see also Roux Report at 59. Among the materials manufactured by
Olin was nitroglycerin for dynamite. See Olin Counter Remaining
Sites 56.1 at ¶ 221. There is evidence that Olin disposed of its
wastes in an on-site landfill and in disposal pits. Id. at ¶
222. Groundwater at the site was found to be contaminated with
carbon tetrachloride ("CTC"), which allegedly was used by Olin

in its operations, and Olin was named as a potentially liable
person by the Washington Department of Ecology in 1995. Id. at
¶¶ 224-225; see also Martin Remaining Sites Opp. Decl. Ex. 98
(letter from the Department of Ecology dated December 1, 1995
stating its finding that "credible evidence exists which
supports Olin's status as a potentially liable party for the
release of carbon tetrachloride at the Frederickson Industrial
Park Site.").

Lamorak moves for summary judgment on the ground that the
1964 Endorsement in its Policies applies. Per that Endorsement,
Lamorak is not liable to Olin for any costs incurred by "reason
of" acts committed by Olin prior to February 1, 1964. Olin's
only connection to and responsibility for the Brazier Site
relate to its activities during the time that it owned and
operated the site from 1956-1963. See Olin Counter Remaining
Sites 56.1 at ¶ 220.

Olin argues that Lamorak forfeited reliance on the 1964
Endorsement. The Court agrees. The Second Circuit has held that
under New York law, "an insurer is deemed, as a matter of law,
to have intended to waive a defense to coverage where other
defenses are asserted, and where the insurer possesses
sufficient knowledge (actual or constructive) of the
circumstances regarding the unasserted defense." New York v.

59

AMRO Realty Corp., 936 F.2d 1420, 1431 (2d Cir. 1991) (citing

General Accident Ins. Grp. v. Cirucci, 46 N.Y.2d 862, 864

(1979); Appell v. Liberty Mutual Ins. Co., 22 A.D.2d 906, 906

(2d Dep't 1964); Albert J. Schiff Assocs., Inc. v. Flack, 51

N.Y.2d 692, 698 (1980)). In that same case, the Second Circuit

indicated that out-of-state cases that "impose the prejudice

requirement where waiver is claimed" seem to "contradict

previous New York law as pronounced by the Court of Appeals."

AMRO Realty Corp., 936 F.2d at 1432 n.12. That is, "the act by

an insurer of disclaiming on certain grounds but not others is

deemed conclusive evidence of the insurer's intent to waive the

unasserted grounds." Id. at 1432.

When Lamorak answered Olin's Second Amended Complaint,

which included claims relating to Brazier, it asserted twenty-

six affirmative defenses – but not the 1964 Endorsement. See

Martin Remaining Sites Opp. Decl. Ex. 103 (Answer dated November

18, 1993). Moreover, at the time it answered the Second Amended

Complaint Lamorak had actual or constructive knowledge of the

facts underlying a defense based on the 1964 Endorsement. See

Martin Remaining Sites Decl. Ex. 72 at 2018OLINFACSITES_00047800

(letter from Olin dated October 7, 1991, informing insurers that

Olin operated Brazier from the late 1950s until 1963). Lamorak's

reservation of rights to add new defenses as new information

60

became available does not preclude a finding of waiver. Accordingly, Lamorak waived its right to invoke the 1964 Endorsement.

In light of this waiver, there is no genuine dispute that Lamorak is obligated to indemnify Olin for its costs at the Brazier Site. There was property damage at the Brazier Site in 1970. See Lamorak Counter Remaining Sites 56.1 at ¶ 95 (raising only the meritless argument that Olin's expert reports and testimony are inadmissible hearsay); see also Roux Report at 59, 61, 63; Hall Report at Brazier 12; Martin Remaining Sites Decl. Ex. 35 at 176:14-180:24 (Senh deposition).

Olin did not expect or intend that damage. See Lamorak Counter Remaining Sites 56.1 at ¶ 99 (raising only meritless objections); see also Martin Remaining Sites Decl. Ex. 4 at 14 [hereinafter Brody Report]; Goodfellow Report at 32, 36-37; Lamorak Counter Remaining Sites 56.1 at ¶ 100 (neither of Lamorak's experts offered an opinion regarding whether Olin expected or intended the damage at Brazier).

Finally, there's no genuine dispute that Olin is legally liable at the site. Olin (and its successor at the site, Mallinckrodt Inc.) entered into Agreed Order No. DE 97TC-S121 in 1997 - effective date April 3, 1997 - with the Washington Department of Ecology to complete a Remedial

61

Investigation/Feasibility Study at Brazier. See Martin Remaining Sites Decl. Ex. 70. Agreed Order No. DE 97TC-S121 stated that carbon tetrachloride releases had "contaminated groundwater in and around" Brazier at concentrations exceeding state cleanup levels and "present[ed] a threat to human health and the environment." Lamorak Counter Remaining Sites 56.1 at ¶ 103. Based on this finding, the Washington Department of Ecology ordered Olin to take remedial action, and "devise and implement a permanent solution regarding the impact of carbon tetrachloride affected domestic drinking water wells," for the "public interest." Lamorak Counter Remaining Sites 56.1 at ¶ 103(a). In 1997, Olin and Mallinckrodt entered into a Settlement Agreement and Joint Defense Agreement related to remedial costs at Brazier. Lamorak Counter Remaining Sites 56.1 at ¶ 103(b).

### c. Central Chemical

Only Olin moves for summary judgment on the Central Chemical Site in Hagerstown, Maryland. The Central Chemical property was initially developed for fertilizer blending and manufacturing operations that continued until 1984. See Martin Remaining Sites Decl. Ex. 77 at 2018OLINFACSITES_00060626; see also Martin Remaining Sites Decl. Ex. 9 at 2-3 (Recker Report). Olin tolled pesticides at this site from at least 1959 to 1965. See Lamorak Counter Remaining Sites 56.1 at ¶ 109 (disagreeing

that Olin tolled raw pesticide material from 1950 to 1966); see Martin Remaining Sites Decl. Ex. 9 at 3 (concluding that Central Chemical produced finished product under consignment for Olin from 1959 to 1965 at the Central Chemical Site).

During the time Olin tolled with Central Chemical, Central Chemical's operations caused environmental property damage that was continuing to occur in 1970. Lamorak Counter Remaining Sites 56.1 at ¶ 117; see also Hall Report at Central Chemical 10, 13; Hall Report Ex. 5 at Overview, Table 6-1; Goodfellow Report at 44-48; Martin Remaining Sites Decl. Ex. 9 at 8, 11-12 (Recker Report); Martin Remaining Sites Decl. Ex. 34 at 131:2-7 (Recker deposition); Martin Remaining Sites Decl. Ex. 20 at 82:7-12, 83:20-84:18 (Hall deposition).

Olin's experts concluded that Olin did not expect or intend this damage. See Lamorak Counter Remaining Sites 56.1 at ¶ 125(a)-(f). Lamorak's expert does not offer any Central Chemical-specific facts indicating that Olin expected and intended that activities at that site would cause environmental damage to occur. Id. at ¶ 127 (raising meritless objections to Olin's reliance on expert opinion); see also Martin Remaining Sites Decl. Ex. 34 at 44:6-45:6 (Recker "didn't recall seeing anything of Olin's direct knowledge, but it was something that

came off the table very early in the discussions, so I didn't
spend a lot of time on it.").

There also can be no genuine dispute that Olin is legally
liable at the Central Chemical Site. Olin and others entered
into an Administrative Order on Consent No. 97-105-DC with the
EPA. See Martin Remaining Sites Decl. Ex. 76 at
2018OLINFACSITES_0057884 (work plan dated December 20, 2002
prepared for Central Chemical for submittal to the EPA). "The
Consent Order was finalized on September 12, 1997 pursuant to
the Comprehensive Environmental Response, Compensation, and
Liability Act of 1980." Id.[17]

## d. Crab Orchard

Only Olin moves for summary judgment on the Crab Orchard
site, which it leased and operated as a government munitions
manufacturing plant from 1956 to 1996. See Martin Remaining
Sites Ex. 5 at Crab Orchard 1, 3; see also Roux Report at 104.
Olin received notice on October 30, 1990 from the EPA that it
had been "identified as a potentially responsible party with

---

[17] Lamorak disputes the admissibility of this document on the
ground that it "purports" to be a sixteen-year old report
prepared in relation to the alleged investigation of the Central
Chemical Site. See Lamorak Counter Remaining Sites 56.1 ¶ 129.
However, Lamorak does not genuinely dispute that Olin is legally
liable at the Central Chemical Site in its opposition to Olin's
motion for summary judgment.

regard to the PCB Areas Operable Unit at the Crab Orchard" Site. Martin Remaining Sites Decl. Ex. 85 at 2018OLINFACSITES_ 00146438.

There is no dispute that property damage was occurring as a result of Olin's operations in 1970. See Hall Report at Crab Orchard 1, 8-13, 17-18; Hall Report at Overview, Table 6-1; Goodfellow Report at 69-70; Ex. 20 at 263:23-264:8; see also Roux Report at 104; Martin Remaining Sites Decl. Ex. 35 at 231:20-232:7, 233:15-24, 237:25-238:10 (Senh deposition).

Nor is there any dispute that Olin did not expect or intend the damage at the site. Olin's experts found that Olin did not expert or intend the damage. See Brody Report at 22-23; Goodfellow Report at 60, 70-71. Lamorak's experts do not offer any Crab Orchard-specific facts indicating that Olin expected and intended property damage would occur as a result of activities at the site. See Lamorak Counter Remaining Sites 56.1 at ¶ 174. Senh and Swanson had no opinion as to whether Olin knew that activities at the Crab Orchard site would cause environmental damage. See Martin Remaining Sites Decl. Ex. 35 at 245:22-246:23; id. Ex. 36 at 88:2-7. Lamorak's experts do not list Crab Orchard as one of the "Olin sites where" the opinion that Olin expected and intended the property damage that occurred "applies." See Roux Report at 139-42.

65

Finally, there is no dispute that Olin is liable at the

site. The United States EPA and Fish and Wildlife Services have

ordered cleanup of the site by Olin and other Potentially

Responsible Parties alleged to have caused contamination. See

Hall Report at 2-6; Roux Report at 99-103; Martin Remaining

Sites Decl. at Ex. 85 (notice of claim at Crab Orchard dated

November 21, 1990).

### e. Frontier-Chemical – Pendleton

Only Olin moves for summary judgment on the Frontier

Chemical-Pendleton Site, a former waste disposal facility to

which Olin sent waste material from 1959 to at least 1974. See

Lamorak Counter Remaining Sites 56.1 at ¶ 183; see also Roux

Report at 66-67 ("The shipments of waste from Olin's Rochester

facility to Frontier for transfer to other landfills included:

'tars, waste chemicals and junk, trash, junk toluene, waste

toluene, pretreatment pH sludge, sodium sulfide, clarifier

sludge, ammonium fluoride, pyridine goos, spent acid, waste THF

(tetrahydrafuran), tars from man, and waste solvent.'").

During the time that Olin sent waste material to Frontier

for disposal, the disposal of Olin's waste materials caused

environmental damage that was continuing to occur in 1970. See

Hall Report at Frontier 1, 3-4, 6-7, 10-11; Goodfellow Report at

78; Martin Remaining Sites Decl. Ex. 20 at 226:13-227:16 (Hall

deposition); see also Roux Report at 66-67, 71; Ex. 35 at 258:22-260:21 (Senh deposition).

Olin's experts opined that Olin did not expert or intend this damage. See Brody Report at 25; Goodfellow Report at 72, 78-80. Lamorak's experts do not offer any Frontier-specific facts indicating that Olin expected and intended property damage would occur as a result of activities at the site. See Lamorak Counter Remaining Sites 56.1 at ¶ 196. Senh and Swanson testified that they did not have an opinion as to whether Olin knew that the activities at the Frontier Chemical Site would cause environmental damage to occur. See Martin Remaining Sites Decl. Ex. 35 at 261:22-262:9; Ex. 36 at 88:2-7. Lamorak's experts do not list Frontier as one of the "Olin sites where" the opinion that Olin expected and intended the property damage that occurred "applies." See Roux Report at 139-42.

Finally, there is no genuine dispute that Olin is legally liable for damages at the site. In 1994, Olin and others entered into a RD/RA Order on Consent with the New York State Department of Environmental Conservation that stated that contamination of "soil, sediment, groundwater, and surface water" at Frontier had become "contaminated with high concentrations of inorganic and organic chemicals" that "present[ed] a significant threat to the public health or environment," and thereby directed Olin and

67

other potentially responsible parties to develop and implement a remediation plan. See Martin Remaining Sites Decl. Ex. 89 ¶¶ 4, 6, 7. In the Order on Consent, Olin agreed to, among other things, develop and implement a Remedial Program and reimburse and pay certain response costs. See id. at ¶ 8, §§ I, II, VI.

### f. New Haven

Only Olin moves for summary judgment at the New Haven site, where Olin operated a munitions plant and industrial complex from 1931 to 1981. See Martin Remaining Sites Decl. Ex. 5 at New Haven 2-4; Roux Report at 12. Lamorak asserts that Olin is not entitled to summary judgment on the New Haven site because it expected the damage that resulted at that site.

Property Damage in 1970. There was property damage at the New Haven Site in 1970. Olin's experts found that during the time that Olin owned and operated New Haven, Olin's operations, leaks, spills, releases, or waste disposal at New Haven caused environmental damage that was continuing to occur in 1970. See Hall Report at New Haven 1, 5-10, 12; Ex. 5 at Overview, Table 6-1; Goodfellow Report at 102-03; Martin Remaining Sites Decl. Ex. 20 at 144:15-145:7, 147:14-24, 148:6-149:2 (Hall deposition). Lamorak's experts also found that "contamination at the site is consistent with the materials used and stored by Olin." Roux Report at 14-34, 36; Martin Remaining Sites Decl.

Ex. 33 at 265:15-266:12 (Coulon deposition). Lamorak's expert

Coulon additionally "agree[d] that Olin's operations generated

materials containing contaminants of concern at the New Haven

Site," and "that Olin's operations caused property damage at the

New Haven site on or after January 1st, 1970, as a result of

Olin's releases or disposals of material containing contaminants

of concern at the New Haven site." Martin Remaining Sites Decl.

Ex. 33 at 265:15-12. Finally, she "agree[d] that remedial action

was done to address contamination thought to be a source of

groundwater." Id. at 277:17-281:2.

Whether Olin Expected or Intended the Damage. Olin's

experts concluded that Olin did not expect or intend the damage.

See Brody Report at 32; Goodfellow Report at 98, 103. For

example, Brody opined that

> EPA itself was only formed in 1970 and CDEP
> was only formed in 1971. Under the
> circumstances there was no reasonable basis
> for Olin to have concluded in and before 1970
> that its environmental management practices
> were allowing hazardous contaminants to leach
> into the soils and the groundwater at levels
> sufficient to cause environmental concern,
> much less that the evolution of regulatory
> requirements at some point could be used to
> require their cleanup.

Brody Report at 32. "Olin's waste handling at the NHS, including

the collection of wastes on-site and shipment of wastes off-site

69

for disposal, were consistent with the standard-of-practice before 1971." Goodfellow Report at 103.

Lamorak's evidence does not indicate that Olin knew that its practices at New Haven would result in environmental damage. Lamorak points to waste disposal practices at Pine Swamp, to which waste from New Haven was sent, as evidence that Olin knew that its practices at the New Haven site would result in damage at that site. Lamorak justifies conflating Pine Swamp and New Haven on the ground that "[t]he New Haven Plant personnel oversaw the disposal of wastes at the Pine Swamp Site. These wastes were generated from the New Haven Plant operations." Roux Report at 140. However, that New Haven Plant personnel oversaw the disposal of wastes at the Pine Swamp Site in no way indicates that those personnel thought that practices at New Haven would result in damage at that site. Lamorak's evidence that Olin knew that "waste disposal practices of burying or dumping industrial wastes such as mercury-containing wastes, oily wastes, tar, or chemical-containing drums onto the ground surface were causing the environmental harm that ultimately resulted" is not evidence that Olin knew that its practices at New Haven, which did not, according to Lamorak's experts, involve burying or dumping waste, would result in damage. See Roux Report at 121.

Legal Liability. Olin is legally liable for the damage at the New Haven Site. Olin assumed obligations arising from the United States Repeating Arms Company, Inc. ("USRAC") bankruptcy in 1988, including USRAC's obligations, pursuant to consent orders with the Connecticut DEP, to conduct remedial actions to "minimize or mitigate any threat to human health or the environment" beginning in 1987. See Martin Remaining Sites Decl. Ex. 29 at 236:9-23; see also id. Ex. 104 (consent order between Connecticut DEP and USRAC). In 1987, USRAC agreed that, "to minimize or mitigate any threat to human health or the environment, it would contain, remove, or otherwise mitigate the effects of any discharge or spillage of hazardous waste on the site," as approved by the Connecticut Department of Environmental Protection. Martin Remaining Sites Decl. Ex. 104 at 1. The Connecticut Department of Environmental Protection entered a Consent Order in August 1994 finding that the site conditions at New Haven, as documented in the Subsurface Environmental Assessment, and the effects of discharges and spillage of hazardous wastes on the site required investigation and remediation, and directing Olin to investigate the degree and extent of soil and groundwater contamination, to make recommendations as to necessary remedial measures, and to

undertake remedial measures as approved by CT DEP. Id. at 1-4, 7.

In sum, the Court finds that there is no genuine dispute that Lamorak is liable for Olin's costs at the New Haven site.

### g. Niagara County Refuse

Only Olin moves for summary judgment at the Niagara County Refuse Site. The Niagara County Site is a former landfill located along the eastern border of Wheatfield and western border of North Tonawanda, Niagara County, New York. Hall Report at Niagara 2; see also Roux Report at 112. Olin did not own or operate the Niagara County Refuse Site. Lamorak Counter Remaining Sites 56.1 at ¶ 284; see also Roux Report at 112.

Lamorak's experts concede that during the time Olin sent waste materials to Niagara County Refuse for disposal, the disposal of Olin's waste materials caused environmental damage at the site that began to occur in 1970. See Roux Report at 112-115 (noting that EPA "determined that uncontrolled leachate outbreaks would continue to degrade Site groundwater quality," and writing that "[c]ontamination at the Niagara County Refuse Site was caused, in part, by disposal of wastes at the Site by Olin no earlier than September 11, 1970."); Ex. 33 at 363:8-365:24 (Coulon stating belief that material disposed of by Olin at the Niagara County Refuse site caused third party damage,

72

that Olin continued to dispose of waste at the site until 1973, and that disposal of waste by Olin from 1970 to 1973 contributed to the contamination at the Site). Olin's experts, unsurprisingly, concluded the same. Hall Report at Niagara 9-10. Therefore, there is no genuine dispute that there was property damage at the Niagara site during the policy period.

There also is no dispute that Olin did not expect or intend the damage. Olin's experts concluded that Olin did not expect or intend the damage. See Brody Report 34; Goodfellow Report at 104, 110-112. Lamorak's experts do not offer any specific facts indicating that Olin expected or intended property damage would occur as a result of activities at Niagara County Refuse. See Roux Report at 120-142. Coulon and Swanson testified that they did not have an opinion regarding whether Olin knew that the activities at the Niagara County Refuse Site would cause environmental damage. See Martin Remaining Sites Decl. Ex. 33 at 365:25-366:2 (Coulon deposition); Ex. 36 at 88:2-7 (Swanson deposition). Lamorak's experts do not list Niagara County Refuse as one of the "Olin sites where" the opinion that Olin expected and intended the property damage that occurred "applies." See Roux Report at 139-42.

Finally, there is no genuine dispute that Olin is legally liable at the site. In 1993, EPA issued a Record of Decision for

Niagara County Refuse stating that the "[a]ctual or threatened releases of hazardous substances from the site, if not addressed by implementing the response actions elected in this [Record of Decision] may present an imminent and substantial endangerment to public health, welfare, or the environment" and noting that "[t]he selected remedy is protective of human health and the environment." Martin Remaining Sites Decl. Ex. 109 at i-ii; see also id. at 3, 10 (describing environmental impacts and remedial objectives).

### h. Damages as to Bethany, Brazier Forest, Central Chemical, Crab Orchard, Frontier-Chemical, New Haven, and Niagara County Refuse

Olin would be entitled to summary judgment on the Bethany, Brazier Forest, Central Chemical, Crab Orchard, Frontier-Chemical, New Haven, and Niagara County Refuse Sites except that there is a genuine dispute as to Olin's damages. To carry its burden as to damages, Olin must show by a preponderance of the evidence that it has suffered damages. Warehouse Wine & Spirits, Inc. v. Travelers Prop. Cas. Co. of Am., No. 13-cv-5712, 2016 WL 3911949, at *12-13 (S.D.N.Y. July 14, 2016), aff'd 711 F. App'x 654 (2d Cir. 2017). "Once the fact of damages is established '[t]he plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach.'" Warehouse Wines, 711 F. App'x at 657. Once Olin carries its burden, Lamorak "bears the

74

burden of proving facts in mitigation of the damages." Id. at 657. That means "the burden of uncertainty as to the amount of damage is upon" Lamorak. See Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 926-27 (2d Cir. 1977). And as "the party who has caused the loss," Lamorak "may not insist on theoretical perfection" in Olin's damages. Warehouse Wines, 2016 WL 3911949, at *12.

As an initial matter, Lamorak objects to much of the evidence that Olin relies on in order to establish its damages.

First, Lamorak argues that the expert report of Frank Rovers is inadmissible because he is now deceased and he was not deposed. See Lamorak Counter Remaining Sites 56.1 at ¶ 58. Olin does not argue that his report falls within any of hearsay exceptions for unavailable declarants in Federal Rule of Evidence 804. Indeed, none of the exceptions appears to apply. See Fed. R. Evid. 804, 807 (providing the following exceptions: (1) former testimony; (2) statement under the belief of imminent death; (3) statement against interest; (4) statement of personal or family history; (5) statement offered against a party that wrongfully caused the declarant's unavailability; and (6) other statements with equivalent circumstantial guarantees of trustworthiness offered as evidence of a material fact that is more probative on the point for which it is offered than any other evidence that the proponent

75

can obtain through reasonable efforts). Therefore, the Court has not considered Rovers' expert report in adjudicating the parties' motions for summary judgment.

Second, Lamorak argues that Exhibit 52 of the Martin Remaining Sites Declaration is inadmissible hearsay. It is a one page document titled "Current Claim for Remaining Sites in Fourth Amended Complaint / Olin Costs Through December 2016." It lists the indemnity start date, years of spending in Lamorak claim, and total claimed spending prior to deductible for each site. It was used as an exhibit at the deposition of Curtis Richards, who testified that it was "a document that was created for [him]," "reflect[ing] the current claim for remaining sites in the fourth amend[ed] complaint." Luongo Remaining Sites Decl. Ex. H at 159:19-24. Olin again does not argue that this document falls within any of the exceptions to rule against hearsay and the Court does not believe that any apply. Therefore, the Court finds that this document also is inadmissible for purposes of these motions for summary judgment.

Third, Lamorak argues that the so-called "Lutz Report" – a summary spreadsheet of environmental remedial cost figures incurred by Olin over time – is inadmissible hearsay and that, given that the originator of that report, Lutz, is deceased, the summary cost figures must be interpreted, verified, and

76

substantiated in order be admissible. Olin responds that the report is admissible as a business record given that it is "a spreadsheet that Olin maintains regularly in the course of its business and that Olin has used since 1986 to track remediation costs at environmental sites." Olin Remaining Sites Mem. at 22; see also Martin Remaining Sites Decl. Ex. 8 at 5 (Zetlmeisl Report) ("Beginning in 1985, Hal Lutz, an accountant for Olin began tracking Olin's cost of remediation at all Olin's remediation sites. This report has been maintained to the present by Mr. Lutz's successors at Olin. It tracks the costs by site and also by category of phase code."). Olin asserts that the genesis and use of the Lutz report – to compile costs, regardless of whether they are potentially covered by insurance or recoverable in litigation, and serve as the base for Olin's audited SEC statements related to remediation costs – further indicates its reliability. See, e.g., Lewis v. Velez, 149 F.R.D. 474, 486 (S.D.N.Y. 1993).

However, the conditions for admission of the Report as a business record must be "shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (2) or with a statute permitting certification." Fed. R. Evid. 803(6)(D). Although Olin has not offered an affidavit from such a witness or explained to the Court who would serve as a custodial witness, neither has Lamorak

demonstrated that Olin will not be able to produce such a qualified custodial witness, which would seem likely, at trial. Given the indication that the Lutz Report is a business record, and in order to more forward expeditiously for present purposes, the Court, in the exercise of its discretion, will treat the Lutz Report as admissible for the limited purpose of ruling on these summary judgment motions, without prejudice to Lamorak's moving to exclude the Report at trial.

Fourth, and finally, Lamorak argues that the report by Olin's cost expert, Tom Zetlmeisl, is inadmissible. Lamorak argues that Zetlmeisl's report merely attempts to match up figures on the Lutz Report with documentary support. Zetlmeisl opined that the Lutz Report "provides a reliable indication of the cost incurred by Olin at each of The Sites." Lamorak Counter Remaining Sites 56.1 at ¶ 30(c). Zetlmeisl also used other evidence to corroborate the Lutz Report, including Olin's tracking of environmental costs through project codes dedicated to each site, Olin's audited financial statements and SEC filings, invoices, accounts payable data, general ledger detail, Olin memos and other documentation, as well as depositions and prior reports related to other sites in this proceeding. Id. at ¶ 30(d). He reviewed these documents to cross check, for example, that dollars reported in the Lutz Report tied directly to Olin's reported financial numbers, which were

audited by a major accounting firm. Id. "[He] analyzed [the Lutz Report] in total for all sites by comparing it to the SEC filings over the period 1993 through 2016. [He] noted that, for the period 1993 through 2016, the Lutz Report totals tie to within 0.25% of the remediation costs reported in Olin's SEC filings. The fact that the Lutz Report amounts tie so closely to the SEC filings over the past 24 years provides it with an additional layer of credibility." Martin Remaining Sites Decl. Ex. 8 at 5. He also reviewed: (1) "Chem Group Envr Expense" reports, which are extracts from Olin's general ledger for periods prior to 1998; (2) accounts payable data; and (3) invoices. Id. at 6. The Court sees no reason why this report should not be admissible.

As discussed in greater detail above, Lamorak has introduced an expert opinion challenging Zetlmeisl's conclusions. Specifically, the Roux Report opines that Zetlmeisl was not actually able to corroborate many of the costs listed in the Lutz Report.

Olin argues that Lamorak has forfeited its opportunity to challenge Olin's remediation costs. Even though, in Olin's view, it was not obligated to obtain Lamorak's approval for each remediation expense once Lamorak made clear that it had no intention of paying Olin's claims, Olin provided notices that "detailed Olin's damages at each site and described Olin's

remediation measures. The notices also invited [Lamorak] to investigate Olin's claims. Olin regularly supplemented these notices with updated information about damages, costs, and remedial measures at each site." Olin IV, 864 F.3d at 136. That is, in Olin's view, Lamorak has had years to work collaboratively with Olin to manage these remediation projects. Olin complains that Lamorak "cannot now benefit from its tactical decision to deny its contractual obligation to indemnify Olin for covered losses by avoiding liability" based on its newfound gripes about those costs. Olin, however, cites no case law in support of this forfeiture argument. The Court accordingly declines to find that Lamorak has forfeited its right to challenge Olin's claimed damages.

Given the questions surrounding the admissibility of the Lutz Report and the objections raised by the Roux Report to the Zetlmeisl Report, the Court finds that there is a genuine dispute of material fact as to how much Olin can recover in damages on the sites for which it has established Lamorak's liability.

### 3. **Remaining Sites**

As for the remaining sites – Assonet, Charleston, Middletown, Morgantown, North Little Rock, Olin Water Services,

80

Pine Swamp, and Wallisville - the Court denies the pertinent motions for summary judgment.

### a. Assonet

Olin and Lamorak both move for summary judgment on the Assonet Site, which is a 170-acre property in Assonet, Massachusetts. See Olin Counter Remaining Sites 56.1 at ¶ 101; see also Roux Report at 81. A plant for the manufacture of polyvinyl chloride ("PVC") was constructed there in the early 1960s. Luongo Remaining Sites Decl. Ex. II. Manufacturing operations "appear" to have commenced in 1964. Id. When Olin purchased the site in 1968, it continued the PVC resin-manufacturing operations of Continental Oil Company (later known as Thompson Chemical), which formerly operated the site. Olin Counter Remaining Sites 56.1 at ¶¶ 101-104. In 1976, Olin sold Assonet to Polaroid Corporation ("Polaroid"), which in turn sold the property to International Specialty Products, Inc. ("ISP") in the late 1990s. Id. at ¶¶ 115, 117.

Lamorak argues that Olin is not entitled to coverage for the Assonet site because Olin is not legally liable at the site. In the alternative, Lamorak argues that Olin is not entitled to coverage from Lamorak for the portion of its claimed costs relating to contaminated conditions on its own property as this is not covered "property damage" under the terms and conditions

81

of the Lamorak Policies. Lamorak also contends that there is a
genuine dispute as to whether Olin expected or intended the
damage.

Liability. Lamorak is not entitled to summary judgment on
the ground that Olin is not legally liable at the site. Indeed,
on the whole, the record evidence indicates that Olin was
legally liable at the Assonet site. When Polaroid sold the site
(in the late 1990s), extensive environmental due diligence work
was undertaken, as required by the sale agreement. Id. at ¶¶
115, 117-18. During the course of this investigation,
contaminants were discovered in two discrete locations: near a
reactor building known as the F-6 Building and in the PVC
Disposal Area. Id. at ¶ 119.

Excavations in the former PVC Disposal Area on November 6,
1997 revealed the presence of buried drums. Id. at ¶ 124. Some
of these drums "contained material or were suspected of
containing material." Luongo Remaining Sites Decl. Ex. TT at
2018OLINFACSITES_00002967. Soil samples were collected from the
excavation area and tested positive for contaminants. Id. The
report concluded that "[c]ontamination at the Site is attributed
to drums that were buried at the Site. . . . [B]oth soil and
ground water at the Site have been impacted." Martin Remaining
Sites Opp. Decl. Ex. 71 at 7.

Polaroid informed Olin in a letter that it had determined that these "buried drums and other waste materials . . . had apparently been used by Olin for waste disposal (but not by Polaroid)." Martin Remaining Sites Opp. Decl. Ex. 69 at 2018OLINFACSITES_00027804-05. Three of the deteriorating drums of liquid chemicals "had clear Olin labels and addresses," "approximately 600 to 800 cubic yards of contaminated soils in the same area," and "a distinct layer of white powdery material that Polaroid understands is off-site specification PVC that was disposed of by Olin in this area of the property." Id. at 00027805. Polaroid stated that it "wish[ed] to resolve this matter in a cooperative, amicable manner, without the need for a formal claim . . . or other legal proceedings." Id.

In 2001, Olin and Polaroid entered into a Settlement Agreement and Mutual Release pursuant to which Olin agreed to pay Polaroid an additional $1,000,000, "without any admission of liability by either party." Luongo Remaining Sites Decl. Ex. VV at 2018OLINFACSITES_00000379-80. The settlement agreement provides that in the course of this investigation and remediation, Polaroid "made a claim against Olin for the reimbursement of Polaroid's past and future response costs incurred in investigating and remediating historical contamination at the Site." Id. at 2018OLINFACSITES_00000379.

Then, the parties "engaged in good faith settlement discussions, pursuant to which Olin has reimbursed Polaroid for $571,899 in past response costs to date." Id.

In Olin's view, Polaroid's demand letter was an "obvious threat to litigate." Memorandum of Law in Opposition to Lamorak's Motion for Summary Judgment on Liability, Damages and Other Relief Sought by Olin Corporation for the Remaining Sites ("Olin Remaining Sites Opp. Mem.") at 23, ECF No. 2267. "Equally obvious," Olin argues, was that Olin had a good faith basis for believing that it might be liable for contamination at the site, given that Polaroid found drums bearing Olin labels. Id. In Olin's view, this demonstrates that Polaroid's demand and threatened litigation was more than "an invitation to voluntarily initiate cleanup activities." See Ryan, 916 F.3d at 741.[18]

On the other hand, Lamorak argues that Olin's settlement with Polaroid was voluntary for several reasons. First, Olin has

---

[18] Lamorak also points to the fact that Thompson Chemical, Olin's predecessor at the Assonet site, "declined" to contribute to the remediation costs. See Olin Counter Remaining Sites 56.1 at ¶ 138; Defendant Lamorak Insurance Company's Memorandum of Law in Support of Its Motion for Summary Judgment on Liability, Damages and Other Relief Sought by Olin Corporation for the Remaining Sites ("Lamorak Remaining Sites Mem.") at 11, ECF No. 2213. This does not support the inference that Olin was not actually liable absent evidence that contamination directly attributable to Thompson Chemical was found at the sites.

never been ordered or directed to perform investigation or
remediation, and has never received an inquiry letter, or indeed
any communication from a federal, state or local agency, in
connection with Assonet. See, e.g., Luongo Remaining Sites Decl.
Ex. B (Hall deposition) at 458:15-19. Second, Olin's expert,
Hall, testified that the Massachusetts DEP issued an order to
Polaroid and then Olin "was pulled into this as equivalent to a
PRP." Id. at 426:8-11. He further explained that "Olin is drawn
into the cost and the actions that occur here due to the claims
that Polaroid could have against them." Id. at 426:18-427:3.
Olin then made a "business decision" as to whether it was better
to fight or cooperate "to deal with this liability that has been
imposed by the state." Id. at 427:6-15. Lamorak's expert
described Olin's settlement with Polaroid as "voluntary" because
"Olin entered this agreement without any regulatory enforcement,
to [his] knowledge." Luongo Remaining Sites Decl. Ex. WW at
143:13-20 (Senh deposition). The Court is doubtful that a
reasonable juror would place as much weight as Lamorak does on
Hall's statement that Olin's decision to settle was a "business
decision." Therefore, Lamorak is not entitled to summary
judgment on this basis.

Property Damage. Lamorak alternatively argues that it is
entitled to partial summary judgment because a portion of Olin's

costs at the Assonet Site was limited to Olin's property and therefore not covered by Lamorak's policies.

As part of the above-mentioned investigation of contamination at the Assonet Site, soil contamination from the buried drums near the PVC Site was determined to be limited to the site property boundaries.[19] A December 7, 1999 letter from GEI Consultants, Inc. ("GEI") to the Massachusetts DEP reported that "the Site boundary encompasses the horizontal event of contamination." Luongo Remaining Sites Decl. Ex. UU at 2018OLINFACSITES_00005083. GEI also concluded that "groundwater contamination at the Site is limited vertically to the groundwater present in the silty sand unit and the top 10 feet of the till unit." Id. In December 1999, it was determined that "a condition of No Significant Risk of harm to safety exists" at the PVC Disposal Area. Id. at 2018OLINFACSITES_00005071, 5095.

---

[19] Lamorak concedes that Olin's costs relating to damage near the F-6 building are covered by its policies. See Lamorak Remaining Sites Mem. at 26-27. Soil samples taken from the area just northwest of the F-6 building contained high TCE concentrations and Polaroid was required to excavate 200 cubic yards of TCE-contaminated soil around the building. Olin Counter Remaining Sites 56.1 at ¶ 120. The TCE contaminants extended from the F-6 Building and beyond site boundaries. Id. at ¶ 123. The contamination associated with the area just northwest of the F-6 building was the result of routine releases, minor spills and leaks, and overfills of the TCE tank during Olin's use of the Assonet Sites between 1968 and 1974. Id. at ¶ 121.

There is some record evidence that this remediation was undertaken to prevent damage to third parties, but it is relatively weak. Olin argues that removing soil to protect the groundwater was "consistent" with the state's position that remediation at Assonet was needed "to prevent harm to health, safety, public welfare and the environment from . . . release and/or threat of release" of contaminants. Martin Remaining Sites Opp. Decl. Ex. 68 (Notice of Responsibility dated November 14, 1997 sent by the Massachusetts Department of Environmental Protection to Polaroid regarding the Assonet Site). This generic statement of concern for the "public welfare" and the "environment" is not strong evidence that the state required the site to be cleaned up in order to prevent damage to third-party property.

Olin also contends that there was concern about groundwater contamination. For example, Olin's expert concluded that contaminants of concern at the site "initially contaminated the soil on-Site and were transported via groundwater and surface water to sediments of the Taunton River." See Hall Report at Assonet 8. On the other hand, Lamorak's experts agreed that monitoring wells were installed and that existing wells in the PVC dump area were sampled, but concluded that these wells do not indicate that the remedial work done at the time was

87

undertaken to prevent third-party property damage. See Roux Report at 85-86; see also Martin Remaining Sites Decl. Ex. 35 at 94:22-95:3, 108:19-22 (Senh deposition) ("[T]here was some soil contamination, there was certain groundwater contamination. . . . . "[T]he groundwater contained low-level exceedances, but did not require any additional monitoring, delineation, or remediation.").

While the Court finds Lamorak's evidence persuasive, the Court, as previously noted, will not exercise its discretion to grant partial summary judgment on liability but only entire summary judgment on liability or none. Accordingly, it denies summary judgment on this site.

Expect or Intend Damage. There is a genuine dispute as to whether Olin expected or intended the damage. Olin's experts concluded that Olin did not expect or intend the damage in part because "none of Olin's practices [at Assonet] regarding the handling and disposal of waste materials were in violation of state and federal regulations existing during its time of operation." Brody Report at Assonet 9. In addition, "[b]efore 1971, almost no information was known about contaminant migration from waste burial or leaks and connected impacts to the environment." Goodfellow Report at 24. With respect to Assonet in particular, former employees have described Olin's

88

housekeeping practices at the plant as "good," "very good," and "excellent." Martin Remaining Sites Decl. Ex. 26 at 98:1-21 (defining housekeeping as "cleaning up things, [not] leaving debris and garbage laying about" and washing down the buildings); Ex. 27 at 51:20-52:5 (describing the "upkeep" of the plant).

Lamorak's experts, on the other hand, found that "extensive scientific and industry literature" existed prior to 1971 that described the environmental pollution that would be caused by the disposal of industrial wastes, including drums containing chemicals, resins, and solvents into an onsite, unlined dump, and disposal of wastewaters into unlined settling ponds. See Lamorak Counter Remaining Sites 56.1 at ¶ 58 (citing Luongo Remaining Sites Opp. Decl. Ex. A (Swanson deposition) at 246:16-249:2). In particular, the "technical aspects" of surface water and groundwater pollution had been extensively studied prior to 1971. Id. (citing Luongo Remaining Sites Opp. Decl. Ex. A at 109:6-110:8, 118:3-119:23).

Lamorak's Roux Report similarly concludes that "Olin certainly knew before 1970 and as early as 1950 that their waste disposal practices of burying or dumping industrial wastes such as mercury-containing wastes, oily wastes, tar, or chemical-containing drums onto the ground surface were causing the

89

environmental harm that ultimately resulted." Roux Report at
121. As with other sites that the Roux Report addresses
(Morgantown, Pine Swamp, New Haven, and Charleston), the
report's opinion is based on "Historical Environmental Awareness
of the General Public" going back to the mid-nineteenth century,
state and local environmental regulation dating back to 1899,
creation of EPA in December 1970, and "Historical Environmental
Awareness of the Scientific and Engineering Community." See id.
at 121-32. The Roux Report's discussion of "Olin's Knowledge of
Pollution Prior to 1970" additionally cites Olin's involvement
with the Manufacturing Chemists' Association dating back to the
1920s, including attendance at MCA "meetings where matters
related to environmental pollution were discussed" and where the
term "pollution," "groundwater," or "landfill" appeared in the
minutes. See id. at 133-39.

    As to Assonet in particular, the Roux Report contends that
"Olin knew prior to 1970 that the disposal of industrial wastes,
including drums containing chemicals, resins and solvents into
an onsite, unlined dump, and disposal of wastewaters into
unlined settling ponds, were causing the environmental damage
that resulted." Roux Report at 141. In support, the report notes
that "[c]hemical waste was purposely dumped in a hidden area
located in an undeveloped and underutilized portion of the Site

90

behind a forest of trees away from the main plant. When the dump was filled, it was covered with soil and grass as a façade." Id. Moreover, one of the employees who praised Olin's practices at the site in a recent deposition stated in an interview nearly twenty years ago that "housekeeping practices for all of these companies [including Olin at the Assonet Site] . . . [were] poor . . . [w]hen a drum of chemicals was punctured, the contents that had leaked out would be left there on the ground." See Luongo Remaining Site Decl. Ex. NN at 2018OLINFACSITES_00000395.

Based on the foregoing, the Court finds that reasonable jurors could disagree as to whether Olin expected or intended the damage at the Assonet Site.

### b. **Charleston**

Only Olin moved for summary judgment on the Charleston Site. The Charleston Site is located in Charleston Tennessee and Olin has operated the site as a chlor-alkali plant since 1961. Martin Remaining Sites Decl. Ex. 5 at Charleston at 1; see also Roux Report at 107.

Olin is not entitled to summary judgment on this site because there is a genuine dispute whether Olin expected or intended the damages. Olin's experts concluded that Olin did not expect or intend the damages at Charleston. See Brody Report at 19-20; Goodfellow Report at 51, 58-59. These opinions were based

on the facts that, among other things: (i) "mercury contamination was not regulated by either the state or federal government prior to the creation of RCRA in 1976," Brody Report at 19; (ii) "Olin only became aware of the potential impact of mercury on groundwater in the mid-1970s," id. at 19-20; (iii) "Olin's management and handling of the materials and wastes at the Charleston site was consistent with the standard-of-practice prior to 1971," Goodfellow Report at 51; (iv) "[u]nderstanding of the biological transformation of elemental mercury to methyl mercury was inadequate until the mid to late 1980s to have forewarned of its impending potential environmental damages," id. at 59.

On the other hand, Lamorak's Roux Report concluded that "Olin knew prior to 1970 that industrial waste including brine muds and filter cake disposed in multiple unlined onsite landfills contained mercury, and was contaminating the soils and underlying groundwater." Roux Report at 141. For example, a 1952 article describes three types of stream pollution – chemical, physical, and biological – and states that "[t]he chemical pollutants include such toxic substances as cyanides, acids, chromates, . . . and mercury, which kill fish and other life and render water unfit to drink." See Roux Report at Table 15-1 and documents cited therein; Lamorak Counter Remaining Sites 56.1 at

¶ 148. Further, a 1960 meeting of the Manufacturing Chemists'
Association, of which Olin was a member, describes an incident
where mercury wastewater was released into the environment and
caused neurological disorders in the local population. See Roux
Report at Table 15-1 and documents cited therein; Lamorak
Counter Remaining Sites 56.1 at ¶ 148. Also, a 1960 book titled
"Status of Knowledge of Groundwater Contaminants" specifically
identifies mercury as a potential inorganic contaminant (pg. 58)
and describes the toxic effect of mercury on water quality (pg.
61 and 65). See Roux Report at Table 15-1 and documents cited
therein; Lamorak Counter Remaining Sites 56.1 at ¶ 148.

 With respect to the Charleston Site in particular, the Roux
Report explains that "Olin began disposing of brine muds and
miscellaneous chlor-alkali waste at unlined landfills" in 1962."
Id. at 141. "Wastes disposed in the landfills were in direct
contact with surrounding soils and, in turn, groundwater." Id.
at 110. Moreover, by 1970, Olin had invented a device, called
the Olin Mercury Monitor, to measure part per billion levels of
mercury in water. The device was being installed at that time at
Charleston plant. Olin touted this device as a "major step in
the world battle against mercury pollution of the environment."
See id. Table 15-1 and documents cited therein.

Although the Roux Report does not cite any documents or
testimony directly stating that Olin subjectively knew that it
would cause the specific property damage that occurred at
Charleston, see Lamorak Counter Remaining Sites 56.1 at ¶ 152,
it nonetheless raises through circumstantial evidence a genuine
dispute of material fact as to whether Olin had such subjective
knowledge.

### c. Middletown

Olin and Lamorak both move for summary judgment on Olin's
claim for costs at the Middletown Site, where Olin operated a
facility for the manufacturing of skis. Lamorak Counter
Remaining Sites 56.1 at ¶ 206. Olin operated the Middletown Site
through its subsidiary, Olin Ski Company, Inc., until that
subsidiary merged with Trak Inc. in 1986 to form Tri-Star
Sports, Inc. ("Tri-Star"). See Olin Counter Remaining Sites 56.1
at ¶ 25. Tri-Star owned and operated the Middletown Site from
1986 through 1989. See id. at ¶ 26.

Property Damage in 1970. Lamorak contends that Olin is not
entitled to coverage from Lamorak because Olin has not met its
burden to prove an "occurrence" during 1970. The Court finds
that there is a genuine dispute as to whether there was an
occurrence in 1970. Since Olin settled claims for damage at the
site with the state of Connecticut, the question becomes whether

Olin reasonably settled claims for damage occurring in 1970 with the state. As discussed, supra, it is the law of the case that Lamorak is liable to Olin where Olin reasonably settled claims brought against it for covered property damage. Here, however, there is a genuine dispute as to whether Olin reasonably settled claims for damage in 1970.

On August 26, 2003, Olin provided Connecticut with an environmental condition assessment form for the Middletown Site. See Martin Remaining Sites Opp. Decl. Ex. 36. In this form, Olin informed Connecticut that, in 1970, it had constructed a building on the site that it used for the production of alpine skis and, further, that this production involved the use hazardous materials. See id. at 2, 4 ("In 1970 the Site was purchased and the building used for production of alpine skis was constructed."). Olin disclosed that from 1970 to 1986, the Olin Ski Company manufactured "alpine skis and acrylonitrile butadiene-styrene plastic coating and finishing of skis." Id. at 2.

In response, Connecticut alleged that Olin was liable for the "investigation and remediation of all releases of hazardous waste and hazardous substances at or from the facility." Id. Ex. 38 at 2018OLINFACSITES_00296673. Olin commissioned a Remediation Work Plan, which state authorities approved. This Plan provided

as background that "[i]n 1970, Olin Ski Company, Inc. purchased the Site from the City of Middletown and an industrial building was constructed for the manufacture of alpine skis." Id. Ex. 42 at OLIN2011-021210. In addition, "[t]he ski manufacturing operations were present at the Site from 1970 to 1986" and Olin's "processes involved ski manufacturing, acrylonitrile butadiene-styrene plastic coating and ski finishing." Id.

Olin determined that releases of hazardous materials occurred at four areas of concern: (1) the underground emergency spill containment tank ("AOC 3"); (2) the former raw chemical storage area ("AOC 6"); (3) the roof drain leader discharge point ("AOC 12"); and (4) the former non-contact cooling water recovery system ("AOC 13"). See Olin Counter Remaining Sites 56.1 at ¶ 47. Most relevant here,[20] Olin informed Connecticut that "[a]n aboveground 1,000-gallon tank used to store 1,1,1-TCA was located in [AOC-6] from 1970 to 1989." Martin Remaining Sites Opp. Decl. Ex. 42 at OLIN2011-021212. Results "indicated that a release had apparently occurred at this AOC," and "[s]everal chlorinated VOCs were also detected in a soil sample collected from investigation of a neighboring AOC." Id. at OLIN2011-021213.

---

[20] Olin's expert conceded that AOC 3, 12, and 13 were constructed after 1971. Id. at ¶¶ 49, 56.

In 2004, Olin "settled" Connecticut's claim by agreeing to conduct additional investigation and remediation of all releases of hazardous waste and hazardous substances at or from the facility included in the demand letter. Id. at Exs. 39, 41.

There is a genuine dispute as to whether Olin reasonably settled claims for damage in 1970 because there is evidence that Olin did not begin manufacturing skis until 1971. When Olin purchased the undeveloped site in February 1970 to house a ski manufacturing operation, Olin Counter Remaining Sites 56.1 at ¶ 24, there were no buildings present at the site, id. at ¶ 28. Construction activities were not visible at the Site until June 28, 1970. Id. at ¶ 29.[21]

_____

[21] In addition, Lamorak identifies record evidence indicating that even if manufacturing did begin in 1970, the contamination could not have reached groundwater in that year. Olin's expert stated that he did not think the contaminants "would be in the groundwater in 1970, but it would be in the subsurface and moving early in the operation of the facility." Martin Remaining Sites Decl. Ex. 12 at 605:8-22, 608:20-610:22. When asked how long it would take spilled materials from Olin's Middletown operations to move into the groundwater, Hall simply stated that "material would be moving as soon as the release occurred." Id. at 605:8-14; see also id. at 609:18-610:6 ("I said the contamination, that the incidental releases would commence at the time the facility operated, that the material is moving. I did not do a prediction that when it got to the groundwater, because I think it is in the subsurface and moving."). Lamorak's expert explained that "[t]he subsurface geology at the site consists of 20 to 30 feet of glacial drift overlying the . . . bedrock. The glacial overburden is generally classified as low plasticity clays with very low hydraulic connectivity, with

97

Olin's evidence that construction was completed, and manufacturing began, in late 1970 consists of the following: (1) a newspaper article discussing Olin's limited start-up production of skis at the Middletown site by October 30, 1970. Martin Remaining Sites Decl. Ex. 95 (indicating that "[p]arts manufacturing beg[a]n" at Middletown "in October [1970], with the first production models molded on Oct. 30. Construction was completed in December."); (2) a brochure published for the plant's official opening on January 15, 1971, which states that "[c]onstruction began on the plant in the spring of 1970" and that "[o]n October 19, 1970, parts manufacturing was started on production equipment in the new factory, and on October 30 the first production Olin Mark I skis were molded." Id. at Ex. 91; and (3) testimony from Lamorak's expert, Kelly Coulon, during her deposition that she had seen evidence that Olin began manufacturing operations within the calendar year of 1970 (specifically, the just-mentioned newspaper and brochure). Id. Ex. 33 at 343:16-345:11.

---

occasional zones of fine sands." Olin Counter Remaining Sites 56.1 at ¶ 33. Depth to groundwater is approximately 8-12 feet below land surface. Id. at ¶ 34. Given these conditions, Lamorak argues, contaminants would not flow quickly or easily through the ground and into the groundwater.

However, a statewide building code in effect as of October 1, 1970 provided that "no building or structure erected or altered in any municipality after October 1, 1970, shall be occupied or used, in whole or in part, until a certificate of occupancy has been issued by the building official," Roux Report at 74. Olin did not submit an Application for Certificate of Occupancy to the Department of Public Works, Middletown, CT, seeking approval for industrial manufacturing at the site, until November 4, 1970. Olin Counter Remaining Sites 56.1 at at ¶ 30. The Certificate of Occupancy was not "issued" until September 29, 1971. Luongo Remaining Sites Decl. Ex. G. Therefore, if Olin was manufacturing skis in 1970, it would have been in violation of the statewide building code. Moreover, Olin's expert testified that he did not recall seeing any records of the volume of raw products or chemicals that were at the Middletown site prior to January 1, 1971 – nor had he seen documentation of the number of skis that were produced prior to that date. Olin Counter Remaining Sites 56.1 at ¶ 37.

Based on the foregoing, there is a genuine dispute that Olin reasonably settled claims for covered property damage in 1970 at the Middletown Site and, relatedly, whether any property damage occurred at the site in 1970. The Court therefore denies both parties' motions for summary judgment.

### d. **Morgantown**

Morgantown consists of approximately 800 acres in Morgantown, West Virginia, Olin Counter Remaining Sites 56.1 at ¶ 74, which Olin leased and operated as a government munitions manufacturing plant from 1951 to 1958, see Lamorak Counter Remaining Sites 56.1 at ¶ 232 (raising only objection to reliance on expert testimony). Olin's operations included the production of ammonia, methyl alcohol, formaldehyde, hexamine, and ethylene diamine. Olin Counter Remaining Sites 56.1 at ¶ 75.

Olin and Lamorak both move for summary judgment on this site. Lamorak contends that Olin is not entitled to coverage from Lamorak for the Morgantown Site because Olin has not met its burden to prove an "occurrence" during the Lamorak Policy Period and because application of the 1964 Endorsement bars coverage under the Lamorak Policies.

As with the Brazier Forest Site, Lamorak has waived its right to assert the 1964 Endorsement as a defense and accordingly is not entitled to summary judgment on this site. Lamorak failed to include the 1964 Endorsement among the 26 affirmative defenses it asserted when first answering Olin's Morgantown claims, see Martin Remaining Sites Opp. Decl. Ex. 109 (Answer to Third Amended Complaint dated December 22, 2010), even though it knew that Olin's operations at the site were

limited from 1951 to 1958, see Martin Remaining Sites Decl. Ex. 53 at OLIN-CT 3782048 (notice dated August 24, 1998).

Property Damage. Lamorak argues that there was no property damage in 1970 because contaminants did not increase or spread during that year. Lamorak is not entitled to summary judgment on this basis.

Environmental remediation action took place in two distinct areas at the Morgantown site: Operable Unit-1 ("OU-1") and Operable Unit-2 ("OU-2"). Olin Counter Remaining Sites 56.1 at ¶ 78. The contaminated areas at OU-1 included a landfill, a scraped area (an area of bare soil where wastes were deposited), and two former lagoons. Id. at ¶ 79. The only active disposal sites at OU-1 during Olin's operations were the scraped area and the landfill. Id. at ¶ 81. The landfill and scraped areas were used beginning in 1942 through 1962. Id. at ¶ 80. OU-2, was remediated through removal of contaminated material in 1997. Id. at ¶ 83. All the contaminated material was removed at that time, such that no further remediation at OU-2 was required. Id. at ¶ 84.

As with Middletown, Olin does not need to prove that any damage actually occurred in 1970 in Morgantown if it reasonably settled the EPA's claims of 1970 property damage at Morgantown. With respect to OU-1, the EPA alleged that contaminants disposed

101

of by Olin were detected in leachate emanating from the landfill and in "surface water and sediments downgradient of the Site." Martin Remaining Sites Opp. Decl. Ex. 65 (Sept. 30, 1999 Record of Decision) at 10-11, 16. The EPA further alleged that, as of 1998, the "migration of such contaminants via surface water runoff and/or leachate seepage has resulted in widespread inorganic levels of significant ecological concern in the receiving ecosystems," and that "off-site transport of site-related contaminants is occurring." Id. at Ex. 58 at 1-2. The EPA concluded that these contaminants would remain mobile until an impermeable cap was constructed to "control . . . soils and sediments" to "[r]educe the potential for organic and inorganic contaminants in the surface and subsurface soils and sediments to migrate to the groundwater or to migrate offsite" and to "prevent offsite migration of contaminated soil and reduce the amount of precipitation which infiltrates through contaminated soil." Id. at Ex. 65 at 43.

The 1999 Record of Decision for OU-1 included the following as one of its remediation objectives: "Reduce or eliminate the threat of migration of contaminants from the landfill." Martin Remaining Sites Decl. Ex. 98 (Record of Decision on OU-1) at 16. The EPA also directed that Olin install a multi-layer RCRA cap that would "reduce the amount of precipitation which infiltrates

through contaminated soil above the water table and into the
ground water." Id. at 19-21, 43. The 1989 ROD for OU-1 further
stated that if no remedial action were taken at all, it "may
eventually allow ground water to become contaminated." Martin
Remaining Sites Opp. Decl. Ex. 62 at 41; see also id. at 42
("Long-term ground water monitoring would be necessary to verify
that ground water is not contaminated by wastes left in
place.").[22]

---

[22] Lamorak argues that the absence of groundwater contamination
at Morgantown indicates that wastes and contamination could not
have migrated from the disposal areas utilized by Olin. See
Luongo Remaining Sites Decl. Ex. E at 525:25-526:5 (Olin
corporate designee stating that there was no groundwater
contamination issue at Morgantown); Luongo Remaining Sites Decl.
Ex. U at 2018OLINFACSITES_00452969 ("There was no evidence that
the groundwater had been significantly impacted by disposal
operations at OU1 and no unacceptable risks were posed to
receptors of the groundwater at OU1. Therefore, the remedy
selected in the 1999 ROD did not include a groundwater
remediation component.") (Final Close Out Report for Morgantown
Site dated September 2017). However, Lamorak does not explain
why the absence of groundwater contamination means that the
contamination could not have spread to third-party property at
all. Both the EPA and Olin's expert identified several means (or
"exposure pathways") by which the contaminants continued to
migrate after 1958, including surface water runoff, as rainwater
and other surface water passed over and through the uncapped
landfill, and exposed liquid leachate, which mobilized
contaminated particles and carried them offsite. Olin Counter
Remaining Sites 56.1 at ¶¶ 265-67, 278. Further, human activity,
either by trespassers or workers walking or driving through
contaminated areas and tracking contaminated particles away from
the site and/or through construction activity on site, such as
the construction of lagoons on the property in 1970, which can
disturb and mobilize previously deposited contaminants. Id. at

103

The record is sparser with respect to OU-2. Olin entered into an administrative order with the EPA regarding that site on June 4, 1990. Martin Remaining Sites Opp. Decl. Ex. 64. This order found that "copper, lead, and mercury were detected above background concentrations in a majority of sampling locations within the process building complex in OU2, and that the concentration of mercury exceeded the risk-based cleanup level at one sampling location." Id. at 2018OLINFACSITES_00406189. As part of this consent order, Olin was required to submit a work plan that, among other things, would "define the extent of surface and subsurface migration of such contaminants." Id. at 2018OLINFACSITES_00406193.

Based on the foregoing, the Court finds that Lamorak is not entitled to summary judgment on the Middletown site. It is a closer question whether Olin is entitled to summary judgment on the issue of whether there was an occurrence in 1970 at Middletown. Nevertheless, since, as discussed immediately below, there is a genuine dispute whether Olin expected or intended the damage, the Court denies summary judgment on the site.

_____

¶¶ 270-71, 278. Finally, ecological receptors could spread the contamination. For example, insects, worms, and other on-site organisms ingest contaminated particles, and in turn are ingested by other animals, which migrate offsite and cause a bio-accumulation of contaminants in the ecosystem food chain. Id. at ¶¶ 272-73, 278.

Expect or Intend Damage. Olin's experts concluded that Olin did not expect or intend the damage that occurred at Morgantown. See Brody Report at 29-30; Goodfellow Report at 89, 97. "The chemicals produced by Olin were similar to those manufactured by prior companies who operated the Site, and Olin performed landfilling disposal practices consistent with its peers at the time." Brody Report at 29. "The landfill practices of waste handling that occurred from 1951-1958 by Olin at the Morgantown Ordnance Site were standard practices for the period in which they occurred and consistent with the standard-of-practice before 1971." Goodfellow Report at 97. "Furthermore, the federal government extended their lease of operation during Olin's tenure at the facility. The government had detailed knowledge of what Olin was doing at the site and did not question Olin's waste handling practices." Id. In a memo from 1985, an Olin employee stated that he and other Olin employees visited Morgantown and concluded that, "there is no evidence of any adverse situation contributed to or caused by Olin at" Morgantown. Martin Remaining Sites Decl. Ex. 99.

By contrast, Lamorak's experts point to scientific and industry literature that existed prior to 1971 that described the environmental pollution that would be caused by the disposal of industrial wastes, including drums containing chemicals,

resins, and solvents into an onsite, unlined dump, and disposal of wastewaters into unlined settling ponds. With respect to the Morgantown Site in particular, the Roux Report contends that "Olin knew that the disposal of wastes, including oily wastes and tar, into a ravine and onto the ground surface in OU-1 were causing the environmental damage that resulted." Roux Report at 121. "The ravine dumping area and scraped area each essentially represented a 'hole in the ground' where wastes were indiscriminately dumped. No effort was made to prevent contaminants from entering the subsurface." Id. at 139. "These activities violated the terms of the lease." Id.

On this record, the Court holds that there is a genuine dispute as to whether Olin expected or intended the damage.

### e. North Little Rock

Olin operated North Little Rock ("NLR") as a pesticide manufacturing and research plant. See Lamorak Counter Remaining Sites 56.1 at ¶ 306; see also Olin Counter Remaining Sites 56.1 at ¶ 139. In 1970 or 1980, Olin conducted investigations at the NLR site to evaluate whether there were any levels of contamination that had to be addressed. Olin Counter Remaining Sites 56.1 at ¶ 140. In addition, in around 1980 or 1981, the EPA conducted its first investigation of the NLR site. Id. at ¶ 141. In connection with that investigation, the EPA found on-

site contamination from pesticides, metals, and low pH in the soil and drainage ditches. Id. at ¶ 142.

Olin and Lamorak both move for summary judgment. Lamorak argues that Olin is not entitled to coverage on the NLR site because the contaminated conditions were on its own property and therefore not covered "property damage" under the terms and conditions of the Lamorak Policies. Olin argues that the evidence shows that Olin did not remediate the onsite soils and sediment for its own benefit but rather did so to prevent migration of contaminants to groundwater and off-site property and to protect public health and prevent damage to third-party property. The Court denies both motions for summary judgment.

Property Damage. In the northeast corner of the site, Olin historically burned waste until it was prohibited in the 1960s, at which time Olin began burying waste in trenches. Id. at ¶ 143. In 1979 or 1980, Olin conducted investigations at NLR to evaluate whether there were any levels of contamination that had to be addressed, with an investigation by the EPA following in 1980 or 1981. Id. at ¶¶ 140-144. In connection with that investigation, the EPA found onsite contamination from pesticides, metals, and low pH in the soil and drainage ditches. at ¶ 142.

107

Olin argues that, although the remediation was focused on on-site contamination, it was intended to prevent property damage to third-party property. The clean-up order refers to "on-site soil" contamination and remediation. Id. at ¶ 152; see also Martin Remaining Sites Opp. Decl. Exs. 25-26. Olin's corporate designee, James Brown, testified that the remediation would be "focused on" onsite soil. Luongo Remaining Sites Decl. Ex. E at 136:10-18, 137:8-22. In addition, Richard McClure, who works with the Olin Environmental Remediation Group and was previously the project manager at the NLR site, testified that the "soil in and around the pesticide areas were being consolidated and capped" and that the pH treatment and soil remediation were done on the property. See id. Ex. FFF at 37:7-23. McClure also testified that sediments were addressed by installing a liner in drainage ditches, that all of the liners were installed on Olin's property, and that he was not aware of any work on sediments off of the property. See id. at 38:2-39:1. Finally, Lamorak's expert, Recker, testified that there were "off-site impacts below remedial action levels" in both the groundwater and in the sediments. Martin Remaining Sites Opp. Decl. Ex. 19 at 156:14-15.

On the other hand, Brown also stated that the risk concern was "for off-site ecological receptors." Luongo Remaining Sites

Decl. Ex. E at 137:8-22. And McClure testified that "[t]he pH adjustment in the soil was to reduce the aluminum from being migrated from the soils to the ditches where there were [sic] occasionally surface water." Id. Ex. FFF at 38:2-9. In addition, Olin's expert, Hall, concluded that "waste materials were continuing to be placed in the ground and buried in 1970 and for several years beyond," such that "any precipitation event that occurred from initial placement of waste until capping in 1983 resulted in the transport of pesticide contamination off-Site via runoff from the disposal area." Hall Report at North Little Rock 11. Olin was ordered to line drainage ditches that flow off-site. See Martin Remaining Sites Opp. Decl. Ex. 85 at 2018OLINFACSITES_00518677 (explaining that the drainage ditch linings would "contain sediment in on-site and off-site drainages that will restrict the exposure").

With respect to the groundwater at the NLR Site, Lamorak concedes that there was groundwater contamination, which constitutes damage to third-party property. See Defendant Lamorak Insurance Company's Memorandum of Law in Support of Its Motion For Summary Judgment on Liability, Damages and Other Relief Sought by Olin Corporation for the Remaining Sites at 28, ECF No. 2213 ("If Olin is able to establish an occurrence at NLR, the only potentially covered off-site remedial activities

at NLR relate to groundwater."). However, Lamorak contends that the groundwater contamination did not give rise to any liability. Olin's corporate designee, Brown, opined that the groundwater did not pose an "unacceptable risk." On the other hand, there is a "monitored natural attenuation" in place to monitor and sample the groundwater. Luongo Remaining Sites Decl. Ex. E at 137:23-138:12. This program, selected by the Arkansas Department of Environmental Quality, "implements controls such as fences, locks, and institutional controls to prohibit access to and contact with the contaminated groundwater." Martin Remaining Sites Opp. Decl. Ex. 85 at 2018OLINFACSITES_00518678.

Based on the foregoing, the Court finds that there is a genuine dispute of material fact as to whether damage was limited to Olin's property.

Expect or Intend Damage. Olin's experts concluded that Olin did not expect or intend the damage. See Brody Report at 36-37; Goodfellow Report at 113. Brody concluded based on his experience that "Olin's practices [to burn waste] were entirely consistent with other industrial facilities during the time period and would not have been in contravention of any state or federal regulations." Brody Report at 36. Moreover, "it appears that as soon as possible, after a local ordinance was passed limiting this practice, Olin sought to comply with that

ordinance and began burying waste generated from daily
operations in a manner consistent with prevailing industry
practices at that time." Id. "Again, as RCRA only came into
being in 1976 and CERCLA in 1980, in my opinion there is no
reasonable way in the period up to and including 1970 that there
would have been any reasonable means by which Olin would have
understood that its waste disposal practices at the North Little
Rock Site would lead to environmental impacts that would require
cleanup measures over a quarter of a century later." Id. at 36-
37.

Goodfellow similarly concluded that "Olin's management and
handling of the materials and wastes at the North Little Rock
site was consistent with the standard-of-practice prior to
1971." Goodfellow Report at 122. "Furthermore, in a 1978 EPA
report on the state of the knowledge at the time, EPA stated
that potential impacts were unclear. This report stated that
land disposal methods for pesticides were widely used but under-
researched: 'Leaching and volatile losses from unlined disposal
sites or evaporation/infiltration ponds cannot be predicted with
any certainty. The capacity of various soils to adsorb, retain,
and degrade pesticides has not been adequately quantified' (U.S.
EPA 1978)." Id.

By contrast, Lamorak's expert, Recker, concluded that Olin did expect or intend the damage. He contended that "[t]he potential harm to surface and ground water from the handling, storage and disposal of industrial chemicals and materials was well known by industry including Olin Mathieson." Martin Remaining Sites Decl. Ex. 10 at 8. His conclusion was based in part on general knowledge, evidenced by a 1931 textbook authored by Jerome J. Morgan, a 1941 publication authored by L.C. MacMurray, proceedings at the 1952 Industrial Wastes Forum, the 1952 "general policy" of the U.S. Geological Survey regarding underground waste disposal, statements by N.J. Lusczynski, activities by the American Water Works Association and National Agricultural Chemicals Association, the Industrial Waste Conference held at Purdue University, Olin officials' attendance at the Purdue conferences, the topics discussed at the Purdue conferences, statements by the Olin official L.W. Roznoy, and the fact that Olin employed scientists and engineers with advanced degrees in environmental oversight functions. Id. at 8-13.

With respect to Olin's practices at NLR in particular, Recker cites an Olin internal memo from May 7, 1992 that includes a chronology with information from an interview with Duncan Brown, a former site worker, who started as an intern in

112

the 1930s. Brown indicated that pesticides containing materials
were buried in "disposal pits" in the East 40 portion of the
site in the 1960s, specifically in trenches that were up to 9
feet deep. Id. at 13.

The Court finds, based on this evidence, that there is a
genuine dispute as to whether Olin expected or intended the
damage at the North Little Rock Site.

### f. Pine Swamp

Only Olin moves for summary judgment on the Pine Swamp
Site, which Olin owned and operated as an ammunitions and
disposal facility from 1931 to 1980. See Lamorak Counter
Remaining Sites 56.1 at ¶ 358. The Court denies Olin's motion
for summary judgment on the Pine Swamp Site in light of the
dispute as to whether Olin expected or intended the damage at
that site.

Olin's experts concluded that Olin did not expect or intend
the damage at Pine Swamp. See Brody Report at 40-41; Goodfellow
Report at 134, 142-43. Brody concluded that "[f]or the most
part, laws and regulations covering hazardous wastes disposal at
the Pine Swamp Site were not established until well after Olin's
operations had ceased. As discussed elsewhere in this report,
land disposal was considered a preferable disposal method to air
and water discharge. Regulatory agencies only began to

comprehensively regulate land disposal practices through the
passage of RCRA in 1976, and the formalization of hazardous
waste disposal methods proposed in 1978." Brody Report at 40.
"In addition to the lack of federal regulations, state
regulations at the time did not provide guidance for waste
disposal in and around 1970." Id. at 41. Goodfellow similarly
concluded that "Olin's management and handling of the materials
and wastes at the Pine Swamp site was consistent with the
standard-of-practice prior to 1971." Goodfellow Report at 134,
143.

Lamorak's experts found that Olin must have known before
1970 that its "disposal practices of burying or dumping
industrial wastes such as mercury-containing wastes, oily
wastes, tar, or chemical-containing drums onto the ground
surface were causing the environmental harm that ultimately
resulted." Roux Report at 121. As with other sites, the Roux
Report's opinion is based in part on historical environmental
awareness of the general public and Olin's involvement with the
Manufacturing Chemists' Association. See id. at 121-39.

Regarding Olin's practices at Pine Swamp in particular, the
Roux Report contends that Olin knew that its practices were
causing environmental harm because "[t]he Pine Swamp Site was
primarily used for storage of raw materials used in production

of ammunition (e.g., gunpowder and other chemicals) and for waste disposal and/or incineration from the New Haven Site from approximately 1900 into the 1960s." Id. at 140. "Firing range traps sands were disposed of in ponds and left in piles at the Pine Swamp Site. The five ponds on the Site are connected via surface water to Lake Whitney, which is a drinking water source." Id. "Olin disposed of and burned wastes in Pine Swamp. Wastes burned and/or buried included: wood, demolition debris, metals, glass, trash, waste gunpowder, solvents, off-specification batteries, concrete test pads, trap sands and incinerator ash." Id. "The environmental harm at Pine Swamp was visibly obvious. Waste materials were left exposed at land surface and were visibly obvious." Id.

In addition, the Roux Report states that "In 1966, the Hamden Health Department ordered Olin to cease burning of wastes, cease transporting wastes to Pine Swamp, and to remove non-combustible trash or other wastes from Pine Swamp. The Hamden Health Departed [sic] stated "[b]y burying some of these burned and unburned chemicals in the ground and thus creating a hazard to our public water supply." Lamorak Counter Remaining Sites 56.1 at ¶ 377. Olin complied with the Hamden order and "all of the chemical waste that had been dumped was removed." Id. at ¶ 379. In 1974, Olin and the New Haven Water Company ran

115

water analyses that did not indicate any environmental problems and that were "in the range of Lake Whitney watershed values." Id. at ¶ 381.

In light of this record evidence, the Court concludes that reasonable jurors could disagree as to whether Olin expected or intended the damage at the Pine Swamp Site.

### g. Wallisville

Olin moves for summary judgment on the Wallisville Road Site and Lamorak moves for partial summary judgment. The Wallisville Road Site is located in Houston, Texas. Olin Counter Remaining Sites 56.1 at ¶ 170. Olin purchased the site, including the sulfur plant on it, in 1950. Id. at ¶ 171. Olin operated the sulfur plant and added dry pesticide blending in 1950 and liquid pesticide blending in 1955. Id. at ¶ 172-73. The plant closed in 1972 and was sold to Eureka in 1973. Id. at ¶ 174. Lamorak moves for partial summary judgment on the ground that Olin did not incur any costs for remedial activity on the site after 1989.

Expect or Intend Damage. Olin's experts concluded that Olin did not expect or intend the damages. See Brody Report at 43-44; Goodfellow Report at 144, 153-54. For example, Brody concluded that "Olin's action's with respect to the management of materials at the Wallisville Road Site in and before 1970 were

116

consistent with industry practices and environmental regulations at that time. Under the circumstances there was no reasonable basis for it to conclude in and prior to 1970 that its practices were allowing hazardous contaminants to be released at the Site at levels sufficient to cause environmental concern." Brody Report at 44. "Olin's management and handling of the materials and wastes at the Wallisville Road site was consistent with the standard-of-practice prior to 1971." Goodfellow Report at 144, 153. "Before 1971, almost no information was known about contaminant migration from waste burial and connected impacts to the environment, and there was no standardized practice across industry for disposal of waste. Furthermore, pesticides manufactured at the Wallisville site were meant for future land application use; thus, in my opinion, during this period it would not have been anticipated that a product meant for land use would have detrimental environmental effects, to either soil or groundwater." Id. at 154.

Lamorak's expert, Recker, determined that Olin did expect or intend the damage. He found that "[t]he potential harm to surface and ground water from the handling, storage and disposal of industrial chemicals and materials was well known by industry including Olin Mathieson." Martin Remaining Sites Decl. Ex. 11 at 8. "Piles of materials heavily contaminated with toxaphene

117

were found in the drainage ditches adjoining the property. Piles of materials as discovered by EPA in 1980 would have been dumped in those locations, versus simply migrating to those off-site locations." Id. at 12. Recker concludes that Olin was aware of the dangers of dumping such heavily contaminated materials.

Recker opined that scientific evidence of organochlorine pesticide toxicity, including toxaphene, was growing during the 1950s. See Martin Remaining Sites Decl. Ex. 12 at 10. Recker's conclusion is based on a 1931 textbook by authored by Jerome J. Morgan, a 1941 publication authored by L.C. MacMurray, proceedings at the 1952 Industrial Wastes Forum, the 1952 "general policy" of the U.S. Geological Survey regarding underground waste disposal, statements by N.J. Lusczynski, activities by the American Water Works Association and National Agricultural Chemicals Association, the Industrial Waste Conference held at Purdue University, Olin officials' attendance at the Purdue conferences, the topics discussed at the Purdue conferences, statements by the Olin official L.W. Roznoy, and the fact that Olin employed scientists and engineers with advanced degrees in environmental oversight functions. See id. at 8-13.

The Court finds that there is a genuine dispute of material fact regarding Olin's knowledge or expectation of the damage.

118

Remediation Costs. In addition, Lamorak contends that Olin is not entitled to recover for costs incurred at the Wallisville Road Site after 1989 because, since 1989, there has been no remedial activity with respect to any off-site contamination emanating from the Wallisville Road site. Lamorak's argument is based on a statement in Olin's expert report that post-1989 costs were for non-remedial costs such as routine maintenance to comply with local ordinances. See Martin Remaining Sites Opp. Decl. Ex. 4 at Wallisville at 9 ("Remedial measures were completed for the drainage ditches in 1989.").

Olin disputes that, pointing out that Hall's report also states that "[a] 1993 risk evaluation identified a potential on-going human health risk for trespassers in the Site's northwest panel." Id. Olin also cites the declaration of Curtis Richards, Olin's Vice President of Environmental, Health and Safety, who manages the ongoing remediation efforts at the site, that post-1989 costs have been incurred to monitor and maintain the implemented remedy, to ensure that it remains intact and continues to prevent any further offsite contamination and remains protective of human health and the environment. See Richards Decl. at ¶¶ 74-75, 77; see also Martin Remaining Sites Opp. Decl. Ex. 89 (Texas Water Commission Order dated April 3, 1986) (requiring Olin to take remedial action). These costs fall

within the Policies' coverage of "all sums which the Insured shall be obligated to pay by reason of the liability . . . for damages, direct or consequential and expenses . . . on account of . . . Property Damage." Olin Counter Remaining Sites 56.1 at ¶ 19.

The Court finds there is a genuine dispute as to whether the costs incurred after 1989 were remediation costs.

## C. Application of Condition C

To the extent that Lamorak is liable for payment of any of Olin's costs at the Remaining Sites, the applicable limit of liability must be reduced to account for prior insurance. As discussed in past orders, the Prior Insurance Provision of the Lamorak Policies ("Condition C") states, in relevant part:

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Insured prior to the inception date hereof, the limit of liability hereon . . . shall be reduced by any amounts due to the Insured on account of such loss under such prior insurance.

Olin Counter Remaining Sites 56.1 at ¶ 11.

The Second Circuit has previously held that this provision limits Olin to one occurrence limit for a single loss by reducing the occurrence limits of each policy containing the provision by the amounts due to Olin on account of such loss covered in whole

120

or in part by prior insurance in the same excess layer. Olin Corp. v. Am. Home Assur. Co., 704 F.3d 89, 104 (2d Cir. 2012) ("Olin III") (describing the application as "sweeping a continuing loss into the earliest triggered policy, with that policy then fully indemnifying the insured for that loss"). In Olin IV, the Second Circuit held that the Prior Insurance Provision should apply as written so that Lamorak's limits are reduced by amounts due under prior insurance policies issued by any other insurer in the same policy layer. 864 F.3d at 151.

As previously determined by this Court, the proper approach to calculating this set-off is multiplying the total amount of the settlements by a ratio of settled policy limits at the sites for which Olin is seeking coverage from Lamorak compared to the policy limits at all settled sites. The Court will apply this set-off when it enters final judgment in this case following trial.

## D. Lamorak's Affirmative Defenses

Olin argues that Lamorak cannot assert any affirmative defenses to bar Olin's claims because Lamorak has waived or forfeited all defenses. To the extent Lamorak believes an affirmative defense forecloses some or all of Olin's claims, Lamorak bears the burden of establishing that such a defense

applies. See Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 300 (2d Cir. 1987); 17A Couch on Ins. § 254:12.

Lamorak raised the following affirmative defenses in its answer to the Fourth Amended Complaint: (1) failure to state a claim; (2) ratification, estoppel, waiver, laches, unclean hands, and/or the applicable statute of limitations; (3) failure to disclose material facts and/or misrepresentation of material facts at the time the relevant policies were negotiated or purchased; (4) failure to satisfy conditions precedent to coverage including but not limited to, the notice, assistance and cooperation, loss payable, maintenance or underlying insurance, and other insurance provisions in the policies; (5) failure to exhaust underlying insurance coverage and/or any applicable retentions or deductibles; (6) the terms, definitions, conditions, limits of liability and exclusions contained in the relevant policies and/or the underlying policies to which those policies follow form, including but not limited to, the pollution exclusion clause and nuclear energy liability exclusion endorsement; (7) failure to take appropriate remedial or mitigating action upon discovering the actual or alleged harm involved in the subject environmental matters listed on Schedule B of the Fourth Amended Complaint; (8) the subject environmental matters do not involve an "occurrence"

within the meaning of the relevant policies or in the underlying

policies to which those policies follow form, for reasons that

include, but are not limited to, that the actual or alleged harm

involved did not result unexpectedly or unintentionally; (9) the

actual or alleged harm involved occurred prior to the

commencement of the relevant policies and was known to Olin, and

thus was not, as of that time, a risk susceptible of being

insured; (10); Lamorak has no duty to defend with regard to any

of the subject environmental matters listed on Schedule B; (11)

Olin unreasonably settled the subject environmental matters;

(12) Olin's liabilities are attributable to statutory

violations, criminal fines or sanctions, or punitive damages and

therefore not insurable under public policy; (13) the

environmental matters do not involve damages on account of

"property damage" as that term is used in the relevant policies

or the underlying policies to which those polices follow from;

(14) the claims are barred by the 1964 Endorsement; (15) the

claims are barred in whole or in part by the prior insurance and

non-cumulation of liability condition contained or incorporated

in the policies; (16) the extent of coverage must be limited by

applicable principles of allocation; (17) the claims are barred

in whole or in part to the extent Olin has voluntarily made any

payment or assumed any obligation; (18) Lamorak may be entitled

to certain policy-based defenses; (19) reservation of the right
to raise further specific policy-based defenses and exclusions
upon discovery of further information. Answer of Defendant
Lamorak Insurance Company (f/k/a OneBeacon American Insurance
Company) to the Fourth Amended Complaint of Plaintiff, Olin
Corporation, with Affirmative Defenses, ECF No. 2002.

In its ample briefing, Lamorak has not directed the Court .
to any evidence in the record substantiating any of its
affirmative defenses (with the exception of the 1964
Endorsement). See, e.g., Lamorak Remaining Sites Opp. at 5-12
(defending its affirmative defense exclusively on the ground
that it did not waive its right to raise those affirmative
defenses); Lamorak Remaining Sites Mem. (not discussing
affirmative defenses, other than the 1964 Endorsement, at all).
"Judges are not like pigs, hunting for truffles buried in
briefs." United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.
1991). Nor must this judge trudge the dry desert of the record
of this case, searching for some rumored water hole.
Accordingly, the Court grants summary judgment for Olin on all
of Lamorak's affirmative defenses.

## E. Conclusion

In sum, the Court grants summary judgment for Lamorak on
the Olin Water Services Site; the Court grants summary judgment

for Olin with respect to the Bethany, Brazier Forest, Central Chemical, Crab Orchard, Frontier-Chemical, New Haven, and Niagara County Refuse Sites, except as concerns Olin's damages at those sites; and the Court denies summary judgment as to the Assonet, Charleston, Middletown, Morgantown, North Little Rock, Pine Swamp, and Wallisville sites, except that it grants summary judgment for Olin with respect to Lamorak's affirmative defenses at these sites. These rulings apply both to Olin's breach of contract claims for past damages and its declaratory judgment claims for future damages.

## Motions for Summary Judgment of Lamorak, London Continental Casualty, Munich Reinsurance, and General Reinsurance on Lamorak's Third-Party Claims

Lamorak moves for summary judgment on its third-party claims; Olin, London, General Reinsurance, and Continental Casualty and Munich Reinsurance oppose. Olin moves for partial summary judgment on all of Lamorak's third-party claims except for those concerning Bethany; Lamorak opposes. General Reinsurance moves for summary judgment on Lamorak's third-party claims and Lamorak opposes. Finally, Continental Casualty and Munich Reinsurance jointly move for summary judgment on Lamorak's third-party claims and Lamorak opposes.

After very full consideration, the Court concludes that, as a matter of law and contrary to the Court's earlier ruling, Lamorak cannot seek contribution from London, General Reinsurance, Continental Casualty, and Munich Reinsurance for any claims those co-insurers have settled with Olin. The Court also finds that Lamorak is not entitled to indemnification from the settling insurers.

These two determinations largely resolve the motions for summary judgment on Lamorak's third-party claims in favor of the settling insurers and Olin. The exception is Lamorak's claim for contribution from General Reinsurance and Continental Casualty on the Bethany Site, which was not the subject of those insurers' settlements with Olin. With respect to that claim, the Court finds that there is no genuine dispute that Lamorak is not entitled to contribution on that site because it is virtually impossible for the attachment point of General Reinsurance and Continental Casualty's policies to be reached for that site.

## I. Lamorak's Claims for Contribution

### A. Whether Lamorak Is Entitled To Contribution From Co-Insurers Who Have Settled Olin's Claims Against Them

The threshold question underlying all the motions for summary judgment regarding Lamorak's contribution claims is whether, as a matter of law, Lamorak can seek contribution from

126

co-insurers that have settled their claims with Olin. In
granting Lamorak leave to file its third-party complaint, the
Court held that Lamorak was not barred, as a matter of law, from
seeking contribution from co-insurers that settled. General
Reinsurance, Continental Casualty, Munich Reinsurance, who did
not previously have an opportunity to submit their views on
Lamorak's motion for leave to file a third-party complaint, and
Olin now move the Court to reconsider that ruling. The Court
accordingly here reassesses its conclusion that Lamorak could
seek contribution from its settled co-insurers with the benefit
both of this new briefing by Lamorak's co-insurers and the
implications of the Court's subsequent decision that the Prior
Insurance Provision of Lamorak's policies allows it to set off
its liability by amounts already paid by settled insurers. Upon
such reconsideration, the Court reverses its previous ruling,
and holds that Lamorak is not legally entitled to seek
contribution from settled insurers.

In In re Viking Pump, Inc., 52 N.E.3d 1144, 1151-53 (N.Y.
2016), the New York Court of Appeals held that insurance
policies that contain the "Condition C" language in Lamorak and
the Co-Insurers' policies are subject to an "all sums"
allocation. Under an all sums allocation, a policyholder may
recover its total liability from one selected insurer up to that

insurer's policy limits. See id. at 1149-50. In turn, the
targeted insurer may seek contribution from other insurers whose
policies are triggered by the same loss. See id.

Following Viking Pump, the Second Circuit held that
Lamorak's policies required application of an "all sums"
allocation, such that Lamorak was liable for "all sums Olin
becomes legally obligated to pay for property damage during the
policy period caused by an occurrence." Olin IV, 864 F.3d at
138. The Court of Appeals noted that under this all sums
approach, "the burden [shifts] to the insurer 'to seek
contribution from the insurers that issued the other triggered
policies.'" Id. at 151 (quoting Viking Pump, 52 N.E.3d at 1149-
50).

However, neither Olin IV nor Viking Pump spoke directly to
whether Lamorak could seek contribution from co-insurers who
have settled Olin's claims against them.

By bottom-line order dated October 13, 2017, the Court
permitted Lamorak to file third-party claims against the settled
insurers on the remaining sites. ECF No. 2000. On November 29,
2017, the Court issued a memorandum explaining the basis for
that decision. ECF No. 2024. In that memorandum decision, the
Court relied primarily on Maryland Casualty Co. v. W.R. Grace &
Co., 218 F.3d 204, 210 (2d Cir. 2000), in which the Second

Circuit held that two insurers, CNA and Maryland – which had themselves settled the insured's claims (for coverage of the insured's defense costs) – could, potentially, be liable in contribution to two other insurers who also had settled (though after CNA and Maryland had settled). The Second Circuit rejected the argument that "[c]ontribution claims against settled insurers . . . are barred as a matter of law," id. at 209, finding "[t]he notion that any settlement by which an insurer obtains a release from its insured, regardless of its terms, . . . is untenable," id. at 210. "It is . . . a well-settled principle in the law of contribution that when one party jointly liable on an obligation pays more than its pro rata share, it may compel the co-obligors to contribute their share of the amount paid." Id. (citing Henry L. McClintock, Handbook of the Principles of Equity 542 (2d ed. 1948)).[23]

---

[23] The Second Circuit further explained that "[c]ontribution rights, if any, between two or more insurance companies insuring the same event are not based on the law of contracts. This follows from basic common sense because the contracts entered into are formed between the insurer and insured, not between two insurance companies . . . . [W]hatever obligations or rights to contribution may exist between two or more insurers of the same event flow from equitable principles." Id. at 210-211; see also Turner Const. Co. v. American Mfrs. Mut. Ins. Co., No. 01-CV-2899, 2007 WL 2710114, at *6 (S.D.N.Y. Aug. 31, 2007) ("The Second Circuit has held that contribution rights among insurance companies insuring the same event cannot be impacted by any settlement among any of the insurers and the insured.");

129

Thereafter, on April 18, 2018, the Court entered a memorandum opinion determining for the first time, on remand from the Second Circuit, the effect on the judgment against Lamorak of Olin's prior global settlements with its other insurers. ECF No. 2176. In that opinion, the Court concluded that the Second Circuit had clearly directed it to set off Lamorak's liability by the amounts actually paid in settlement by Lamorak's co-insurers (a so-called pro tanto set-off) rather than by those settled insurers' pro rata shares of the liability. See, e.g., Olin IV, 864 F.3d at 150 (explaining that "if, as Olin suggests, Olin entered into a global settlement with the London Market Insurers releasing claims under those policies as to all sites potentially at issue — and not just those that were the subject of adjudication at trial in this matter — there is no easy way to determine the amount of this settlement that is properly associated with claims arising from the five manufacturing sites that are the focus of this appeal," and remanding to this Court to allow discovery on and resolve this question).

DaimlerChrysler Ins. Co. v. Universal Underwriters Ins. Co., 2010 N.Y. Misc. LEXIS 1686, at *11-12 (N.Y. Sup. Ct. Mar. 31, 2010) (because "obligations or rights to contribution . . . flow from equitable principles," "[t]he contract of settlement an insurer enters into with the insured[] cannot affect the rights of another insurer who is not a party to it.").

At the same time, the Court recognized that applying a pro rata set-off rather than a pro tanto set-off had some comparative advantages. A pro rata approach ensures that the insured does not double recover, while avoiding the possibility that an insured might settle for a small amount with a preferred insurer, knowing that the other insurer(s) will be required to pay the remaining amount. See ECF No. 2176 at 25 n.11. As previously noted, the inequity that can result from the pro tanto approach, even in the absence of collusion, is stark in this case: Since Olin entered into global settlements with its other insurers, it was impossible for Lamorak to prove, as required by the Second Circuit, exactly how much of those settlements was properly allocated to the sites on which Olin was seeking indemnity.[24]

---

[24] Notwithstanding this potential for unfairness, a number of courts have adopted the pro tanto approach. The jurisdictions that have chosen to apply a pro tanto setoff include Delaware, Massachusetts, Ohio, and Washington. See Liberty Mutual Ins. Co. v. Black & Decker Corp., 383 F. Supp. 2d 200, 216-17 (D. Mass. 2004); Stonewall Insurance Co. v. E.I. du Pont De Nemours & Co., 996 A.2d 1254, 1260 (Del. 2010); Mass. Elec. Co. v. Commercial Union Ins. Co., No. 99-00467B, 2005 WL 3489874, at *2 (Mass. Super. Ct. Oct. 25, 2005); Goodrich Corp. v. Commercial Union Ins. Co., Nos. 23585 & 23586, 2008 WL 2581579, at *7-9 (Ohio Ct. App. June 30, 2008); Weyerhaeuser Co. v. Commercial Union Ins. Co., 15 P.3d 115 (Wash. 2000). The downsides of awarding a pro rata set-off to non-settling insurers are that it might encourage settlement less well than a pro tanto set-off and may result in the insured not recovering the "all sums" for which it

Accordingly, were it writing on a blank slate, the Court

might have interpreted the Prior Insurance Provision to require

a pro rata set-off to account for settlements, which it believes

is the more equitable approach.[25] At the same time, the Court

_____

contracted. With respect to the latter point, the insured is in
a better position, on a pro rata approach, to ensure that it
recovers the full coverage for which it contracted than an
insurer is, on a pro tanto approach, to ensure that it is not
saddled with more than its equitable share of the insured's
costs. This is because the insured is party to all the
settlements, whereas an insurer has no say with respect to the
settlements between its co-insurers and the insured. With
respect to the former point, as noted in the Court's summary
judgment opinion on the Remand Sites, there is reason to doubt
that pro tanto setoffs always better encourage settlement than
pro rata set offs. See Lewis A. Kornhauser & Richard L. Revesz,
Settlements Under Joint and Several Liability, 68 N.Y.U. L. Rev.
427, 469 (1993) (concluding that "the pro tanto set-off rule has
better settlement-inducing properties than the apportioned share
set-off rule for low litigation costs and worse settlement-
inducing properties for high litigation costs in cases in which
the plaintiff has sufficient bargaining power"). Moreover, the
Supreme Court has concluded that "[t]he additional incentive to
settlement provided by the pro tanto rule comes at too high a
price in unfairness." McDermott, Inc. v. AmClyde, 511 U.S. 202,
215 (1994).

[25] Moreover, there is reason to believe that the New York Court
of Appeals would apply the greater of a pro rata and pro tanto
set-off. See N.Y. Gen. Obl. Law § 15-508(a) ("When a release or
a covenant not to sue or not to enforce a judgment is given to
one of two or more persons liable or claimed to be liable in
tort for the same injury, or the same wrongful death, . . . it
reduces the claim of the releasor against the other tortfeasors
to the extent of any amount stipulated by the release or the
covenant, or in the amount of the consideration paid for it, or
in the amount of the released tortfeasor's equitable share of
the damages under article fourteen of the civil practice law and
rules, whichever is the greatest.").

132

felt that the potential for inequity inherent in the pro tanto
approach, and the inequity in fact present in this case, would
be ameliorated by Lamorak's ability to seek contribution from
the settling insurers.

However, the Court has now reached the conclusion that
permitting Lamorak to both apply a pro tanto set-off and seek
contribution is the least sensible approach of all possible
approaches. That is, applying a pro tanto set-off and permitting
contribution claims is worse than both (1) applying a pro tanto
set-off and not permitting contribution claims and (2) applying
a pro rata set-off. In so holding, the Court is guided by the
Supreme Court's decision in McDermott, Inc. v. AmClyde, 511 U.S.
202 (1994).[26] In that case, the Supreme Court explained that it
"is generally agreed that when a plaintiff settles with one of
several joint tortfeaors, the nonsettling defendants are
entitled to a credit for a settlement." 511 U.S. at 208. The
Court then evaluated the relative merits of different approaches
courts had applied in determining that credit: (1) applying a
pro tanto set-off and allowing for contribution; (2) a pro tanto

---

[26] Although this case involved admiralty law, such that its
holding is not binding on this Court, which is tasked with
predicting how the New York Court of Appeals will rule, its
reasoning is highly persuasive.

set-off and not allowing for contribution; and (3) a pro rata set-off and not allowing for contribution. Id. at 208-09.

The Supreme Court held that the first option - which Lamorak asks the Court to apply now - was "clearly inferior to the other two alternatives, because it discourages settlement and leads to unnecessary ancillary litigation." Id. at 211. "It discourages settlement, because settlement can only disadvantage the settling defendant." Id. Moreover, the contribution claims burden the courts with additional litigation.[27] By contrast, applying a pro tanto set-off or a pro rata set-off avoids unnecessary ancillary litigation. The Court agrees.

The cases on which the Court previously relied in permitting Lamorak to seek contribution are distinguishable because they did not involve set-offs. See Md. Cas. Co. v. W.R. Grace & Co., 218 F.3d 204 (2d Cir. 2000); DaimlerChrysler Ins. Co., Index No. 601238/008, 2010 WL 1459007 (N.Y. Sup. Ct. Mar. 31, 2010); Scotts Co. v. Ace Indem. Ins. Co., Index No. 602712/05, 2008 WL 518062 (N.Y. Sup. Ct. Feb. 26, 2008), aff'd sub nom Scotts Co. v. Pac. Empl'rs Ins. Co., 61 A.D.3d 464 (N.Y.

---

[27] The Supreme Court found that the choice between options 2 and 3 was less clear, but ultimately adopted option 3. Id. at 217. As already discussed, this Court believes that option 3 is precluded here by the Second Circuit's decision in Olin IV.

134

App. Div. 2009). Therefore in those cases, unlike here, if the insurer had not been permitted to seek contribution from the settling insurers, those settling insurers' liability would not at all have been accounted for.[28]

It could be argued that while, as a general matter, a pro tanto set-off plus contribution is the worst approach, it would be inequitable to apply only a pro tanto set-off in this unique context, where the law of the case changed midway through litigation. When Lamorak chose not to settle Olin's claims

---

[28] At oral argument, Lamorak placed significant weight on Cosmopolitan Mut. Ins. Co. v. Lumbermen's Mut. Cas. Co., 228 N.E.2d 893 (N.Y. 1967), see Transcript dated June 19, 2018 at 7:20-24, but the case is inapposite. There, the insured was covered by a single insurer, Lumbermen's, when an accident occurred in June, but a month later the insured got coverage from Cosmopolitan, which was made retroactive to the previous month. The Cosmopolitan policy contained a coinsurance clause limiting Cosmopolitan's liability to its proportional share. The insured then "canceled flat" its policy with Lumbermen's, meaning that the binder was canceled from its inception without any premiums being collected – including with respect to the June accident, for which Cosmopolitan was now liable. The New York Court of Appeals held that Lumbermen's could not cancel flat its policy because it affected the rights of a third-party and, accordingly, that Lumbermen's was jointly liable for the June accident. This case has no bearing on whether or not Lamorak can seek contribution from co-insurers who legitimately settled their claims with Olin. As for the other cases cited in Lamorak's brief, they only speak to whether particular policy provisions (rather than settlement) preclude claims for equitable contribution. See, e.g., United States Fire Ins. Co. v. Fed. Ins. Co., 858 F.2d 822 (2d Cir. 1998); Nat'l Union Fire Ins. v. Hartford, 248 A.D.2d 178 (N.Y. App. Div. 1998).

135

against it, it was operating under the (justified) assumption that it could never be liable for more than its pro rata share of Olin's costs. Had Lamorak known that it would in fact be on the hook for the entirety of Olin's damages, it may well have chosen to settle. However, the Court sees no reason to shift the inequity from Lamorak to the settled insurers who, when they settled Olin's claims against them, also were operating under the assumption that each insurer would only ever be liable for its pro rata share, such that the settling insurers also did not anticipate that contribution claims could ever be brought against them.[29]

Therefore, the Court finds that Lamorak is not entitled to contribution from any of the settled insurers with respect to sites that they have settled with Olin.

## B. Lamorak's Claims for Contribution from General Reinsurance and Continental Casualty on the Bethany Site

Lamorak can seek contribution from Continental Casualty and General Reinsurance as to the Bethany Site because those two insurers did not settle Olin's claims as to the Bethany Site.

---

[29] The Court notes that the London Market Insurers' Settlement agreement does contemplate contribution actions and, accordingly, requires Olin to effectively indemnify the London Market Insurers from such claims. Nevertheless, there is no indication that the London Market Insurers actually anticipated they would ever be subject to contribution claims.

See Statement of Undisputed Material Facts in Support of Olin
Corporation's Motion for Partial Summary Judgment on Lamorak's
Third-Party Claims at ¶¶ 11-12, ECF No. 2217; Transcript dated
June 19, 2018 at 35:12-13; Reply Memorandum of Law in Further
Support of Continental Casualty Company and Munich Reinsurance
America, Inc.'s Joint Motion for Summary Judgment at 1 n.1, ECF
No. 2275. However, Lamorak's claims for contribution at this
site nevertheless are nonjusticiable.

### 1. Continental Casualty

Lamorak's claims for contribution from Continental Casualty
at the Bethany Site must be dismissed as nonjusticiable. Article
III, Section 2 of the United States Constitution limits federal
court jurisdiction to actual cases and controversies. In
applying the constitutional prohibition against suits that do
not constitute a case or controversy in the context of insurance
coverage actions, the Second Circuit requires the dismissal of
high-layer excess insurance carriers when the "practical
likelihood" of such carrier being reached is too remote, or is
based upon speculative future possibilities that may not come to
pass. Certain Underwriters at Lloyd's, London v. St. Joe
Minerals Corp., 90 F.3d 671, 674-75 (2d Cir. 1996) (upholding
the dismissal of an excess insurer, finding that the record as a
whole consisted of speculation as to whether or not the excess

137

policy would ever be reached); E.R. Squibb & Sons, Inc. v.

Lloyd's & Cos., 241 F.3d 154, 177-78 (2d Cir. 2001); Associated

Indem. Corp. v. Fairchild Indus., 138 F.R.D. 384, 387 (S.D.N.Y.

1991) (dismissing coverage action where there was nothing "more

than a contingent speculation which may never occur that [the

insurer's] policy limitations will be reached"), rev'd on other

grounds, 961 F.2d 32 (2d Cir. 1992). New York State courts have

similarly held that coverage actions against excess insurers are

premature — and therefore not justiciable — where the

contingencies required to reach an excess insurance policy are

speculative or too remote. See, e.g., Combustion Eng'g, Inc. v.

Travelers Indem. Co., 75 A.D.2d 777, 778-79 (N.Y. App. Div. 1st

Dep't 1980), aff'd, 53 N.Y.2d 875, 877 (1981).

Lamorak agrees that if the Court finds that contribution

should be measured in terms of pro rata allocation by time on

the risk, then Continental Casualty should be dismissed from the

case because Olin's costs at Bethany (as well as the other

remaining sites) will, in all likelihood, never reach the limits

of its policies. See Lamorak Insurance Company's Memorandum of

Law in Opposition to the Motions for Summary Judgment on

Lamorak's Third-Party Claims Filed by Certain Underwriters at

Lloyd's, London and London Market Insurance Companies,

Continental Casualty Company and Munich Reinsurance America,

Inc., and General Reinsurance Corporation at 19-21, ECF No. 2253; see also Transcript dated June 19, 2018 at 17:19-19:2.

Continental Casualty issued two excess insurance policies to Olin that are relevant to this action: (1) Policy No. RDX 9561640, for the policy period March 1, 1961 through February 1, 1964, with limits of $1.25 million part of $5 million, excess of $5.3 million; and (2) Policy No. RDX 9896836, for the policy period February 1, 1964 through January 1, 1967, with limits of $1.25 million part of $15 million, excess of $5.3 million (collectively, the "CCC Policies"). See Lamorak Insurance Company's Response to Third-Party Defendants Continental Casualty Company and Munich Reinsurance America, Inc.'s May 11, 2018 Joint Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 at ¶ 23, ECF No. 2254. Olin does not seek to recover past costs from Lamorak for Bethany. Olin estimates that its future costs at Bethany will be approximately $8 million. Lamorak Counter Remaining Sites 56.1 at ¶ 84.

The Court agrees with Lamorak that a pure time-on-the-risk calculation for pro rata contribution is appropriate. As Lamorak explains, time on the risk is the most appropriate methodology for pro rata contribution because this is what New York courts use in pro rata allocation in cases involving progressive injuries and damage. See U.S. Fid. & Guar. Co. v. Treadwell

Corp., 58 F. Supp. 2d 77, 97 (S.D.N.Y. 1999) (noting that after accounting for the selected insurer's right to contribution, the net results of all sums allocation would match those of pro rata allocation); KeySpan Gas E. Corp. v. Munich Reinsurance Am., Inc., 31 N.Y.3d 51, 58, 62 (noting that a pro rata approach "reflects the ratio of [each insurer's] coverage (and thus the premiums it collected) to the total risk"). Such an approach is particularly apt here, as it was used for Olin's insurers' policies when pro rata allocation was the law of the case. See, e.g., Olin IV, 864 F.3d at 138 ("Under this pro rata method, the total property damage is divided into equal annual shares for each year in which such damage took place. This annual share is then treated as the total property damage attributable to that occurrence for that year, and the insurer providing coverage for that year is responsible for indemnifying an insured only to the extent of its contractual liability for such deemed property damage.").

Olin objects to the "time on the risk" methodology, urging the Court to adopt instead an approach referenced by the Third Circuit in Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440 (3d Cir. 1996). Koppers addressed an analogous situation: several insurers had settled their claims with the insured and one insurer was held jointly and severally liable for all of the

insured's costs. Koppers predicted that the Pennsylvania Supreme
Court would account for the settling insurers' share of the
liability by applying a pro rata set-off. After reaching this
determination, the Third Circuit indicated that the district
court, on remand, might "find" that the "the applicable rule of
allocation among excess policies" is "a pro rata allocation
based on the limits of each policy and the total limits of all
triggered policies." 98 F.3d at 1456. But Koppers did not, as
Olin suggests, find such an approach appropriate for every case
involving joint and several liability. Moreover, in indicating
that the district court might take this approach, the Third
Circuit relied on a Pennsylvania Superior Court case applying
Pennsylvania law, not New York law, which the Court must apply
here. See id. (citing Gould, Inc. v. Continental Cas. Co., 585
A.2d 16, 19 (Pa. Super. Ct. 1991)). Therefore, Koppers is not as
instructive as Olin believes.

Nevertheless, the Court recognizes that there may be some
tension between calculating a pro rata share using the time-on-
the-risk approach following Viking Pump. The Second Circuit
explained in Olin IV that "Viking Pump departs from the 'legal
fiction' that property damage can be cleanly allocated between
policy years, and instead adopts a joint and several liability
theory that allows the insured to seek indemnification for the

141

full amount of damage incurred over the continuing damage period from any insurer whose policy language dictates all sums liability with language similar to Condition C." 864 F.3d at 144. However, Viking Pump did not depart from that legal fiction only to adopt the method Olin proposes. Rather, Viking Pump rejects any "logical" pro rata allocation among insurers in the context of determining an insurer's liability to the insured where the policies, like Lamorak's, contain a non-cumulation clause. See Viking Pump, 27 N.Y.3d at 261 ("[N]on-cumulation clauses cannot logically be applied in a pro rata allocation.").

Moreover, there arguably is a difference between a pro rata share in the context of determining a liability to an insured and a pro rata share in the context of determining contribution. To determine how much an insurer owes an insured, on the pro rata approach, a court must determine how much damage happened during the year(s) that insurer's policy covered. Time-on-the-risk pro rata allocation is a legal fiction in that context because it "treat[s] continuous and indivisible injuries as distinct in each policy period" despite "the fact that the injuries may not actually be capable of being confined to specific time periods." Viking Pump, 27 N.Y.3d at 261. By contrast, to determine how much an insurer owes a co-insurer in contribution, where "several insurers bind themselves to the

same risk and one insurer pays the whole loss," the court must determine the "ratable proportion of the amount paid by [the one insurer] because he has paid a debt which is equally and currently due by the other insurers." Zurich-Am. Ins. Cos. v. Atl. Mut. Ins. Cos., 139 A.D.2d 379, 387 (N.Y. App. Div. 1988), aff'd, 539 N.E.2d 1098 (N.Y. 1989); see also Beazley Ins. Co. v. Ace Am. Ins. Co., 150 F. Supp. 3d 345, 358 (S.D.N.Y. 2015) ("[T]he purposes of contribution . . . '[are] to accomplish substantial justice by equalizing the common burden shared by the co-insurers, and to prevent one insurer from profiting at the expense of others.'" (citation omitted)). Therefore, determining an insurer's equitable share when each insurer agreed to cover all the insured's costs arising from continuing and indivisible damage does not involve figuring out how much damage actually occurred in any given year.

Therefore, Viking Pump does not provide much guidance when it comes to how this Court should now calculate the pro rata shares of Lamorak's co-insurers. Indeed, the Court of Appeals has stated that "there are different ways to prorate liability among successive policies" and, in affirming a trial court's decision to adopt a time-on-the risk method, indicated that "this is not the last word on proration." Consolidated Edison Co. of New York, Inc. v. Allstate Ins. Co., 98 N.Y.2d 208, 224-

143

25 (2002). In the face of this uncertainty, the Court believes that the best approach is to continue with the method of proration that has previously applied in this case, i.e. time-on-the-risk.

Lamorak concedes that Olin's damages at the Bethany Site will never reach the attachment points of Continental Casualty's policies under the time-on-the-risk approach to calculating pro rata shares. Accordingly, Continental Casualty is entitled to summary judgment for Lamorak's claims against it for contribution on the Bethany Site.

### 2. General Reinsurance

General Reinsurance, by contrast, does not argue that the costs at Bethany will never reach the limits of its policies. However, since its policies attach at the same or higher amounts than Continental Casualty's policies, the Court finds that Olin's costs at Bethany also will never reach its limits.

General Reinsurance issued two excess policies to Olin: policy no. X-2657 for the period from May 1, 1957 to February 1, 1964 and policy number X-3517 for the period from February 1, 1964 to January 1, 1967. See Lamorak Insurance Company's Response to Third-Party Defendant General Reinsurance Corporation's May 11, 2018 Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 at ¶ 1, ECF No. 2255.

Policy X-2567 attaches at $10.3 million and Policy X-3517

attaches at $5.3 million. See Memorandum of Law in Support of

Lamorak Insurance Company's Motion for Summary Judgment on Its

Third-Party Claims at 5, ECF No. 2209; see also Declaration of

Michael J. Balch in Support of General Reinsurance Corporation's

Motion for Summary Judgment Regarding Lamorak's Remaining Sites

Claims Ex. A, ECF No. 2207 (policy X-2567); id. Ex. B (policy X-

3517).

Since Lamorak has conceded that Olin's claims at Bethany

will never reach Continental Casualty's policies, which attach

in excess of $5.3 million, it must also concede that Olin's

claims at Bethany will never reach General Reinsurance Company's

policies, which attach in excess of $5.3 million and $10.3

million. Accordingly, General Reinsurance is entitled to summary

judgment on Lamorak's claim for contribution at the Bethany

Site.

## II.    **Lamorak's Claims for Indemnification**

Lamorak argues that it also is entitled to summary judgment

on its claim for indemnification from the Co-Insurers.

Indemnification "finds its roots in the principles of equity."

McDermott v. City of New York, 406 N.E.2d 460, 462 (N.Y. 1980).

The concept avoids unfairness "by recogniz[ing] that [a] person

who, in whole or in part, has discharged a duty which is owed by

145

him but which as between himself and another should have been discharged by the other, is entitled to indemnity." Murray Bresky Consultants, Ltd. v. N.Y. Comp. Manager's Inc., 106 A.D.3d 1255, 1258 (N.Y. App. Div. 2013) (alterations in original) (internal citations omitted). Lamorak's claim for indemnity fails as a matter of law.

A claim for indemnity may arise from an express agreement between the parties or a common law implied indemnity arising from the breach of a duty owed by the alleged indemnitor to the indemnitee. See Mas v. Two Bridges Assoc., 75 N.Y.2d 680, 689-90 (1990); Broyhill Furniture Indus., Inc. v. Hudson Furniture Galleries, LLC, 61 A.D.3d 554, 556 (N.Y. App. Div. 1st Dep't 2009). Here, there is no contract or agreement between Lamorak and any of the settled insurers. Therefore, Lamorak may not maintain a claim against them based on contractual indemnification.

Nor can Lamorak maintain a claim against them based on common law indemnity. A party seeking common law indemnity must establish that the alleged indemnitor was actively at fault in bringing about the injury or damages at issue, and that the alleged indemnitee is vicariously liable therefor. See, e.g., Rogers v. Dorchester Assocs., 32 N.Y.2d 553 (1973); Bigelow v. Gen. Elec. Co., 120 A.D.3d 938, 939 (N.Y. App. Div. 4th Dep't

2014). Indemnity "involves an attempt to shift the entire loss
from one who is compelled to pay for a loss . . . to another
person who should more properly bear responsibility for that
loss because he was the actual wrongdoer." County of Westchester
v. Welton Becket Assocs., 102 A.D.2d 34, 46-47 (N.Y. App. Div.
2d Dep't 1984). That is, "the predicate of common law indemnity
is vicarious liability without actual fault on the part of the
proposed indemnitee." Atanasoki v. Braha Indus., Inc., 124
A.D.3d 705, 706 (N.Y. App. Div. 2d Dep't 2015) (citation
omitted). Therefore, an indemnity claim requires that Lamorak
was not responsible in its own right but instead merely
vicariously liable to virtue of its relationships with the co-
insurers. That is not the case here. As the Second Circuit held
in Olin IV, Lamorak agreed in its policies to insure Olin on an
all sums basis. Therefore, its liability to Olin is not
vicarious liability but rather arises out of the terms of its
own agreements with Olin.

Therefore, the Court finds that Lamorak is not entitled to
indemnification from London, Munich Reinsurance, Continental
Casualty, or General Reinsurance.

## **London's Motion for Summary Judgment on Its Rule 14 Claims**

London's motion for summary judgment on its Rule 14 claims
- which seek a ruling that any judgment Olin obtains against
Lamorak for the Remaining Sites shall be automatically reduced
by the amount, if any, that the London Market Insurers are
liable to pay Lamorak in contribution - is moot in light of the
Court's foregoing conclusion that Lamorak is not entitled to
seek contribution from London. Therefore, the Court denies
London's motion for summary judgment on its Rule 14 claims.

## Conclusion

In sum, the Court grants Olin's motion for summary judgment
on its claims for breach of contract and for a declaratory
judgment as to the Bethany, Brazier Forest, Central Chemical,
Crab Orchard, Frontier-Chemical, New Haven, and Niagara County
Refuse Sites except with respect to damages. The Court grants
Lamorak's motion for summary judgment on Olin's claims for
breach of contract and declaratory judgment as to the Olin Water
Services Site, except to the extent that Olin seeks to recover
costs other than defense costs. The Court denies Olin and
Lamorak's motions for summary judgment on Olin's claims for
breach of contract and declaratory judgment as to the Assonet,
Middletown, Morgantown, and North Little Rock Sites, and denies
Olin's motion for summary judgment on its claims for breach of

contract and declaratory judgment as to the Charleston, Pine Swamp, and Wallisville sites. The Court denies Lamorak's motion for summary judgment on its third-party claims and grants Continental Casualty, Munich Reinsurance, General Reinsurance, London Market Insurers, and Olin's motions for summary judgment on Lamorak's third-party claims. Finally, the Court denies London Market Insurers' motion for summary judgment on its Rule 14 claims.

The parties are reminded that the trial of all remaining claims will commence on August 27, 2018.

The Clerk is directed to close the entries at docket numbers 2186, 2187, 2188, 2189, 2090, 2191, 2192, 2195, 2205, 2222, and 2252.

Dated:  New York, NY
        July 15, 2018                   JED S. RAKOFF, U.S.D.J.