UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------- x
OLIN CORPORATION,                   :
                                    :    84-cv-1968 (JSR)
        Plaintiff,                  :
                                    :
        -v-                         :    OPINION & ORDER
                                    :
LAMORAK INSURANCE COMPANY,          :
                                    :
        Defendant.                  :
---------------------------------- x

JED S. RAKOFF, U.S.D.J.

        This is the latest and, Lord willing, last chapter of a
decades-long insurance coverage litigation dispute between
plaintiff Olin Corporation ("Olin") and its many insurers. The
case has consumed an inordinate amount of time and effort on the
part of no fewer than three district judges (two of whom are now
deceased, apparently from other causes), not to mention numerous
judges of the Court of Appeals.

        The remaining dispute concerns the amount of damages to which
Olin is entitled from the sole remaining defendant Lamorak
Insurance Company ("Lamorak") in connection with the single site
-- the Crab Orchard site -- that these two parties largely carved
out of a settlement they entered into in 2018 (the "2018
Settlement"). Under the 2018 Settlement, Olin agreed to release
its claims against Lamorak as to all but one of the remaining sites
in exchange for $120 million. As to the Crab Orchard site, Olin

agreed to release its claims for the $1,289,338 Olin had incurred through December 31, 2017, but expressly carved out, as relevant here, (1) costs incurred by Olin on or after January 1, 2018, and (2) any costs "whenever incurred" by General Dynamics Ordnance & Tactical Systems ("GD-OTS"), the successor owner of certain of Olin's Crab Orchard operations (collectively, the "Carve Out Claims"). Olin and Lamorak now cross-move for summary judgment on the Carve Out Claims.

## Background

"The background of this interminable litigation has been recounted in countless orders, memoranda, and opinions issued over the past several decades, familiarity with all of which is here, of course, presumed." Olin Corp. v. Lamorak Ins. Co., 332 F. Supp. 3d 818, 829 (S.D.N.Y. 2018).[1] The following facts, undisputed except as otherwise noted, are particularly relevant for present purposes.

I.   Factual Background

Olin, a manufacturing company, brought this action over three decades ago seeking insurance coverage for environmental contamination at certain of its manufacturing sites throughout the

---

[1]   Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

United States. <u>See</u> Olin Corporation's Counterstatement of Undisputed Material Facts in Opposition to Lamorak Insurance Company's Motion for Summary Judgment ("Olin Counter to Lamorak's MSJ 56.1 Statement"), Dkt. No. 2426, at ¶ 1. Because of the volume of claims and locations involved, the judges who previously presided over this action "chose to address coverage on a site-by-site basis." <u>Olin Corp. v. OneBeacon Am. Ins. Co.</u> ("<u>Olin IV</u>"), 864 F.3d 130 (2d Cir. 2017).

A. <u>The Lamorak Policies</u>

The Second Circuit's prior decisions in this case set forth the general mechanics of Olin's insurance scheme:

> Olin's insurance policies are "occurrence policies," meaning that they are "triggered by occurrence of the property damage during the policy period." <u>Olin Corp. v. Ins. Co. of North America</u> ("<u>Olin I</u>"), 221 F.3d 307, 321 (2d Cir. 2000). "[P]roperty damage occurs as long as contamination continues to increase or spread," and includes not only "contamination . . . based on active pollution," but also "the passive migration of contamination into the soil and groundwater." <u>Olin Corp. v. Certain Underwriters at Lloyd's London</u> ("<u>Olin II</u>"), 468 F.3d 120, 131 (2d Cir. 2006). Accordingly, pollution at any individual manufacturing site can trigger coverage under a large number of Olin's policies. Moreover, insurers whose policies contains "Condition C" (discussed below) must indemnify Olin up to the limits of their policies for all property damage that occurred not only during, but also after, the termination of those policies. <u>See</u> <u>Olin Corp. v. American Home Assurance Co.</u> ("<u>Olin III</u>"), 704 F.3d 89, 100 (2d Cir. 2012).

<u>Olin Corp. v. Lamorak Ins. Co.</u>, No. 84-cv-1968, 2018 WL 1901634, at *3 (S.D.N.Y. Apr. 18, 2018).

At issue in these motions are five Lamorak insurance policies, which together provide coverage of up to $27 million for each covered occurrence. Lamorak Insurance Company's Response to Olin Corporation's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment and Lamorak's Counterstatement of Undisputed Material Facts ("Lamorak Counter to Olin's 56.1 Statement"), Dkt. No. 2439, ¶ 34. Each of these policies is an "excess" or "umbrella" policy that attaches at various points, including insurance owed above an underlying primary policy limit of $300,000. Id. ¶ 29. The latest of these policies expired on January 1, 1972. Id. ¶ 33.

Each of the policies contains a "Condition C" clause, which, as discussed below, has already been the subject of extensive litigation. A Condition C clause contains two provisions: (1) a Prior Insurance Provision; and (2) a Continuing Coverage Provision:

> Prior Insurance Provision: It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Insured prior to the inception date hereof, the limit of liability hereon . . . shall be reduced by any amounts due to the Insured on account of such loss under such prior insurance.

> Continuing Coverage Provision: Subject to the foregoing paragraph and to all the other terms and conditions of this Policy in the event that personal injury or property damage

-4-

> arising out of an occurrence covered hereunder
> is continuing at the time of termination of
> this Policy, the Company will continue to
> protect the Insured for liability in respect
> of such personal injury or property damage
> without payment of additional premium.

Id. ¶ 43.

### B. The Prior Settlements

Starting in 2005, Olin entered into "global settlements" with its primary insurer Insurance Company of North America ("INA"), and with its excess insurers, London Market Insurers ("London"), Continental Casualty Company ("Continental"), General Reinsurance Corporation ("GenRe"), Federal Insurance Company ("Federal Insurance"), Fireman's Fund Insurance Company ("Fireman's Fund"), and Munich Reinsurance America, Inc. ("AmRe") Olin Counter to Lamorak's MSJ 56.1 Statement ¶¶ 3-5. These settlements released these insurers of alleged liabilities as to hundreds of sites, many, but not all, of which liabilities had been the subject of ongoing litigation. Id. By 2011, the only insurer that had not settled was Lamorak. See Olin, 2018 WL 1901634, at *5.

### C. The Crab Orchard Site

One of the sites covered under some of these settlement agreements was the Crab Orchard Site, located near Marion, Illinois. Lamorak Counter to Olin's 56.1 Statement ¶ 3. From 1956 to 1996, Olin leased portions of the Crab Orchard site. Id. ¶ 2

-5-

There, Olin had two lines of business: explosives manufacturing and ordnance manufacturing. Id. In 1963, Olin sold off its explosives manufacturing business. Id. ¶ 9. In 1996, Olin spun off its ordnance manufacturing business, including the operations at Crab Orchard, to Primex Technologies, Inc. ("Primex"). Lamorak Insurance Company's Response to Olin Corporation's Additional Material Facts in Support of its Opposition to Lamorak's Motion for Summary Judgment ("Lamorak MSJ Reply 56.1 Statement"), Dkt. No. 2444, ¶ 192. As part of that deal, Primex assumed liabilities arising out of that business, and Olin putatively assigned to Primex its insurance coverage with respect to Olin's historical operations at those sites. Id. ¶¶ 196-197; see also Declaration of Ralph J. Luongo in Support of Lamorak Insurance Company's Motion for Summary Judgment ("Luongo Decl."), Dkt. No. 2404, Ex. HH (the "Spin Agreement"), §§ 1(A)-(b); id., Ex. GG (the "Distribution Agreement"), § 5.02. Olin also assumed responsibility for litigating on behalf of Primex insurance claims that related to the Crab Orchard liabilities that Primex had assumed. Lamorak MSJ Reply 56.1 Statement ¶ 198. In 2001, General Dynamics acquired the assets and liabilities of Primex and changed Primex's name to "GD-OTS." Id. ¶¶ 199-201.

In 1987, the Crab Orchard site was added to the National Priority List ("NPL") pursuant to the Comprehensive Environmental

Response, Compensation, and Liability Act, 42 U.S.C. § 9601 <u>et</u> <u>seq.</u> ("CERCLA"). Lamorak Counter to Olin's 56.1 Statement ¶ 48. The NPL "identifies polluted or potentially polluted sites for purposes of CERCLA enforcement" by the United States Environmental Protection Agency ("EPA"). <u>Olin IV</u>, 864 F.3d at 136. The Crab Orchard site was divided into two "operable units" relevant to these motions: (1) the Additional and Uncharacterized Sites Operable Unit (the "AUS OU") and (2) the Miscellaneous Operable Unit (the "MISCA OU"). Lamorak Counter to Olin's 56.1 Statement ¶¶ 57, 60. An operable unit is a discrete area identified by a government agency as requiring environmental investigation or remediation. <u>See</u> 40 C.F.R. § 307.14.

In December 2002, GD-OTS executed an administrative order on consent (an "AOC") with the EPA, among other governmental entities. <u>See</u> Declaration of Craig C. Martin in Support of Olin Corporation's Motion for Summary Judgment ("Martin Support Decl."), Dkt. No. 2414, Ex. 26 (Consent Order). The AOC required GD-OTS to, among other things, perform a remedial investigation and feasibility study for the AUS OU and to pay past and future response and oversight costs to regulatory agencies. <u>See</u> <u>id.</u> ¶¶ 1, 85-93. Olin contends that GD-OTS has since incurred nearly $50 million in costs in connection with its AOC obligations at Crab Orchard. Lamorak Counter to Olin's 56.1 Statement ¶ 91. As for the MISCA OU, the

-7-

United States brought litigation against GD-OTS in 2011, seeking reimbursement for over $8.9 million in costs that the Government had incurred for remedial activities at the MISCA OU. GD-OTS settled the claim for $1,614,812.50. Id. ¶¶ 173-178.

In 2004, GD-OTS notified Olin that it had "accepted responsibility for liabilities pertaining to Olin's ordnance and aerospace operations with respect to the AUS OU." In that letter, GD-OTS also notified Olin "of [Olin's] potential responsibility for certain costs related to the operations of Olin's industrial explosives division at the AUS OU," and explained that it believed it was "entitled to insurance coverage for its liabilities with respect to the AUS OU." Olin Corporation's Response to Lamorak Insurance Company's Counterstatement of Undisputed Material Facts Regarding Olin's Motion for Summary Judgment ("Olin Reply 56.1 Statement"), Dkt. No. 2454, ¶ 20.

Between 2007 and 2009, after Olin settled with INA and London, GD-OTS demanded a portion of the proceeds of each settlement as the current owner of the operations at certain of the settled sites. Lamorak MSJ Reply 56.1 Statement ¶¶ 209, 212. Olin and GD-OTS disputed, among other things, the "appropriate method for calculating the amount of GD-OTS' share" of the INA and London settlement proceeds. Olin Counter to Lamorak's MSJ 56.1 Statement ¶¶ 81, 91; Luongo Decl. Ex. FF (the "2008 Olin/GD-OTS Settlement");

id., Ex. OO (the "2009 Olin/GD-OTS Settlement," and collectively the "Olin/GD-OTS Settlement Agreements"). To settle that dispute, Olin agreed to pay GD-OTS $450,000 of the proceeds of the 2007 settlement with INA and $1.45 million of the proceeds of the 2009 settlement with London. See Olin Counter to Lamorak's MSJ 56.1 Statement ¶ 162.

Also in 2009, GD-OTS made a formal demand on Olin, as a potentially responsible party ("PRP"), for reimbursement for the roughly $26 million that it had incurred as of that date. Olin Reply 56.1 Statement ¶ 23. In its demand letter, GD-OTS explained that "[b]ecause any litigation that may be initiated in the future by GD-OTS may include claims under Section 107 of the [CERCLA] under which Olin is jointly and severally liable, this cost demand is for all of GD-OTS's response costs." Id. More recently, Olin, GD-OTS, and other PRPs participated in mediation regarding the liability and allocation of costs at Crab Orchard. Lamorak Counter to Olin's MSJ 56.1 Statement ¶ 158. Olin contends that it has itself incurred approximately $800,000 in costs since January 1, 2018 in connection with this mediation. Id. ¶¶ 278-80.

## II. Procedural History

The twists and turns of this litigation are central to the present motions for summary judgment. Accordingly, the Court reviews the relevant aspects of the action's procedural history.

-9-

D. 2013 Trial before Judge Griesa on the Five Sites

This case was originally before Judge Sand and then was reassigned in 1997 to Judge Griesa. See Olin, 2018 WL 1901634, at *2; Dkt. No. 679 (notice of reassignment to Judge Griesa). In 2013, Olin and Lamorak went to trial over Lamorak's liability at five particular sites, the so-called "Five Sites." Olin Counter to Lamorak's MSJ 56.1 Statement ¶ 12.[2] After Lamorak's liability as to the Five Sites was established, Judge Griesa entered two judgments for approximately $87 million, inclusive of prejudgment interest (the "Five Sites Judgment"). Id. ¶ 19.

The Court arrived at the $87 million figure by resolving two legal questions regarding the meaning of the Condition C clause. The first question was whether, and if so how and to what extent, Lamorak could offset its liability to account for the money that Olin had already recovered from the other settling insurers. See Olin IV, 864 F.3d at 140. Lamorak sought a ruling that the Prior Insurance Provision of Condition C requires that the occurrence limits of the Lamorak policies be reduced by the occurrence limits of any prior policy in the same layer of coverage triggered by the same occurrence, regardless of which insurer issued the earlier

---

[2]    These sites are McIntosh OU2; Augusta; Rochester; Ashtabula/Fields Brook; and Bridgeport Rental Oil Services. Olin Counter to Lamorak's MSJ 56.1 Statement ¶ 13.

policy or policies. Id. The Court denied Lamorak's motion, ruling
that the Prior Insurance Provision applies only to other excess
policies issued by the same insurer, "not to other excess policies
issued by miscellaneous possible insurers." Id.

The second question was whether to calculate Lamorak's
liability through a "pro rata" or "all sums" approach. Because of
the progressive nature of environmental degradation, Olin's claims
theoretically implicate decades of insurance coverage. As a
result, the Court had to determine whether and how responsibility
should be parceled out among the different insurance policies. One
approach -- the pro rata approach -- divides the total property
damage into equal annual shares for each year in which such damage
took place; this "annual share is then treated as the total
property damage attributable to that occurrence for that year, and
the insurer providing coverage for that year is then responsible
for indemnifying an insured only to the extent of its contractual
liability for such deemed property damage." Id. at 138. Under an
all sums approach, by contrast, each policy is potentially
responsible for all of the loss (subject to its attachment point
and occurrence limit) if the policyholder chooses to allocate the
loss to that policy. Relying on prior rulings issued in this case
by the Second Circuit, the Court adopted a pro rata allocation of
liability. See Olin, 2018 WL 1901634, at *3.

E. <u>The Second Circuit's Decision in Olin IV</u>

Lamorak and Olin each appealed. <u>See</u> Dkt. Nos. 1835 & 1836. On July 18, 2017, the Second Circuit vacated the Five Sites Judgment. It first held that, in light of an intervening decision by the New York Court of Appeals, Condition C requires an application of an all sums allocation that permits Olin to "collect its total liability under any policy in effect during the periods that the damage occurred up to the policy limits." <u>Olin IV</u>, 864 F.3d at 140 (citing <u>In re Viking Pump, Inc.</u>, 27 N.Y.3d 244 (N.Y. 2016)). As for the Prior Insurance Provision, the Second Circuit held that Condition C allows Lamorak "to offset its indemnification obligations by amounts already paid to cover the loss by another insurer in the same coverage tier, so long as Lamorak "prove[s] its entitlement" to that offset. <u>Id.</u> at 151. Recognizing, however, that the record on appeal was "devoid of any information about these settlements," the Second Circuit remanded for this Court to "enhance the record and issue a decision in the first instance as to the effect of Olin's prior global settlement[s]." <u>Id.</u> at 150-51.

F. <u>Post-Olin IV Remand and Discovery</u>

Following remand, the case was reassigned to the undersigned in 2016. The Court's task was to (1) apply an all sums allocation that allowed Olin to seek indemnification from Lamorak for the

full amount of damage incurred over the relevant period up to the policies' applicable limits; and (2) issue a decision in the first instance as to the effect on the judgment against Lamorak of Olin's prior "global settlement[s]" with its other insurers, specifically, by determining the amount of Olin's settlements that is "properly associated" with the claims arising from the Five Sites and subtracting that amount from Lamorak's liability. See Olin IV, 864 F.3d at 135 n.1, 150.

To that end, on October 12, 2017, this Court entered a case management plan that "control[led] two separate issues: (1) the remand from the Second Circuit for the Five Remand Sites . . . ; and (2) the remaining sites that are ripe other than the Remanded Sites." Dkt. No. 1999. The case management plan stated "that all remaining issues in this case between Olin and Lamorak be ready for a final pretrial conference on April 6, 2018." Id. Accordingly, on October 16, 2017, Olin filed its Fourth Amended (and now-operative) complaint, listing not only the "Five Remand Sites" but also the "Fifteen Remaining Sites,"[3] including Crab Orchard, which had been identified in prior pleadings but had not yet been the

---

[3]     These sites are Assonet, Bethany, Brazier Forest Industry, Central Chemical, Charleston, Crab Orchard, Frontier Chemical-Pendleton, Middletown/Tri-Star, Morgantown Ordinance Works, New Haven, Niagara, County Refuse, North Little Rock, Olin Water Services, Pine Swamp, and Wallisville Road. Olin, 332 F. Supp. 3d at 829 n.1.

subject of litigation. Olin Counter to Lamorak's MSJ 56.1 Statement ¶ 37.

What then happened during that discovery process is at the center of Lamorak's motion for summary judgment. See infra Part I. In particular, Lamorak accuses Olin of engaging in spoliation and perjury in a "coordinated act of litigation deception" to cover up the existence of the Olin/GD-OTS Settlement Agreements. According to Lamorak, those agreements show that Olin allocated proceeds from the prior global settlements to particular sites in a manner that would have been relevant to at least one of the Court's tasks on remand. Olin, for its part, strenuously disputes that characterization of the discovery process and the settlement agreements.

What is undisputed, however, is that the discovery process, fairly or not, did not uncover the Olin/GD-OTS Settlement Agreements. Nor did it bring forth any other evidence that Olin's prior settlement recoveries had been allocated to any of the Five Sites or the Fifteen Remaining Sites. Olin Counter to Lamorak's MSJ 56.1 Statement ¶ 124. Instead, the produced settlement agreements indicated that they generally released the settling insurers of liability as to hundreds of sites, including the Five Remand Sites and the Fifteen Remaining Sites. Id. ¶ 58. In addition, Olin's witnesses all testified that the settlement

payments went into Olin's general corporate account, rather than site-specific accounts. <u>Olin</u>, 2018 WL 1901634, at *6.

G. <u>The Court's April 18, 2018 Decision on the Five Sites</u>

Following discovery, Olin and Lamorak moved for summary judgment regarding the amount of Lamorak's liability for the Five Sites. The parties specifically briefed the "effect of Olin's prior global settlement with its other insurers." <u>Id.</u> at *1. In an April 18, 2018 opinion, the Court observed that Lamorak "did not even try to argue in its motion for summary judgment that any amount of the settlement agreements could be properly allocated to the Five Sites." <u>See id.</u> at *10. Accordingly, the Court found that Lamorak had failed to meet its burden of proving how much of the prior global settlements was properly attributable to the Five Sites. <u>Id.</u> at *6-7, 9.

Still, rather than hold that no setoff was permissible, the Court adopted a multi-step approach that approximated how "much the settled insurers paid in exchange for releases from any potential indemnification claims relating to the Five Sites." <u>Id.</u> at *12. Relying on the insight that the more sites that were released under a settlement agreement, the less of that settlement agreement could be properly allocated to any one site, the Court crafted a setoff that involved dividing the settled policy limits at the Five Sites by the settled policy limits at all the settled

-15-

sites. Id. at *13. Applying this setoff to the relevant settlements, the Court reduced Olin's recovery by $2,664,486.26, resulting in an award of $55,065,203.18 (exclusive of pre- or post-judgment interest). Id. at *13, 22.

H. The Court's July 17, 2018 Decision on the Fifteen Remaining Sites

With the Five Sites litigation resolved, the parties turned their attention to the Fifteen Remaining Sites. Olin moved for summary judgment in its favor as to the Fifteen Remaining Sites, including Crab Orchard. Olin, 332 F. Supp. 3d at 852. In its Rule 26(a)(1) disclosure, Olin "estimate[d] that it ha[d] incurred" $1.65 million in "Approximate Olin Costs through June 30, 2017 for Crab Orchard." Olin Counter to Lamorak's MPSJ 56.1 Statement ¶ 40. Olin did not present any claims for the GD-OTS costs.

On July 17, 2018, the Court granted summary judgement as to liability in favor of Olin at certain sites, including Crab Orchard, but found a genuine dispute as to Olin's damages. Olin, 332 F. Supp. 3d at 856. With respect to Crab Orchard, the Court observed: "[t]here is no dispute that property damage was occurring as a result of Olin's operations in 1970"; "that Olin did not expect or intend the damage at the site"; and "that Olin is liable at the site." Id. 852-53. The Court explained that Olin is liable at the site because the EPA, among other government agencies, "had

ordered cleanup of [Crab Orchard] by Olin and other Potentially Responsible Parties alleged to have caused contamination." Id. The Court made no mention of GD-OTS.

I. The 2018 Settlement

A jury trial over the issue of damages commenced in August 2018. Olin Counter to Lamorak's MSJ 56.1 Statement ¶ 153. Shortly after the trial began, Olin and Lamorak settled all remaining claims, other than certain portions of Olin's Crab Orchard claim, in exchange for $120 million. Id. ¶¶ 306-307. As for Crab Orchard, the parties agreed that Olin was releasing Lamorak from its obligations, duties, and responsibilities for "the $1,289,338.00 Olin has incurred through December 31, 2017." But the settlement carved out not only (1) costs incurred by Olin on or after January 1, 2018 and (2) any costs "whenever incurred" that may be "allocated to Olin as part of the Crab Orchard site mediation or litigation process with GD-OTS," but also (3) any costs "whenever incurred" by GD-OTS "arising out of the former Olin/Primex operations at the Crab Orchard Site." See Luongo Decl. Ex. BBB (the "2018 Settlement"), §§ 9.A.i, ii. Under the 2018 Settlement, both parties "expressly reserve[d] all rights" and did not "release[e] any claims or defenses." Id. § 10.A. On October 11, 2018, this Court dismissed the settled claims but retained jurisdiction over the Carve Out Claims. Dkt. No. 2376

-17-

J. <u>The Tolling Period and Present Litigation</u>

Following the 2018 Settlement, the parties entered into a tolling agreement in an attempt to resolve the Carve Out Claims (the "Standstill Period"). Lamorak Counter to Olin's 56.1 Statement ¶ 202. Negotiations failed, however, and on April 1, 2020, the Court entered another case management plan that governed discovery over the Carve Out Claims. <u>See</u> Dkt. No. 2385. During the course of this discovery, Olin produced -- for the first time -- the Olin/GD-OTS Settlement Agreements. <u>See</u> Olin Reply 56.1 Statement ¶ 98.

## **Discussion**

All of which brings us to the current dispute. Olin and Lamorak each move for summary judgment the extent of Lamorak's liability with respect to the Carve Out Claims.

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) only "if the pleadings, depositions, answers to interrogatories on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). "A genuine dispute exists where the evidence is such that a reasonable jury could decide in the nonmovant's favor." <u>Walsh v. New York City Housing Auth.</u>, 828 F.3d 70, 74 (2d Cir. 2016). The moving party

has the burden of demonstrating the absence of any genuine disputes of material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). In determining whether summary judgment is appropriate, the court must resolve all ambiguities and draw all reasonable inferences against the movant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Where, as here, "there are cross motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law." Admiral Indem. Co. v. Travelers Cas. and Sur. Co. of America, 881 F. Supp. 2d 570, 574 (S.D.N.Y. 2012).

I.   Lamorak's Motion for Summary Judgment

In its motion for summary judgment, Lamorak accuses Olin of wrongfully concealing the Olin/GD-OTS Settlement Agreements. Lamorak contends that these documents would have enabled the Court to determine how much of the prior global settlements were properly attributable to the Five Sites and the Fifteen Remaining Sites. To punish Olin for its "blatant abuse" of the litigation process, Lamorak asks the Court to order Olin to return to Lamorak the $1,289,338 it already paid for Olin's Crab Orchard past costs, with interest and related litigation fees and costs, and to deem Olin to have forfeited any claim for further coverage from Lamorak for the Carve Out Claims. Brief in Support of Lamorak Insurance

Company's Motion for Summary Judgment ("Lamorak MSJ Mem."), Dkt. No. 2397, at 4. Formally, Lamorak seeks summary judgment as to its (never pleaded) affirmative defenses of partial rescission of the 2018 Settlement as to the Olin's past costs and coverage forfeiture as to the Carve Out Claims. It also asks the Court to impose sanctions under Federal Rule of Civil Procedure 37. Id. at 20.

A. Background

The immediate issue, then, is whether Olin committed litigation misconduct by intentionally suppressing evidence of the Olin/GD-OTS Settlement Agreements. Answering that question requires a review of the discovery process. As mentioned above, following remand from the Second Circuit, the Court ordered separate discovery on the Five Sites, which do not include Crab Orchard, and the Fifteen Remaining Sites, which do. See Dkt. No. 1999. Accordingly, Lamorak made two sets of discovery requests, one relating to the Five Sites and another relating to the Fifteen Remaining Sites.

1. The Five Sites Discovery

The first set of document requests, propounded on October 16, 2017, related to "Remand Issues," which were defined as: "any and all issues that may fairly be the subject of discovery or trial as a result of the July 2017 decision by [Olin IV]." Olin Counter to

Lamorak's MSJ 56.1 Statement ¶ 45. As relevant here, Lamorak asked Olin to produce:

> Document Request 11. Any and all documents and/or communications reflecting Olin's allocation to particular Sites, groups of sites or claims, or particular insurance policies of the funds demanded or received from any Settlement by any and all Insurers and any calculations supporting same.
>
> Document Request 12. All documents and communications that relate, pertain, or refer to any amounts received pursuant to any Settlement reached between Olin and any and all Insurers.

Id. ¶¶ 46, 48. The term "Sites" was defined in the requests as the Five Sites, and the term "Settlement" was defined to mean "any agreement Olin reached with any of its Insurers in connection with Olin's liability for contamination that relates, pertains, or refers to any of the Sites." Id. ¶ 48.

Olin objected to these requests "to the extent [they] seek[] information beyond the limited discovery permitted under" Olin IV. Lamorak MSJ Reply 56.1 Statement ¶¶ 242-45. Olin then produced the prior global settlement agreements and other documents. Id. ¶¶ 246-47. Among these other documents was Olin's general accounting ledger, which reflected the prior global settlements, but which was redacted to exclude information that did not relate to the Five Sites, including information about Olin's settlements with GD-OTS. Id. ¶ 247.

Lamorak also served deposition notices on Olin, seeking testimony on the remand issues. Luongo Decl., Exs. Y, Z, & AA. Lamorak's 30(b)(6) Deposition Notice for the remand issues defined "Sites" as "those locations identified in Olin's Second, Third and Fourth Amended Complaints." See Luongo Decl. Ex. AA. Olin again objected and explained that the depositions would not "cover information unrelated to the five Olin manufacturing sites subject to" the Olin IV decision, and would be limited to "reach only Settlement Agreements or Settlement Communications that concern the Five Sites." Luongo Decl. Ex. BB. Lamorak never challenged these limitations with the Court. Indeed, there is no evidence in the record before the Court that Lamorak ever challenged these limitations with Olin.

As the Court discussed in its April 2018 opinion, Olin's witnesses stated that the settlement payments went into Olin's general corporate account, rather than site-specific accounts. Olin, 2018 WL 1901634, at *3 (citing deposition testimony of Michael Mann, Stuart Roth, and George Pain). For example, Stuart Roth, former Senior Deputy Counsel and Vice President of Regulatory Audit, who was designated to testify "as to all other Settlement Agreements concerning the Five Sites," stated that "settlement monies that came into

-22-

Olin . . . went into the general treasury." Lamorak MSJ Reply
56.1 Statement ¶¶ 258, 260.

### 2. The Fifteen Remaining Sites Discovery

The second set of document requests, propounded on
October 19, 2017, related to the Fifteen Remaining Sites. As
relevant here, Lamorak asked Olin to produce:

> Document Request 25: All documents from [Olin's]
> insurance and/or corporate risk management department
> concerning Olin's insurance coverage for environmental
> contamination relating to the Sites.

> Document Request 31: All documents relating to,
> referring to or payment(s) from any other entity to Olin
> regarding environmental issues at the Sites, including
> but not limited to copies of any agreement(s), the basis
> for any such agreement(s), the allocation(s) utilized in
> such agreement(s), and the basis for such allocation(s)
> including Settlements with Olin's other Insurers.

Olin Counter to Lamorak's MSJ 56.1 Statement ¶¶ 49, 51. Olin
objected to both requests as violating the scope, proportionality,
and importance limitations of Rule 26. Lamorak MSJ Reply 56.1
Statement ¶¶ 277, 281. For Request No. 31, Olin objected to the
terms "any other entity," "Olin's other insurers," and
"Settlements" as overly broad, and limited those terms to
"settlement agreements with Insurers" and "relevant [Potentially
Responsible Party or 'PRP'] allocation agreements" at the Fifteen
Remaining Sites. Id. ¶ 281. Again, there is no evidence that
Lamorak challenged these objections or limitations in any way, and

certainly not by raising them with the Court and asking for a ruling.

B. <u>Analysis</u>

1. <u>Whether Lamorak's Motion is Procedurally Proper</u>

As a threshold matter, Olin contends that, because Lamorak's claims for partial rescission and coverage forfeiture are unpleaded affirmative defenses, they are not properly before the Court. The Court disagrees. While Federal Rule of Civil Procedure 8(c) requires parties to raise affirmative defenses, such as rescission and coverage forfeiture, in the pleadings, "a district court may entertain unpleaded affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." <u>Rose v. AmSouth Bank of Florida</u>, 391 F.3d 63, 65 (2d Cir. 2004). Although Olin suggests Lamorak's delay has deprived Olin of the opportunity to take discovery on "relevant evidence and witnesses," Plaintiff Olin Corporation's Memorandum of Law in Opposition to Lamorak Insurance Company's Motion for Summary Judgment ("Olin Opp. to Lamorak's MSJ"), Dkt. No. 2425, at 20, Olin does not identify what sort of evidence or witnesses it needs and lacks to effectively address Lamorak's motion. Nor does the Court find that Lamorak's delay in bringing these claims is the product of bad faith or dilatory

motive. Accordingly, the Court will, in an exercise of discretion, "construe [Lamorak's] motion for summary judgment as a motion to amend [its] answer." Saks v. Franklin Covey Co., 316 F.3d 337, 350-51 (2d Cir. 2003).

>    2. Whether Lamorak is Entitled to Summary Judgment on the Affirmative Defenses

As noted, Lamorak seeks summary judgment on its rescission and coverage forfeiture defenses. Lamorak contends, and Olin does not dispute, that Lamorak must demonstrate five elements to prevail on its rescission claim: (1) a material misrepresentation or omission, (2) knowledge of its falsity, (3) intent to defraud, (4) reliance, and (5) damages. See Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006). The elements of coverage forfeiture are similar to and are largely encompassed by the elements of rescission, requiring a showing "that the statements in question were (1) false, (2) willfully made, and (3) material to the insurer's investigation of the claim." Mon Chong Loong Trading Corp. v. Travelers Excess & Surplus Lines Co., No. 12-cv-6509 (CM), 2014 WL 406542, at *1 (S.D.N.Y. Jan. 30, 2014). In addition, "proof of intent to defraud is a necessary element of the defense of fraud or misrepresentation by an insured in a proof of loss statement." Id. To earn summary judgment on either defense, then, Lamorak must

establish, at a minimum, that no reasonable trier of fact could infer anything other than intent to defraud by Olin.

Lamorak fails to make that showing. For one thing, the Olin/GD-OTS Settlement Agreements were not responsive to Lamorak's discovery requests, as limited by Olin's unchallenged objections. Document Requests 11 and 12 were part of the Five Sites discovery, and GD-OTS is not a corporate successor to any of those sites. As for the Fifteen Remaining Sites discovery, Document Request 25 sought documents from Olin's "insurance and/or corporate risk management department concerning Olin's insurance coverage," but the Olin/GD-OTS Settlement Agreements are settlements with a non-insurer drafted and signed by Olin's lawyers. Olin Opp. to Lamorak's MSJ at 16. Nor were the documents responsive to Document Request 31, as limited by Olin, since they do not relate to "payment(s) from any other entity to Olin regarding environmental issues"; rather, they involve payments from Olin to a third-party. Id. Likewise, Olin's redactions to the ledger were arguably proper since the ledger was produced in response to Lamorak's Five Sites discovery, and the redactions were consistent with the scope of that discovery. Id. And, again, Lamorak did not challenge those redactions.

While the testimony of Olin's corporate officers may arguably have created a misleading impression, the testimony was

technically true. That Olin eventually entered into an agreement to share certain insurance proceeds with GD-OTS is not inherently inconsistent with Mr. Roth's testimony that Olin deposited settlement proceeds into a general corporate account and did not itself assign any portion of the proceeds to specific sites. Our adversary system leaves it to deposing counsel to follow up with additional questions concerning testimony of the kind here given. And, in any event, Lamorak has failed to come forward with material evidence that the testimony was knowingly false.

Accordingly, Lamorak's motion for summary judgment is denied.

### 3. Whether Rule 37 Sanctions are Warranted

Independently, Lamorak asks the Court to dismiss the Carve Out Claims as a discovery sanction pursuant to Federal Rule of Civil Procedure 37. Under Rule 37, a district court "has wide discretion in sanctioning a party for discovery abuses." Reilly v. Natwest Markets Group Inc., 181 F.3d 253, 267 (2d Cir. 1999). "[D]ispositive measures" under Rule 37, such as dismissal of a claim, are intended "to remedy otherwise irremediable prejudice or to address persistent bad-faith pre-trial conduct by a litigant." D'Attore v. City of New York, No. 10-cv-1782, 2012 WL 5871604, at *3 (S.D.N.Y. Sept. 27, 2012), report and recommendation adopted, 2012 WL 5871602 (Nov. 20, 2012). Courts examine "(1) the willfulness of the non-compliant party or the reason for the

noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party has been warned of the consequences of his non-compliance," as well as "the prejudicial impact of the noncompliance." Id. at *4.

For the reasons laid out above, the Court does not believe that Olin has committed discovery abuse, let alone of a sufficiently grievous nature to warrant dismissal of the Carve Out Claims. In any event, Lamorak has not complied with the procedural requirements of Rule 37 and Local Rule 37.1, which respectively require Lamorak to provide certification that it met and conferred with Olin over any issue in its motion, Fed. R. Civ. P. 37(d)(B), and to request an "informal conference with the Court . . . for a pre-motion discovery conference," Local Civil Rule 37.2.

Simply put, if Lamorak had problems with Olin's many objections and limitations, it should have brought them to this Court. Its failure to have done so dooms Lamorak's request, both substantively and procedurally.

II.  <u>Olin's Motion for Summary Judgment and Lamorak's Motion for Partial Summary Judgment</u>

Olin submits that GD-OTS has incurred approximately $51 million in costs arising out of Olin's operations at the Crab Orchard site, and that Olin itself has incurred $800,000 in such

costs since January 1, 2018. Accordingly, Olin seeks summary judgment in the amount of $25,710,662 (plus prejudgment interest), which, according to Olin, is the available coverage left under the policies after applying the proper setoffs for the 2018 Settlement and the prior global settlements.[4] Lamorak concedes that, but for its allegations of litigation misconduct, the "costs incurred by Olin since December 31, 2017 would be indemnifiable." See Brief in Support of Lamorak Insurance Company's Motion for Partial Summary Judgment ("Lamorak MPSJ Mem."), Dkt. No. 2421, at 6 n.4 (emphasis omitted). But Lamorak maintains that it is not responsible for the GD-OTS costs and that, in any event, Olin forfeited its right to seek those costs by failing to present them in connection with the earlier motion practice over the Fifteen Remaining Sites.

A. Whether the Court Should Dismiss the GD-OTS Claims under Rule 37 or Judicial Estoppel

Lamorak asks the Court to dismiss Olin's claim for the GD-OTS costs because those costs were not presented for adjudication in connection with the earlier motion practice over the Fifteen Remaining Sites. Lamorak Insurance Company's Brief in Opposition to Olin Corporation's Motion for Summary Judgment ("Lamorak Opp.

---

[4]    In the alternative, Olin seeks a declaratory judgment that, to the extent Lamorak's limits are not exhausted, Olin is entitled to recover future costs incurred by Olin or GD-OTS up to the available policy limits.

Mem."), Dkt. 2429, at 13. As mentioned, the Court's case management plan stated that "all remaining issues in this case between Olin and Lamorak be ready for a pretrial conference on April 6, 2018." Even though Olin had notice that GD-OTS believed it was entitled to insurance coverage under Olin's policies, Olin limited its claims to its own costs. Accordingly, Lamorak asks the Court to dismiss Olin's claim for the GD-OTS costs either under Rule 37 or the principle of judicial estoppel.

### 1. Whether Rule 37 Sanctions are Warranted

As discussed above, Rule 37 invests the Court with "broad authority to impose appropriate remedies to cure the harm visited on the discovering party and to deter other litigants from similarly refusing to comply with the court's scheduling and discovery directives." D'Attore, 2012 WL 5871604, at *3. Lamorak contends that Olin's failure to present the GD-OTS costs in a timely manner was a "calculated litigation" tactic warranting sanctions in the form of dismissal. Lamorak MPSJ Mem. at 18, 20.

The Court finds, however, that Rule 37 sanctions are here unwarranted. For one thing, as explained above, Lamorak's request is procedurally defective since Lamorak failed to abide by either Rule 37's meet-and-confer requirement or Local Rule 37.1's informal-conference requirement. In any event, the Court fails to see how Lamorak suffered any prejudice, other than the

inconvenience of needlessly prolonged litigation, by Olin's failure to present these claims during the prior motion practice. Lamorak contends that Olin's decision to "confine" its earlier Crab Orchard claim to costs incurred by Olin meant that Olin "withh[e]ld from Lamorak the documents, testimony, expert reports, and other proofs to substantiate a GD-OTS claim by proxy." <u>Id.</u> at 17-18. But Lamorak has received these materials during the most recent discovery period. As a result, Lamorak now has every opportunity to, and does, strenuously defend against the GD-OTS claims in these motions. Accordingly, the Court will not impose Rule 37 sanctions on Olin.

## 2. Whether Judicial Estoppel is Warranted

Lamorak also invokes the doctrine of judicial estoppel. Under that doctrine, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." <u>In re Adelphia Recovery Trust</u>, 634 F.3d 678, 695 (2d Cir. 2011). "Typically, judicial estoppel will apply if: 1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the

two positions would derive an unfair advantage against the party seeking estoppel." Id.

The Court holds that Olin is not judicially estopped from seeking to recover the GD-OTS costs. As explained above, Lamorak has failed to explain how Olin has derived an unfair advantage from its decision to confine its earlier Crab Orchard claim to costs incurred by Olin. In the absence of prejudice, judicial estoppel is unwarranted. Even if Olin should have presented the GD-OTS costs in connection with the prior motion practice, the Court will not preclude Olin from doing so now.

B. Whether Olin is Entitled to Recover the GD-OTS Costs

That Olin is permitted to seek the GD-OTS costs does not necessarily mean that Olin is entitled to recover them. It must still establish that those costs are covered under the policies. Olin contends that GD-OTS has coverage rights under the policies because GD-OTS was assigned those insurance rights as part of the 1996 spin-off transaction. Memorandum of Law in Support of Olin Corporation's Motion for Summary Judgment ("Olin Mem."), Dkt. No. 2412, at 11-14.[5] Lamorak responds that the policies have a non-

_____

[5]    Olin also argues that GD-OTS is entitled to coverage for the independent reason that it is an insured under the policies. The three lowest 1970 policies define "Named Insured" as Olin "and/or subsidiary, associated affiliated companies or owned or controlled companies as now or hereafter constituted." See, e.g., Martin

assignment provision that prohibits any assignment without Lamorak's consent. Lamorak Opp. Mem. at 15.

Under New York law, an assignment is valid, even in the face of a non-assignment provision, where the assignment is made after the insured-against loss has already occurred. See Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 170 (2d Cir. 2006). The rule comes down to whether "the risk imposed on an insurer by the assignment of a claim is meaningfully different from that borne by the insurer before such assignment." SR Inter. Business Ins. Co., Ltd. v. World Trade Center Properties, LLC, 375 F. Supp. 2d 238, 249 (S.D.N.Y. 2005). Thus, the issue here is whether Olin's assignment to Primex in 1996 (and the subsequent assumption of those rights by GD-OTS) increased the risk borne by Lamorak when it initially issued the policies to Olin. Lamorak contends that summary judgment for Olin must be denied because the record is

---

Decl., Ex. 1. Olin argues that this language obligates Lamorak to provide coverage to GD-OTS because GD-OTS is the reconstituted version of Olin's ordinance business. Olin Mem. at 13-14 (citing P.R. Mallory & Co., Inc. v. Am. States Ins. Co., No. 54C01-0005-CP-00156, 2004 WL 1737489, at *11 (Ind. Cir. Ct. July 29, 2004)). However, as Lamorak points out, courts routinely limit such provisions to entities affiliated with the insured during the policy period. See, e.g., Maryland Cas. Co. v. W.R. Grace & Co. - Conn, No. 88-cv-2613 (SWK), 1994 WL 592267, at *4 (S.D.N.Y. Oct. 26, 1994). Olin also contends that since GD-OTS acquired all of Primex's stock during the spin-off, it is entitled to coverage as a stockholder of the insured. This argument, too, misses the mark, since the policies only provide coverage to a stockholder "acting in his capacity as such." Olin Reply 56.1 Statement ¶ 105.

unclear as to the extent to which "GD-OTS' Crab Orchard liability arise from [its] post-'spin' period of Primex and GD-OTS actively operating and polluting." Lamorak Opp. Mem. at 16.

The Court disagrees. The policies expired many years before the 1996 spinoff. As the Supreme Court of New Jersey has explained, where the right to insurance for the "occurrence" of environmental contamination is assigned after the policies have expired, "[t]he risk of exposure that was contractually undertaken by the insurer occurred prior to the assignment." <u>Givaudan Fragrances Corporation v. Aetna Casualty & Surety Company</u>, 151 A.3d 576, 591-92 (N.J. 2017). Indeed, "[t]he environmental contamination occurrence -- and resultant loss -- took place during the relevant policy periods. The assignment does not alter the insurers' liability for indemnifying the underlying insured event. The loss event has occurred. It is no more, and no less, as a result of [Olin's] assignment of its rights under the respective policies to [GD-OTS]." <u>Id.</u> And "[t]he fact that the environmental claim will require time to sort out liability and damages resulting therefrom d[id] not alter [the court's] conclusion." Other courts have adopted the same rule. <u>See</u> <u>Fluor Corp. v. Superior Court</u>, 354 P.3d 302, 326-27 (Cal. 2015) (collecting cases).

The Continuing Coverage Provision of Condition C does not change this analysis. As noted, Lamorak must cover "all sums that

the insured shall be obligated to pay by reason of liability imposed upon it by law . . . on account of property damage caused by or arising out of an occurrence." Olin, 332 F. Supp. 3d at 847. A covered occurrence is defined as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally result in . . . property damage . . . during the policy period." Lamorak Counter to Olin's 56.1 Statement ¶ 41. When, but only when, an occurrence is "continuing at the time of termination" of the policy, the Continuing Coverage Provision may "require[] the insurer to indemnify the insured for personal injury or property damage continuing after the termination of the policy." Olin III, 704 F.3d at 100. In Olin III, for example, the Second Circuit explained that "damage 'continuing at the time of termination' of the policy clearly contemplates property damage from the migration of chemicals in the expanding groundwater plume during the term of the policy and continuing after the policy terminated." Id. at 101. Unlike the passive migration of chemicals, any post-spin pollution on the part of Primex and GD-OTS, years after the policies expired, would not trigger the Continuing Coverage Provision. Thus, the post-spin activity of Primex and GD-OTS could not have increased Lamorak's liability under the policies. The assignment, therefore, is valid.

C. Whether the GD-OTS Costs are Covered Under the Policy

That the assignment is valid does not necessarily mean that the costs Olin now seeks to recover are covered under the policies. Olin must show that the GD-OTS costs are based on Olin's historical operations at the Crab Orchard site. This is so not only because the Distribution Agreement assigned GD-OTS coverage as to liabilities that "aris[e] from the activities of Olin prior to [December 31, 1996]," see Distribution Agreement § 5.01, but also because the 2018 Settlement carved out "GD-OTS' own past costs (whenever incurred) and future costs arising out of the former Olin/Primex operations at the Crab Orchard site."

The policies require Lamorak to indemnify the insured for "all sums" the insured becomes obligated to pay for the "ultimate net loss" that the insured incurs on account of property damage "caused by or arising out of [an] occurrence." Lamorak Counter to Olin's 56.1 Statement ¶ 39. "Ultimate net loss" is defined as the "total sum which the Insured . . . becomes obligated to pay by reason of . . . property damage . . . claims, either through adjudication or compromise." Id. ¶ 40. It includes "all sums paid . . . for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered." Id. Under New York law, policies with an "all sums" provision cover environmental response costs that the government compels the insured to incur. See Texaco A/S (Denmark) v. Com.

-36-

Ins. Co., 160 F.3d 124, 130 (2d Cir. 1998); see also Olin, 332 F. Supp. 3d at 847 (explaining that the insured is liable "for damages arising out of an occurrence where it received some adversarial communication or it was the object of an adversarial action").

To make that showing, Olin offers the expert testimony of Jeffery Zelikson, who "identifie[d]" costs GD-OTS has incurred for the AUS OU and MISCA OU and "characterize[d]" those costs by analyzing why they were incurred and how they related to Olin's historical operations at the Crab Orchard site. Lamorak Counter to Olin's 56.1 Statement ¶¶ 237-38.[6] Based on that analysis, Zelikson opined that GD-OTS reasonably incurred more than $51 million in costs "because of contamination released by historical operations at the Crab Orchard Site," and that it was compelled to do so by regulatory agencies. Id. ¶ 238.

---

[6]     In its Rule 56.1 Statements, Lamorak disputes Olin's reliance on expert reports because such "expert reports and opinions are inadmissible hearsay and may not be used to admit into evidence the documents on which they purport to rely or to prove the existence of any such facts." See, e.g., Lamorak Counter to Olin's 56.1 Statement ¶ 237. Lamorak made a similar argument in opposition to Olin's motion for summary judgment in a prior phase of this litigation, and the Court rejected it. See Olin, 332 F. Supp. 3d at 837. As before, "Lamorak has not contended, let alone established, that any of the underlying evidence on which the[] experts rely is inadmissible." See id. The Court therefore rejects Lamorak's objection to Olin's reliance on expert testimony. See Federal Rule of Evidence 703.

In addition, Olin points to several pieces of circumstantial evidence that suggest that the GD-OTS costs arose out of Olin's historical operations at the Crab Orchard site. For example, the Fish and Wildlife Service identified the "peak industrial years" of the Crab Orchard site as the 1950s, 1960s, and 1970s, decades before the 1996 spin-off. See Lamorak Insurance Company's Response to Olin Corporation's Additional Material Facts in Support of its Opposition to Lamorak's Motion for Partial Summary Judgment, Dkt. No. 2445, ¶ 84. Moreover, the AUS OU was first established between 1997 and 1999, shortly after the 1996 spinoff. Declaration of Craig C. Martin in Support of Plaintiff Olin Corporation's Memoranda of Law in Opposition to Lamorak Insurance Company's (1) Motion for Summary Judgment and (2) Motion for Partial Summary Judgment ("Martin Opp. Decl."), Dkt. No. 2438, Ex. 24, ¶ 13. That the AUS OU was setup so soon after the spinoff lends additional support to the inference that the operable unit was created in response to Olin's historical operations at the Crab Orchard site, rather than any post-spinoff activity.

In response, Lamorak contends that GD-OTS's liability for the Crab Orchard costs arises independently of Olin's historical operations at Crab Orchard. That is because GD-OTS's liability arises under Section 107(A) of CERCLA, which imposes joint and several liability on any party that owned or operated a facility

at a time when any hazardous substances were disposed of at the facility, regardless whether that party's activities caused the contamination. Lamorak Insurance Company's Reply Brief in Support of its Motion for Partial Summary Judgement ("Lamorak MPSJ Reply"), Dkt. No. 2453, at 6. Thus, Lamorak concludes, "GD-OTS is stuck paying 100% of the Crab Orchard AUS OU investigation costs not because of Olin's historical operations at Crab Orchard, but because its own presence and operations there caused the United States to target it, only, as CERCLA permits." Id.

The Court finds that there is no genuine dispute of material fact as to whether GD-OTS's costs arose in connection with Olin's historical operations at the site. Olin's expert testified that the costs were incurred in connection with Olin's historical operations. Lamorak does not seriously dispute that testimony or point to any other evidence in the record that suggests otherwise. It is perhaps true, as Lamorak points, that the Government could have brought claims against GD-OTS for its post-spin activity, to the extent that such activity resulted in additional property damage. But there is no evidence to suggest that that is what happened here. Instead, the undisputed evidence establishes that the GD-OTS costs were reasonably incurred as a result of Olin's historical operations at the Crab Orchard site. Those costs are therefore covered under the policies.

D. Whether Lamorak's Newly Pleaded Affirmative Defenses Preclude Summary Judgment

Because, as discussed above, the Court treats Lamorak's motion for summary judgment as a motion to amend its answer to include the affirmative defenses of rescission and coverage forfeiture, the Court must decide whether those affirmative defenses preclude granting summary judgment to Olin. For substantially the reasons discussed above, the Court grants summary judgment for Olin on these affirmative defenses. Simply put, no reasonable juror could find that Olin's failure to produce evidence of the Olin/GD-OTS Settlement Agreements was the product of fraud.

E. Whether the Court Should Otherwise Limit Olin's Recovery

Finally, Lamorak asks the Court to make certain other adjustments to limit Olin's recovery.

1. The Start Date for the GD-OTS Costs

Lamorak argues that if Olin is permitted to recover the GD-OTS costs, Olin's recovery should be limited to those costs incurred after December 31, 2017. Before that date, Olin had represented to the Court that the only Crab Orchard costs it sought to recover were the costs that it had itself incurred. Lamorak contends that these representations were "judicial and evidentiary admissions, and Olin should be held to them." Lamorak MPSJ Mem. at 21.

-40-

"A judicial admission is a statement made by a party or its counsel which has the effect of withdrawing a fact from contention and which binds the party making it throughout the course of the proceeding." In re Motors Liquidation Company, 957 F.3d 357, 360 (2d Cir. 2020). It must be "intentional, clear, and unambiguous." Id. at 361. While Olin previously represented that it was seeking to recover its own costs, it never affirmatively disclaimed the GD-OTS costs. Therefore, the Court will not construe its prior representations to the Court as judicial admissions disclaiming the GD-OTS costs. Furthermore, while Olin's prior representations to the Court might constitute evidentiary admissions, such admissions "may be controverted or explained by the party." Guadagno v. Wallack Ader Levithan Assocs., 950 F. Supp. 1258, 1261 (S.D.N.Y. 1997). Because Olin has since provided supplemental discovery and additional testimony making clear that it does seek the GD-OTS costs, Olin's prior representations to the Court do not provide a basis to limit the recoverable costs.

2. The Start Date for Prejudgment Interest

Lamorak argues that any award of prejudgment interest to Olin for the GD-OTS costs should start from October 16, 2019, the end of the Standstill Period, when Olin first formally claimed from Lamorak GD-OTS' past costs. Lamorak MPSJ Mem. at 23-24. However, as Olin responds, under New York law, when an insurer breaches its

-41-

policy obligations, prejudgment interest starts to accrue from the invoice date. See Danaher Corp. v. Travelers Indem. Co., No. 10-cv-121 JPO, 2015 WL 1647435, at *6 (S.D.N.Y. Apr. 14, 2015). This Court previously held that Lamorak breached and repudiated its policy obligations for Olin's Crab Orchard site claim in the 1990's by failing to respond to Olin's timely notice letter and disclaiming coverage. Olin, 332 F. Supp. 3d at 841, 852-53.[7] That the policies were thereafter assigned to GD-OTS does not undo Lamorak's breach. Accordingly, prejudgment interest will run from the date each invoice was paid.[8]

### 3. The Cooperation Requirement

Lamorak contends that its liability for costs incurred by GD-OTS should be "net of any sums recovered by [GD-OTS] from other Crab Orchard PRPs in the underlying Crab Orchard" dispute. Lamorak MPSJ Mem. at 22. Lamorak bases this request on the fact that GD-OTS, if deemed to be covered by the policies, breached its duty to cooperate with Lamorak after first becoming liable when it entered into the AOC in 2002. Id. at 23. However, as discussed above,

---

[7]   While this holding pertained only to the three of the five policies here at issue, the same evidence establishes that Lamorak is liable under the remaining two policies.

[8]   Except, as Olin concedes, that Olin is not entitled to recover prejudgment interest during the Standstill Period.

Lamorak breached the policies in the 1990's by disclaiming coverage. Because Lamorak disclaimed the coverage even before the assignment, any failure on the part of Olin or GD-OTS to cooperate with Lamorak is excused. See Stradford v. Zurich Ins. Co., No. 02-cv-3628, 2002 WL 31819215, at *5 (S.D.N.Y. Dec. 13, 2002) ("New York law requires that in order for an insured's non-cooperation to be excused, the insured must carry the heavy burden of demonstrating that the insurer intended to deny the claim prior to demanding the insured's cooperation.").[9] Therefore, the Court will not reduce Olin's recovery by the sums recovered by GD-OTS from other PRPs.

## 4. The Application of the Exhaustion Doctrine

Next, the parties dispute whether and how Olin must exhaust underlying policies before accessing other policies at a higher coverage layer. As mentioned, there are five policies that, together, provide coverage up to $27 million for each covered occurrence. Functionally, there are two so-called "policy towers":

---

[9]    Because the Court holds that any non-performance on the part of GD-OTS was excused following Lamorak's coverage disclaimer, the Court does not address Olin's suggestion that GD-OTS satisfied the cooperation requirement by, among other things, inviting Lamorak to participate in the negotiations with other PRPs for Crab Orchard. See Plaintiff Olin Corporation's Memorandum of Law in Opposition to Lamorak Insurance Company's Motion for Partial Summary Judgment ("Olin MPSJ Opp."), Dkt No. 2430, at 24.

the 1965 tower and the 1970 tower. Three policies in the 1970 tower collectively provide coverage up to $20 million excess of the $300,000 primary policy issued by INA.[10] Then, one policy in the 1965 tower provides up to $3 million of coverage for costs between $20.3 million and $30.3 million.[11] Finally, another policy back in the 1970 tower provides up to $4 million of coverage for costs between $30.3 million and $40.3 million.[12]

If these policies were all in one tower, the operation would be straightforward: Olin could access each excess policy only once the immediately underlying policy's limits are depleted. This would be a straightforward application of Olin IV's so-called "vertical exhaustion" requirement. See 864 F.3d at 143.

---

[10]   The policy in the 1970 tower with the lowest attachment point is Policy No. EY-8057-011. Lamorak Counter to Olin's 56.1 Statement ¶ 29. It is excess of $300,000 of primary coverage and has an occurrence limit of $1 million. Id. At the next layer of coverage, excess of $1.3 million, is Lamorak Policy No. EY-8057-012, with a $4 million occurrence limit. Id. ¶ 30. At the third layer of coverage, excess of $5.3 million, is Lamorak Policy No. EY-8057-013, with a $15 million occurrence limit. Id. ¶ 31. These policies cover the period from January 1, 1970 to January 1, 1973. Id. ¶ 29.

[11]   This policy is Lamorak Policy No. EY-16-8057-001 and it covers a policy period of October 8, 1962 to January 1, 1966. Lamorak Counter to Olin's 56.1 Statement ¶ 32.

[12]   This policy is Lamorak Policy No. E-16-8057-004 and it covers a policy period of January 1, 1969 to January 1, 1972. Lamorak Counter to Olin's 56.1 Statement ¶ 33.

-44-

Here, however, Lamorak has no excess policies directly underlying the 1965 tower. The question, then, is how Olin must allocate its costs in order to access both the 1965 tower's coverage for costs between $20.3 million and $30.3 million and the 1970 tower's coverage for costs between $30.3 million and $40.3 million? Olin maintains that it may use a single underlying payment to satisfy underlying limits in more than one policy tower; in other words, it could climb both the 1965 and the 1970 policy towers at the same time. On this theory, Olin would allocate the first $20 million in costs excess $300,000 to the 1970 policy tower, then jump sideways and allocate the subsequent $10 million in costs excess $20.3 million to the 1965 policy tower, before returning to the 1970 policy tower to allocate costs excess $30.3 million. Courts have described this method of allocation as "hopscotching" because it enables an insured "to move outside of a vertical line of underlying insurance and tap into a horizontally located policy." See Kaiser Aluminum & Chem. Corp. v. Certain Underwriters at Lloyd, No. 312415, Decision on Group IIA Trial Issues, at 9 (Cal. Super. Ct., S.F. Cnty., June 13, 2003).[13]

Lamorak maintains that "hopscotching" is impermissible. "Rather, Olin must first demonstrate proper exhaustion of the

---

[13]    It may be observed, however, that "hopscotching" between two "towers" is a classic example of a mixed metaphor.

coverage directly underlying Lamorak's '1965 tower' policy for the Crab Orchard occurrence." Lamorak Opp. Mem. at 24. Olin responds that the policies simply state that coverage is triggered when the insured "pa[ys] the amount of the underlying limits" and contain no language that would require the insured to allocate costs exclusively to the underlying coverage. Reply Memorandum in Support of Olin Corporation's Motion for Summary Judgment ("Olin Reply"), Dkt. No. 2447, at 8.

The Court agrees with Olin that "hopscotching" between policy towers is permissible. With its 1965 policy tower, for example, Lamorak contracted to cover costs in excess of $20.3 million. So long as the insured's costs exceed that attachment point, the underlying coverage has been functionally exhausted and the insured can proceed up to the next coverage layer. Nothing in the language of the policies dictates a contrary outcome.

Other cases construing similar policies also permit hopscotching. See Kaiser Aluminum & Chem. Corp. v. Certain Underwriters at Lloyd, No. 312415, Decision on Group IIB Trial Issues at 5 (Cal. Super. Ct., San Francisco, Feb. 20, 2004) (permitting hopscotching to fill gaps created by settlements of an underlying insurance policy); Kaiser, No. 312415, Decision on Group IIA Trial Issues at 9 (permitting hopscotching to fill gaps created by the insolvency of an underlying insurer). In these

-46-

cases, the court held that where a policy in one tower provides coverage on an "all sums" basis for the same liability and at the same excess layer as a policy in another tower, an insured can hopscotch between those towers so long as the amounts of the underlying liability specified in the policies have been satisfied. See Kaiser, No. 312415, Decision on Group IIB Trial Issues at 5. These decisions were based on the fact that the "all sums" provisions "render each policy liable from its trigger point for all losses resulting therefrom regardless of whether a portion of such losses occurs after the trigger point year." Id. These well-reasoned opinions, although not binding on this Court, are persuasive.

That is especially so since the parties have not directed the Court to any controlling case law. As mentioned, Olin IV holds that New York law requires vertical exhaustion. In doing so, it rejects horizonal exhaustion, which would require an insured to "exhaust all triggered primary and umbrella excess layers before tapping into any of the additional excess insurance policies." Olin IV, 864 F.3d at 143. Olin maintains that a prohibition on hopscotching would effectively impose a horizontal exhaustion requirement in violation of Olin IV. The Court disagrees. Horizontal exhaustion would require Olin to allocate losses to all of the policies in the first excess layer in all of the policy

-47-

towers before accessing any policy in the second excess layer. By contrast, if hopscotching were prohibited, Olin could still access the fourth excess layer in the 1965 policy tower without first allocating losses to the first through third excess layers in the 1970 policy tower; it would simply have to allocate $20.3 million in losses to the 1965 policy tower.

Accordingly, the Court holds that hopscotching is permitted under the policies and is consistent with the exhaustion requirement set forth in Olin IV.

### 5. The Application of the Condition C Setoff

Finally, the Court must apply the appropriate setoff under the Prior Insurance Provision of Condition C. As discussed, the five policies together provide coverage of up to $27 million. Under Olin IV, that limit must be reduced by the amount of Olin's settlements that are "properly associated" with the claims arising from the Crab Orchard site. 864 F.3d at 150. There are two relevant classes of settlements: (1) the 2018 Settlement between Olin and Lamorak; and (2) the prior global settlements between Olin and other insurers.

The parties agree that the available limits must first be reduced by $1,289,338 to reflect the amount of released costs for Crab Orchard in the 2018 Settlement. See Martin Support Decl., Ex. 138 ("McGrath Report"), at 8 (Olin's expert); id., Ex. 140

("Scarcella Report") at 8 (Lamorak's expert). This results in an available policy limit of $25,710,662.

The parties disagree, however, over how to account for the prior global settlements. As discussed, the Court previously crafted a setoff formula for global settlements that sought to approximate how much the settled insurers paid in exchange for releases from any potential indemnification claims relating to a given site. Olin, 2018 WL 1901634, at *13. But Lamorak asks the Court to abandon this formula and to impose a "new pro tanto limits reduction" to reflect the fact that the Olin/GD-OTS Settlement Agreements "allocated $1.45 million from [a global settlement] to the Crab Orchard site in response to the GD-OTS demand for a share of that settlement." Lamorak MPSJ Mem. at 22.

The Court will not do so. For one thing, the Olin/GD-OTS Settlement Agreements do not specifically allocate funds to Crab Orchard; rather, they cover multiple sites that Olin had spun off to Primex. In any event, Olin IV strongly suggests that the allocations must be found in the settlement agreement themselves. See Olin IV, 864 F.3d at at 150 ("[W]e agree with [Lamorak] that its limits of liability should be reduced by amounts paid to settle claims with respect to the five manufacturing sites at issue here . . . .") (emphasis added). That an insured might, after the fact, decide to allocate some money to certain sites and not to others

does not necessarily mean that those monies were paid to settle claims with respect to those sites.[14] Thus, while this Court discussed three potentially relevant forms of evidence in its April 2018 opinion -- (1) express allocations in the settlements themselves; (2) internal allocations by the insured; and (3) internal allocations by the insurer, Olin, 2018 WL 1901634, at *6-7, 9 -- the Court now holds that the first category of evidence is the most relevant to the setoff formula. Accordingly, the Court will apply here the same setoff methodology it applied in its earlier opinions.

Still, the parties disagree over how that methodology should operate in this case. It is undisputed that, under that methodology, the amount of the prior global settlements properly associated with the Crab Orchard site is $543,673. See McGrath Report at 7; Scarcella Report ¶ 14. That number is calculated for each settlement by dividing the total settlement value by the number of sites covered under the settlement. Olin, 2018 WL 1901634, at *12. For example, the London settlement released Olin's claims as to 108 sites in exchange for $55,201,431, yielding a

---

[14]     That is because a site's clean-up costs are not necessarily correlated with the amount of liability an insurer faces. If, for example, an insurer has an affirmative defense as to its liability at a particular site, it might be willing to pay far less to settle those claims, even if the claims are very expensive.

per-site apportionment of $511,124 (that is, 1 / 108). Summing up the per-site apportionment for each of the six prior global settlement yields $543,673.[15]

The parties disagree over how the Court should apply the $543,673 setoff. Olin argues that the $543,673 should be subtracted from the total claimed costs of $51,795,399, resulting in $51,251,726 claimable costs. See McGrath Report at 22. The Court notes that Olin's proposed methodology would render the setoff a nullity where, as here, the available limits are smaller than the claimable costs. After accounting for the $1,289,338 setoff from the 2018 Settlement, Olin seeks $25,710,662 (plus prejudgment interest).

Lamorak contends that the $543,673 should not only be subtracted from Olin's claimed costs, but also should be subtracted from available policy limits. See Scarcella Report ¶ 14. After also accounting for the 2018 Settlement, Lamorak's proposed

---

[15] The $1.5 million AmRe settlement covered 185 sites for a per-site apportionment of $8,108; the $2 million Continental settlement covered 185 sites for a per-site apportionment of $10,811; the $300,000 GenRe settlement covered 106 sites for a per-site apportionment of $2,830; the $1.5 million Fireman's Fund settlement covered 187 sites for a per-site apportionment of $8,021; and the $500,000 Federal Insurance settlement covered 180 sites for a per-site apportionment of $2,778. See McGrath Report at 17; Scarcella Report at 8 fig. 4.

methodology would result in an available limit of $25,177,789.[16] Olin takes issue with this approach on the ground that it results in double counting the setoff: first by reducing the available limits under the policies and then by reducing Olin's claimed costs. See Olin Mem. at 19 n.9. As a sort of compromise, Olin's expert concedes that the setoff should either be applied by reducing the claimed costs or by reducing the available policy limits -- but not both. McGrath Supp. Report at 6.

The Court holds that the setoff should be applied by reducing the available policy limits. This approach ensures that the setoff takes effect even where, as here, the available policy limits are smaller than the claimable costs. Accordingly, the Court holds that the available policy limits of $27 million should be reduced by $1,822,211, which reflects both the 2018 Settlement and the prior global settlements, resulting in $25,177,789 in available policy limits.

## Conclusion

---

[16]   Technically, as both parties' experts recognize, applying the setoff to the policy limits would result in a deduction of only $532,873. See Martin Support Decl., Ex. 138 ("McGrath Supp. Report") at 5; Scarcella Report ¶ 19. This is because the $10,799 in setoffs for the Fireman's Fund and Federal settlements do not reduce Lamorak's limits since those insurers' settled policies are in the fourth and fifth layers in which Lamorak has a quota share.

For the foregoing reasons, Olin's motion for summary judgment is granted in part and Olin's claim against Lamorak is awarded in the amount of $25,177,789 plus prejudgment interest. Lamorak's motion for summary judgment and motion for partial summary judgment are denied. The parties are hereby ordered to submit to the Court, by no later than February 8, 2021, a written statement of how much prejudgment interest would be added were the Court to enter judgment on the Crab Orchard site as of February 12, 2021, on which date the Court will enter judgment and close the case. The Clerk of the Court is directed to close the entries at docket numbers 2397, 2399, and 2411.

SO ORDERED.

Dated:   New York, NY
         February 4, 2021           _____
                                    JED S. RAKOFF, U.S.D.J.